**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| DELAWARE STATE UNIVERSITY<br><br>Plaintiff,<br><br>v.<br><br>THOMAS COMPANY, INC., LIBERTY MUTUAL INSURANCE COMPANY, RICHÄRD+BAUER, LLC, CZAR ENGINEERING, LLC, PRECISION FOAM FABRICATORS, INC., WHITING-TURNER CONTRACTING CO., AND ANTHONY P. ASHFORD<br><br>Defendants. | **Civil Action No. 15-1144-LPS-MPT** |

**CONSOLIDATED ANSWERING BRIEF IN OPPOSITION TO
DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT AND
MOTION TO STRIKE EXPERT REPORT OF MARK E. DANNETTEL**

**SAUL EWING ARNSTEIN & LEHR LLP**

James D. Taylor, Jr. (#4009)
Charles E. Davis (#6402)
1201 North Market Street, 23rd Floor
Wilmington, DE  19801
(302) 421-6800
(302) 421-6813 (facsimile)
james.taylor@saul.com
chad.davis@saul.com

*Of Counsel:*   Donald A. Rea (*admitted pro hac vice*)
Jillian K. Walton (*admitted pro hac vice*)
Saul Ewing Arnstein & Lehr LLP
500 East Pratt Street, Suite 900
Baltimore, MD 21202-3133
(410) 332-8680
(410) 332-8078 (facsimile)
don.rea@saul.com
jillian.walton@saul.com

Dated: September 20, 2019                  *Counsel for Plaintiff Delaware State University*

35933204.1

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................................ 1

SUMMARY OF ARGUMENT ....................................................................................... 3

STATEMENT OF FACTS .............................................................................................. 4

ARGUMENT ................................................................................................................... 4

I.    Not Every Breach of Contract Requires Expert Testimony as Defendants'
      Collectively Contend. ......................................................................................... 4

   A.   The Standard of Professional Care Applicable to Claims Founded on Negligent
        Conduct Does Not Apply to Every Commonplace Breach of Contract at Issue in this
        Case. ............................................................................................................... 5

   B.   Even if a Negligence Standard Did Govern Each of Defendants' Breaches of Contract
        in this Case, Expert Testimony Is Not Required Under Delaware Law. ....................... 8

   C.   Even Where Expert Testimony May Be Required, the Expert Testimony Provided by
        Mr. Dannettel Is Sufficient Under Delaware Law to Present this Matter to a Jury. ...... 15

II.   Defendants' Motion to Strike Mr. Dannettel's Expert Opinion and Testimony
      Is Equally Without Merit. .................................................................................. 24

   A.   Mr. Dannettel is Qualified to Testify Under Federal Rule of Evidence 702. ............... 24

      1.   Mr. Dannettel's Extensive Experience as a Façade Consultant and Contractor
           Qualify Him to Testify on Defendants' Obligations and Responsibilities. ............. 25
      2.   Mr. Dannettel's Testimony is Based on Sufficient Facts and Data. ....................... 33
      3.   Mr. Dannettel's Testimony is the Product of Reliable Principles and Methods that
           Were Properly Applied to the Facts of this Case. ....................................... 34

III.  DSU is an Intended Third-Party Beneficiary to the Subcontracts Between ....Thomas Co.,
      Czar Engineering and Precision Foam. .................................................................. 37

IV.   DSU is Entitled to Recover Its Costs to Remediate the Panel Wall System. .................. 40

CONCLUSION ............................................................................................................... 48

i

# TABLE OF AUTHORITIES

**FEDERAL CASES**

*Cmty. Television Servs., Inc. v. Dresser Indus., Inc.*, 435 F. Supp. 214 (D.S.D. 1977) ................................................................................................43

*Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993) ...........................................24

*Estate of Schneider v. Fried*, 320 F.3d 396 (3d Cir. 2003)......................................24, 25

*Hemmings v. Tidyman's Inc.*, 285 F.3d 1174 (9th Cir. 2002).................................34, 36

*Hologic, Inc. v. Minerva Surgical, Inc.*, 325 F. Supp. 3d 507 (D. Del. 2018).............................34

*Jaeger v. Henningson, Duncan & Richardson, Inc.,* 714 F.2d 773 (8th Cir. 1983) ..........13, 14, 15

*Johnson v. Big Lots Stores, Inc.*, 2008 WL 1930681 (E.D. La. Apr. 29, 2008) ...........................25

*Martinez v. Alter Indus., Inc.*, 2005 WL 1862677 (M.D. Fla. Aug. 3, 2005) ...............................25

*McCusker v. Surgical Monitoring Assoc.*, 2005 WL 348307 (D. Del. 2005)...................16, 17, 18

*Pierce Assocs., Inc. v. Nemours Found.*, 865 F.2d 530 (3d Cir. 1988) ...................37, 39

*Proctor & Gamble Co. v. Teva Pharmaceuticals USA, Inc.*, 2006 WL 2241018 (D. Del. Aug. 4, 2006) ......................................................................16

*Rushing v. Kansas City S. Ry. Co.*, 185 F.3d 496 (5th Cir. 1999) .................................25

*Sonos, Inc. v. D & M Holdings Inc.*, 297 F. Supp. 3d 501 (D. Del. 2017) .............................24, 25

**STATE CASES**

*Bachman v. Parkin*, 471 N.E.2d 759 (Mass. App. Ct. 1984)........................................43

*Carey v. McGinty*, No. CIV.A. 86C-JL17, 1988 WL 55336 (Del. Super. Ct. May 18, 1988) ................................................................................40

*Club Lane Ass'n v. Armstrong*, No. 80C-JN-99, 1983 WL 879124 (Del. Super. Ct. Apr. 20, 1983) ................................................................................43

*Council of Unit Owners of Sea Colony E., Phase III Condo., on Behalf of Ass'n of Owners v. Carl M. Freeman Assocs., Inc.*, 564 A.2d 357 (Del. Super. Ct. 1989) ................................................................................40, 41, 42

*Dornfried v. Granquist*, No. CV000502628, 2003 WL 1996024 (Conn. Super. Ct. Mar. 27, 2003) ........................................................................................................ 42

*Fleming v. Scott*, 348 P.2d 701 (Colo. 1960) ............................................................... 42

*Gary Eberhard v. A± Floor Store, Inc.*, No. 99-03-0065AP, 2000 WL 33275022 (Del. Com. Pl. Feb. 1, 2000) ................................................................................... 40

*Grossman v. Sea Air Towers, Ltd.*, 513 So.2d 686 (Fla. Dist. Ct. App. 1987) ............ 42

*Harley Paws, Inc. v. Mohns, Inc.*, 639 N.W.2d 223 (Wis. 2001) ................................. 43

*Hollon v. McComb*, 636 P.2d 513 (Wyo. 1981) ........................................................... 43

*Lochrane Eng'g, Inc. v. Willingham Realgrowth Inv. Fund, Ltd.*, 552 So.2d 228 (Fla. Dist. Ct. App. 1989) ........................................................................................ 42

*Magnum Constr. Mgmt. Corp. v. City of Miami Beach*, 209 So. 3d 51 (Fla. Dist. Ct. App. 2016) ........................................................................................................... 42

*Martin v. Phillips*, 122 N.H. 34, 440 A.2d 1124 (N.H. 1982) ...................................... 43

*Oakwood Villa Apartments, Inc. v. Gulu*, 157 N.W.2d 816 (Mich. App. 1968) ........... 43

*Seiler v. Levitz Furniture Co. of the Eastern Region, Inc.,* 367 A.2d 999 (Del. 1976) ................................................................................................................ passim

*Shipman v. Hudson*, No. 88C-JN32, 1995 WL 109009 (Del. Super. Ct. Feb. 17, 1995) ...................................................................................................................... 42

*St. Joseph Hosp. v. Corbetta Const. Co.*, 316 N.E.2d 51 (Ill. App. 1974) ................... 42

*State Prop. & Buildings Comm'n of Dep't of Fin. v. H. W. Miller Const. Co.*, 385 S.W.2d 211 (Ky. 1964) ........................................................................................... 42

*Temple Beth Sholom & Jewish Ctr., Inc. v. Thyne Const. Corp.*, 399 So.2d 525 (Fla. Dist. Ct. App. 1981) ........................................................................................ 42

**FEDERAL STATUTES**

Federal Rule of Evidence 702 ................................................................................... 5, 24

Plaintiff Delaware State University ("DSU") respectfully submits the following Consolidated Answering Brief in Opposition to the Motions for Summary Judgment filed on behalf of (i) Richärd+Bauer, LLP [D.I. 203]; (ii) Whiting-Turner Contracting Co., Inc. [D.I. 210] ("Whiting-Turner"); (iii) Precision Foam Fabricators, Inc. [D.I. 206] ("Precision Foam"); (iv) Thomas Co., Inc. [D.I. 218]; and (v) Czar Engineering, LLC [D.I. 216]; and in Opposition to Defendants Whiting-Turner and Precision Foam's Motion to Strike Expert Report of Mark E. Dannettel [D.I. 202].

## INTRODUCTION

This is a breach-of-contract case, not a professional negligence case, and while some of the Defendants' contract breaches may involve a negligence "standard of care," the majority of the breaches alleged by DSU are of clear and obvious contractual provisions that were breached on their face. As to these breaches of contract, Defendants cannot impose an additional professional negligence standard where negligence is not the basis of the claim or Defendants' liability. In particular, DSU's Motion for Partial Summary Judgment [D.I. 213] provides undisputed evidence of several breaches of Richärd+Bauer and Whiting-Turner's respective contracts that requires no proof whatsoever that they breached any professional standard of care. As both of these Defendants admit, each of their respective contracts required them to report any known errors, omissions and defects in the work to DSU. As both admit, DSU's Third Amended Complaint contains specific allegations that they breached those obligations.

The undisputed facts show that Richärd+Bauer and Whiting-Turner breached their reporting obligations, and DSU is entitled to judgment as a matter of law as to their liability for those straightforward contract breaches. Those contractual obligations do not impose or implicate an additional standard of care otherwise required in professional negligence cases; in

1

short, negligence is not the basis of the claim, but instead, Defendants' undisputed breach of the clear and unambiguous terms of their contracts. Even if a negligence standard were applicable to these straight forward breach-of-contract claims, the "common knowledge" exception to the expert testimony requirement clearly applies inasmuch as the breaches are so clear and obvious that they are within the common knowledge of a reasonable lay person.

Moreover, as to the breaches that do involve the application of a professional standard of care, the expert opinion and testimony of Mark Dannettel and his team are more than sufficient to present a genuine issue of material fact to a jury. As reflected in various Defendants' cross-motions for summary judgment, there is a dispute of fact as to whether the Specifications provided for a "delegated design" that somehow absolves Richärd+Bauer of its obligations for the panel wall system. In this regard, Mr. Dannettel's expert opinion provides a thorough and detailed explanation of the engineering and design standards required to properly account for the single most important issue resulting in the defects in these panels. The report discusses ALL of the Defendants' failures to address thermal loads, comprehensive engineering, sufficient validation and verification of issues, and several other duties, as well as the facts showing that Defendants' deficient performance was the proximate cause of the resulting defects. Indeed, Defendants contend that Mr. Dannettel failed to opine as to their breaches of the standard of care while simultaneously itemizing many of the instances in which his opinion provides just that opinion. (*See, e.g.*, D.I. 210 at 13-14.)

Defendant Whiting-Turner and Precision Foam Fabricators' Motion to Strike Mr. Dannettel's opinion fails for principally the same reasons. Furthermore, Defendants contend that Mr. Dannettel lacks an engineering license as a façade consultant, but they fail to address his vast experience in the field and the fact that his colleague, Christopher E. Pinto, P.E., who is a

2

licensed engineer in Delaware and other states, co-authored the report.  Mr. Pinto and a team of Thornton Tomasetti engineers and computer analysts assisted Mr. Dannettel in preparing various engineering aspects and computer modeling in support of the opinions in the report.   Mr. Dannettel's experience in the façade industry on projects around the world is overwhelmingly sufficient to address the issues that will be before the jury.  Ironically, although Whiting-Turner now suggests that a façade consultant is insufficient to address the defects at issue, their Project Managers actually recommended that Richärd+Bauer retain one for the project.  That fact calls into question the nature of Defendants' attack on an extraordinarily qualified expert and international engineering firm.

For all of these reasons, Defendants' Motions for Summary Judgment and Motion to Strike Mr. Dannettel's expert opinions should be denied.

## SUMMARY OF ARGUMENT

Defendants' Motions for Summary Judgment and Motion to Strike should be denied for the following reasons:

1.  The requirement for expert testimony as to the standard of care to prove professional negligence does not apply to every commonplace breach of contract in this case.

    a)  Even where that general rule might apply, expert testimony is unnecessary under the common knowledge exception.

2.  The expert testimony provided by Thornton Tomasetti's team of façade consultants and engineers, and the testimony of Mark Dannettel, DSU's testifying expert, extensively addresses the standards and duties to which each of these Defendants are subject and how each breached those standards.  Defendants' motions for summary judgment on these grounds should, therefore, be denied.

3.  In addition to the foregoing reasons regarding Mr. Dannettel's testimony, Defendants' Motion to Strike should be denied because the evidence shows that Mr. Dannettel possesses vast experience, training and expertise that is more than sufficient to opine as to the issues in this case.

     a)    The Motion to Strike should also be denied because the report was co-authored by a licensed engineer in Delaware, contrary to Defendants' allegations, and supported a team of other engineers and professionals.

4.    The Motion to Strike should also be denied because comprehensive testing and evaluations were performed, which represent standard and acceptable methods upon which to form the opinions set forth in Mr. Dannettel's report

     a)    Those opinions are also reliably based on all of the facts, design documents, specifications, Product Data, emails and correspondences produced in the case, as well as site inspections and comprehensive testing of the panels at issue.

5.    Defendants' Czar Engineering and Precision Foam's Motions for Summary Judgment should be denied inasmuch as DSU is an intended third-party beneficiary of their subcontracts with Thomas Co.

6.    DSU is entitled to recover damages reflecting the cost to remediate and replace the Panel Wall System

     a)    Delaware does not recognized the so-called "betterment rule," nor mandate the application of an economic waste doctrine.

     b)    Even if Delaware did apply these doctrines, Defendants' economic waste and "betterment" arguments have no merit in this case.

For all of these reason and as discussed fully herein and in Plaintiff DSU's Opening Brief in Support of its Motion for Partial Summary [D.I. 213], Defendants' motions should be denied in their entirety.

## STATEMENT OF FACTS

The undisputed facts pertaining to this Consolidated Answering Brief are generally set forth in the Statement of Facts contained in Plaintiff DSU's Opening Brief in Support of Its Motion for Partial Summary Judgment [D.I. 213] and the Stipulated Facts for Summary Judgment Motions [D.I. 195] unless otherwise provided below.

## ARGUMENT

**I.**    **Not Every Breach of Contract Requires Expert Testimony as Defendants' Collectively Contend.**

4

Relying principally on allegations in the Complaint without reference to virtually any of the actual evidence obtained during discovery, Defendants lump all of their breaches of contract together into one amalgam in order to argue that a professional negligence standard of care applies to all.  (*See* D.I. 203 at 2-4; D.I. 210 at 2-3, 13-14; D.I. 204 at 2-3, 10-12.)  The argument fails for three principal reasons.  First, not every breach of contract requires proof that Defendants breached a standard of care applicable to professional negligence involving a contractor's technical professional services.  Several of the breaches established by the evidence represent nothing more than commonplace breaches of contract.  Second, even if the standard of care in professional negligence applied to these breaches of contract, they do not require expert testimony inasmuch as they fall within the common knowledge (and indeed common sense) of the lay juror.  Third, as to those breaches that require expert testimony because they are technical and outside the understanding of a lay person, the extensive report and testimony of DSU's expert witness thoroughly addresses how each Defendant breached its individual standard of care such that the testimony is admissible and sufficient to survive summary judgment.[1]

> **A.   The Standard of Professional Care Applicable to Claims Founded on Negligent Conduct Does Not Apply to Every Commonplace Breach of Contract at Issue in this Case.**

The evidence in this case demonstrates distinct breaches of various provisions of each Defendant's contract.  As discussed in detail in DSU's Motion for Summary Judgment as to Defendants Richärd+Bauer and Whiting-Turner, for example, several of their breaches are based on the clear and unambiguous terms in their respective contracts and undisputed evidence.  Those breaches of contract are clear and obvious on their face, and a professional negligence

---

[1] Section II of this Consolidated Answering Brief addresses each of the factors espoused in Federal Rule of Evidence 702 regarding Defendant Whiting-Turner and Precision Foam's Motion to Strike, as well as all of the Defendants' summary judgment arguments.

standard simply does not apply. Even in those instances where a professional negligence standard of care might apply to a particular party's conduct, Defendants necessarily acknowledge that "'*[w]hen the standard of care requires resort to technical or other complex principles*, the plaintiff must establish the standard of care through expert testimony.'" (D.I. 203 at 8 (quoting *Ridgeway v. Acme Markets, Inc.*, 194 A.3d 372 (Del. 2018) (unreported) (emphasis added.))

Relying heavily on *Seiler v. Levitz Furniture Co. of the Eastern Region, Inc.,* 367 A.2d 999 (Del. 1976), Richärd+Bauer acknowledges that "claims of negligence" must be supported by an expert opinion. However, as discussed more fully in Section I.B below, the Delaware Supreme Court actually held that expert testimony was not required to prove negligence in that case because the architect's breach of the duty of professional care was not so technical as to be outside a lay juror's understanding. *Seiler*, 367 A.2d at 1008-09.

It is self-evident that expert testimony regarding a negligent breach of a standard of care is not required for every commonplace breach of contract. If a contractor fails to pay subcontractors, an owner is not required to prove not only that it breached this straightforward obligation but also that it somehow breached a duty of care by doing so. If a contractor fails to perform work altogether, an owner is not subject to an additional burden to prove that the contractor was also negligent, but only that it was required to do the work and did not. Not only are these breaches obvious and within the common knowledge of the lay juror, additional proof that the contractor was negligent is simply not required.

Defendants Whiting-Turner and Richärd+Bauer's breaches of the clear and unambiguous notice requirements in their contracts do not require additional proof that they "negligently" failed to provide any notice at all to DSU. Such an additional burden or hurdle is not required.

6

Defendants' contracts unequivocally require them to provide notice of *any errors, omissions, or defects:*

> Richärd+Bauer Contract § 3.2.1:
>
>> The Architect shall provide prompt written notice to the Owner if the Architect becomes aware of any error, omission or inconsistency in such services or information.
>
> Whiting-Turner Contract § 3.3.14:
>
>> The Construction Manager shall . . . notify the Owner, Contractor and Architect of defects and deficiencies in the Work.

Liability under the clear and unambiguous terms of the contracts does not require an expert to explain to a jury how Defendants negligently failed to report errors to DSU. The undisputed evidence shows they did not report at all. As discussed more fully below, it does not take expert testimony to help a lay juror understand such commonplace breaches.

Interestingly, Richärd+Bauer actually argues that it is only required "to keep DSU ***reasonably*** informed and report any deviations from the contract documents." (D.I. 203 at 12 (emphasis in original).) Richärd+Bauer suggests that expert testimony is required to determine what it means to keep DSU "reasonably informed." (*Id.*) First, Richärd+Bauer is addressing the wrong contract provision. Section 3.6.2.1 does require that the Architect "shall keep the Owner reasonably informed about the progress and quality of the … work" based on site inspections. However, the operative section that Richärd+Bauer failed to perform (and which DSU's summary judgment motion is based) contains no such caveat. Section 3.2.1 unequivocally mandates that the ***"Architect shall provide prompt written notice to the Owner if the Architect becomes aware of any error, omission or inconsistency in such services or information."*** Thus, Richärd+Bauer bases its contention that expert testimony is required on the wrong contract section. Moreover, even if the section Richärd+Bauer cites were the only one at issue, keeping

7

the owner "reasonably informed" regarding the work is not so highly technical and complex that it requires expert testimony. Richärd+Bauer's argument in this regard is without merit. Indeed, to hold as Defendants' suggest would subject owners to an additional burden of proof applicable in a professional negligence context to every single breach of contract. That is not the law of Delaware, and Defendants' motions should be denied.

**B.      Even if a Negligence Standard Did Govern Each of Defendants' Breaches of Contract in this Case, Expert Testimony Is Not Required Under Delaware Law.**

Defendants acknowledge that the standard of care applicable to professional negligence is intended to require a contractor to exercise reasonable care in complex, technical areas that are outside the understanding of lay jurors. (*See* D.I. 203 at 8 (citing *Seiler,* 367 A.2d at 1007).) Although expert testimony is generally required for matters outside a lay juror's common understanding, Delaware recognizes the common knowledge exception to the general rule. In this regard, Defendants cite *Seiler v. Levitz Furniture Co. of Eastern Region, Inc.* for the general rule that breach of the standard of care applicable to particular aspects of a contractor's work requires expert testimony. However, the Delaware Supreme Court in *Seiler* actually held as follows:

> [I]f a layman is as competent as an expert to judge whether or not a particular design created an unusual risk, evidence by experts is inadmissible because their proof that the defendant followed standard practice would not necessarily show he was not negligent.

367 A.2d at 1008 (citation omitted) (cited in D.I. 203 at 8-9).)

At issue in *Seiler* was an architect's negligent design plans and specifications for a furniture store, which failed to account for potential flooding. *Id.* at 1001-02. The plaintiff furniture store alleged negligence against the architect such that there was no dispute about whether a professional standard of care was at issue. *Id.* at 1006-07. Just as in the instant case,

8

the architect claimed that "expert testimony was required to establish the standard of care to which he was bound." *Id.* 1006.

The Delaware Supreme Court rejected the argument and affirmed the trial court's finding against the architect:  "the Trial Judge concluded that Seiler's mistake was so apparent that plaintiff was not obliged to produce expert testimony at trial to establish the bench mark by which his standard of care is measured. We agree."  *Id.* at 1008 (emphasis added).  In so holding, the *Seiler* Court provided the following critically analogous reasoning:

> In the final analysis Seiler, *by his own testimony, admitted that an investigation as to the possibility of flooding was necessary*; he went on to say that he had investigated that possibility. The crux of the Superior Court decision is that in such investigation Seiler was "put on notice" that flood waters had topped Naamans Road on previous occasions and that he failed to design the warehouse accordingly.

*Id.* at 1008.  Thus, the Supreme Court held that "[t]here is evidence to support the conclusion that Seiler knew or should have known of the flooding potential of the area and in accordance with settled law, we affirm it."  *Id.* at 1009.

To the extent a professional standard of care is applicable, this case is governed by Delaware law as espoused in *Seiler.*  By its own testimony Richärd+Bauer admits that it did absolutely nothing to review and approve Precision Foam's product for this application, and that once it did conduct a review after it approved Precision Foam, the product was found unsuitable. (Richärd+Bauer Corp. Des., Kennedy Dep. at 40-41; 48; 83-84 & 155; *see also* **Ex. 34** (submittal comments).  Richärd+Bauer suggests that its alleged failure to "adequately research and specify panels" requires expert testimony.   (*See* D.I. 203 at 13.)   Richärd+Bauer's contention misconstrues the evidence and argument.   (*See* D.I. 213 at 30-34.)   Richärd+Bauer was indisputably responsible for preparing the Specification and approved Precision Foam as the

panel manufacturer in that Specification.  (*See* **Ex. 47**, Richärd+Bauer Contract, Article 3.3 & §§3.3.1, 3.4.1 & 3.6.4.4; *see also* Richärd+Bauer Corp. Des., Kennedy Dep. at 44-45, 54.) Moreover, the undisputed evidence establishes that Richärd+Bauer failed <u>entirely</u> to conduct any investigation or due diligence of Precision Foam's product at all, not simply that it failed to "adequately" research the panels.  (*See* Richärd+Bauer Corp. Des., Kennedy Dep. at 40-41; 48; 83-84 & 155.)  It did not conduct any research or investigation of Precision Foam or its product before approving it.   Furthermore, Thomas Co. specifically and expressly relied on Richärd+Bauer's approval to select Precision Foam as the panel manufacturer based on Richärd+Bauer's Specification.  (**Ex. 3**.)  Thus, while an appropriate level of "adequate" research conducted *might* require some expert testimony, the admitted fact that Richärd+Bauer did absolutely nothing before approving Precision Foam does not.  A company's complete failure to investigate anything about a manufacturer's product whatsoever, but instead to base an "assumption" about the product's suitability on nothing more than a picture of a house that is someone else's product, is not so "highly technical and complex" that a lay person cannot understand it represents an unquestionable failure on Richärd+Bauer's part.

Furthermore, on January 23, 2014 (<u>after</u> Richärd+Bauer approved Precision Foam's product in its Specification and Thomas Co. chose Precision Foam), Richärd+Bauer actually reviewed Precision Foam's Product Data and identified several material respects in which the product was unsuitable:

1. The product is engineered and manufactured for cold storage and industrial freezer units, not a high-end architectural use;

2. The product is intended for galvanized and painted steel to hide imperfections, not highly polished and reflective stainless steel surfaces;

3. The maximum height permitted for the product is 48 feet, but the panels designed for this project were 50 feet tall; and

    4.  The product required back-cutting relief notches (or V Channels), which was never done.

(*See* **Ex. 34**.)  Richärd+Bauer's notes and comments on the submittal indisputably show that it possessed actual knowledge of the deficiencies.  The submittal and comments were delivered to Whiting-Turner, which also admitted that it reviewed them such that it was on notice as well. Nevertheless, neither Defendant reported a thing to DSU but accepted Dan Garner's (a Precision Foam plant manager) changes to the Product Data without a single instance of validation it previously required.  (*See* **Ex. 6**.)  Similarly, neither Richärd+Bauer nor Whiting-Turner stopped and required substitution of the Permatherm product on which the entirety of actual design and specification was based.

By their own testimony, Defendants also admit that they actually knew as early as the spring of 2014 that no one engineered the panels.  (*See* D.I. 213 at 19.)  Indeed, all of the Defendants admit that no one ever engineered the thermal loads on the panels.  Nevertheless Richärd+Bauer claims that its Specification requires such engineering (Kennedy Dep. at 188-89), and both Richärd+Bauer and Whiting-Turner reviewed all of the submittals and correspondences placing them on notice that it was never done.  Nonetheless, despite months of back-and-forth correspondences arguing about whose responsibility it was to conduct the necessary engineering, no one notified DSU of this obvious and critical deficiency.

Exactly as in *Seiler*, Defendants in this case admit by their own testimony that the engineering was required and no one performed it.  Defendants admit that they had actual knowledge of that fact (*i.e.,* the Court need not determine that Defendants "should have known"). These facts are undeniable as evidenced by literally months of emails and correspondences in the record.  (*See* **Exs. 38, 39, 61, 98, 133A**.)  Furthermore, beyond Defendants' failure to review the submittals, shop drawings and information provided and to ensure their compliance with the

project documents, Defendants indisputably failed to notify DSU of the problem for months leading up to the installation of the panels on the building.

Whiting-Turner admits as an "undisputed fact" in its Opening Brief that under its contract with DSU, Whiting-Turner was to report "'to the Owner and Architect (1) known deviations from the Construction Documents….'" (D.I. 210 at 6, Undisputed Fact No. 24.) Nevertheless, Whiting-Turner similarly admits that, at the very most, it only asked DSU to pay some additional costs for engineering that may be outside the original scope of work. (D.I. 212 at ¶¶ 73, 87.) Whiting-Turner never notified DSU of a clear and obvious problem that no one was engineering the panels, a problem that went on for six (6) months leading up to installation. Indeed, the request misleadingly implies that the engineering would be done, resulting in some additional expense. That Whiting-Turner can only point to an email requesting additional money, when a problem of this magnitude is evidenced by ongoing emails, letters and teleconferences for months, highlights the undisputed fact that neither Whiting-Turner nor Richärd+Bauer stopped this runaway train by notifying DSU that there was a serious problem.

As in *Seiler*, Defendants' mistakes were "so apparent that [DSU is] not obliged to produce expert testimony at trial to establish the bench mark by which [Defendants'] standard of care is measured." *Seiler*, 367 A.2d at 1008. Based on Defendants' own testimony, a lay juror can easily determine that no one engineered the panels for thermal loads as required by the Specification. Such a determination requires no expertise or training to determine any highly technical requirements of such engineering. A lay jury can similarly find that Defendants failed to notify DSU of these errors so it could protect its interest to obtain complete engineering for its project. No technical experience, understanding or training is required to explain that simple concept to a lay jury.

12

It does not take an expert to understand this straightforward evidence and, therefore, it is within the common knowledge of any lay juror.  An expert's opinion is not required to explain to a lay juror the meaning of a provision that states simply the contractors must report any errors and omissions to the owner as Defendants suggest.  (*See* D.I. 203 at 10-11 (citing *Oliver v. Bancroft Const. Co.*, 2011 WL 5042389, at *1 (Del. Super. Ct. Oct. 21, 2011).)  Defendants' failure is not so highly technical and complex – indeed, it is not technical at all – that a lay juror simply would have no idea what it means to report errors to an owner without the aid of an expert.

In addition to their fundamental failure to report known errors and omissions, federal law equally provides that Defendants' failure to correct those errors does not require expert testimony.  In *Jaeger v. Henningson, Duncan & Richardson, Inc.,* 714 F.2d 773, 775 (8th Cir. 1983), for example, two individual plaintiffs alleged that the project architect "negligently failed to detect and correct the shop drawings providing for a 14-gauge steel stairway landing pan" where the architect's design drawings and specifications required a 10-gauge steel landing pan.  *Id.*  Just as in the instant case, the contract required the architect to "review and approve shop drawings and other submissions for conformance with information contained in the specifications, blueprints and drawings …:

> The Architect shall review and approve shop drawings, samples,
> and other submissions of the Contractor only for conformance with
> the design concept of the Project and for compliance with the
> information given in the Contract Documents.

*Id.* (quoting contract).  That provision is identical to the review and approval requirements in both of Whiting-Turner and Richärd+Bauer's respective contracts.  (**Ex. 47,** Richärd+Bauer's Contract, § 3.6.4.2; **Ex. 177**, Whiting-Turner's Contract, §§3.2.5 & 3.3.19.)

Equally as in the instant case, the architect in *Jaeger* claimed that the plaintiffs' "failure to present expert testimony to establish the appropriate standard of care and a violation of that standard precludes a finding that HDR was liable for negligence." *Id.* And just as in *Seiler*, the Eighth Circuit disagreed. *Id.* The *Jaeger* Court noted that the general rule regarding expert testimony is "premised on the assumption that laymen are unable to understand highly technical architectural requirements" without expert testimony. *Id.* However, regarding the architect's failure to detect and correct an incorrect gauge of steel on the shop drawings, the Court held as follows:

> ***There is nothing so highly technical about the facts of this case which is not within the common experience or understanding of the average laymen.*** The specifications called for the landing pans to be made from 10-gauge steel with angle stiffeners as required. The shop drawing, however, provided that the landing pan in question should be made from 14-gauge steel without angle stiffeners or supports. Moreover, we observe that there was expert testimony supporting the view that had the pan been built with 10-gauge steel and angle stiffeners, it would not have collapsed under circumstances similar to those of the accident in this case.

*Id.* at 776 (emphasis added). The *Jaeger* Court also noted an important "distinction between actions against architects for negligence-in-preparing plans and actions for negligence-in-supervising plans," the latter of which does not require experts. *Id.* (citations omitted). The Court drew this distinction on the basis that cases involving a party's failure to review and supervise are within the common knowledge of lay jurors. *Id.* In this regard, the *Jaeger* Court specifically held that the "gravamen of the complaint here is that [the architect] negligently failed to supervise the shop drawings pursuant to the contract…." *Id.*

Exactly as in *Jaeger*, the gravamen of the complaint against Defendants Whiting-Turner and Richärd+Bauer is that they failed to **(i)** review and approve submittals from Thomas Co. for conformance with the contract documents or **(ii)** supervise its work and shop drawings to ensure

14

that they conformed.  The submittals and the shop drawings failed to conform to the contract documents in two material respects admitted by both Defendants.  First, no one provided the engineering of the panels for thermal loads required by Richärd+Bauer's Specification.  Second, the shop drawings omitted the V Channels required not only by the design drawings but also Precision Foam's Product Data.

Just like *Jaeger*, **there is nothing so highly technical about the facts of this case which is not within the common experience or understanding of the average laymen.**  It does not take an engineering, construction management, façade or other expert to explain to this jury that Defendants' contract contained review requirements identical to those at issue in *Jaeger*.  It similarly does not take an expert to establish, based primarily on Defendants' admissions, that no one provided the required engineering and that Thomas Co. deleted with V Channels from the shop drawings just like the contractor identified the wrong gauge of steel in its shop drawings in *Jaeger*.  These two failures are clear from the correspondences between the parties and a simple comparison of the shop drawings to the plans (highlighted for the V Channels by Richärd+Bauer's corporate designee).  This evidence does not require reference to anything "so highly technical" that it is "not within the common experience or understanding of the average lay [persons]."  *Id.* at 776.

C.     **Even Where Expert Testimony May Be Required, the Expert Testimony Provided by Mr. Dannettel Is Sufficient Under Delaware Law to Present this Matter to a Jury.**

Defendants' motions regarding Mr. Dannettel's expert opinion and testimony are based on little more than the fact that he did not use the magic words "standard of care."  In addition to being replete with technical data and conclusions regarding the engineering and other failures that caused the defects at issue, Mr. Dannettel did opine that Defendants breached various

15

standards of care and duties governing their performance.  (*See* **Ex. 147**, Expert Report §§4.0 – 4.3, at 23-27 (discussing each Defendants responsibilities and roles in the project and opining as to their failures to perform in each case).)[2]

First, the fact that Mr. Dannettel's report does not use the magic words is of absolutely no legal consequence.  In *McCusker v. Surgical Monitoring Assoc.,* 2005 WL 348307 (D. Del. 2005), the defendants sought judgment as a matter of law following trial because the plaintiff allegedly failed to provide exert testimony regarding the standard of care.  Indeed, the requirement for expert testimony in *McCusker* was arguably more stringent than in the instant case because a Delaware statute specifically mandates it:  "'[n]o liability shall be based upon asserted negligence unless expert medical testimony is presented as to the alleged deviation from the applicable standard of care in the specific circumstances of the case….'"  *McCusker*, 2005 WL 348307, at *3 (quoting 18 Del. C. § 6853(e).)

The defendant asserted that "the Plaintiff's medical expert on the standard of care, Dr. Richmond, simply failed to testify that Dr. Bose's actions constituted a breach of the standard of care or were the cause of the Plaintiff's injury."  *Id.* at *4.  Just as in the instant case, the defendant in *McCusker* also contended that the defendant's conduct only "possibly" could have caused the injury at issue, but not that it did to a "reasonable degree of medical probability."  *Id.* This Court rejected the defendant's argument, and denied its motion for judgment as a matter of law.

---

[2] As Defendants note, Mr. Dannettel was not directed to provide legal interpretations or conclusions regarding the contract language, which are strictly within purview of this Court and not an expert witness.  *Proctor & Gamble Co. v. Teva Pharmaceuticals USA, Inc.*, 2006 WL 2241018, at *1 (D. Del. Aug. 4, 2006) (holding that "[t]he Rules of Evidence do not permit expert testimony as to legal conclusions").  Mr. Dannettel's testimony regarding the standards, duties and responsibilities governing Defendants is based on his experience in the façade industry, as well as other industry sources, not legal opinions about contract language.

16

In rejecting the argument that the expert failed to use the magic words, the Court concluded as follows:

> It may have been preferable for [the expert] to have concisely summed up her testimony in language akin to that found in the Act and customary to lawyers practicing in the field of medical negligence, but the legal standard "does not require medical experts to couch their opinions in legal terms or to articulate the standard of care with a high degree of legal precision or with 'magic words.'

*Id.* at *6 (citation omitted). *See Seiler*, 367 A.2d at 1007 (applying the reasoning in medical malpractice cases regarding expert testimony to an architect "since the professional standard of care for an architect or engineer does not differ in principle from that of a physician") (citation omitted). The Court considered all of the testimony provided by the expert regarding individual, specific errors committed by the defendant, and noted that the expert used terms like "technical errors" and answered direct questions about the defendant's deviation from specific standards governing the defendant's medical work. *McCusker*, 2005 WL 348307, at *5-6.

The Court also rejected the defendant's contention that the expert could not "say specifically how [the injury occurred], is not enough to satisfy the requirement that there be testimony that the [defendant's] operative technique breached the standard of care." *Id.* at *5. In rejecting the argument, the Court held it "flies in the face of the Delaware Supreme Court's specific instruction that an opinion based on an analysis of the circumstances in a case is not mere speculation over the cause of a bad result." *Id.* (citations omitted). The Court further reasoned that the expert's "testimony was sufficiently explicit to allow a reasonable jury to conclude that the Defendant had breached the applicable standard of care." *Id.*

Thus, the Court ultimately concluded as follows:

> There was enough in the record for rational jurors to conclude, as the jury did in this case, that they believed [the expert] and

17

> disbelieved the Defendant's experts as to the cause of the Plaintiff's injuries. Whether or not I or anyone else disagrees with that assessment is immaterial. It is supported by a sufficient evidentiary basis to withstand both the motion for judgment as a matter of law and the motion for a new trial.

*Id.* at *6. *See Seiler*, 367 A.2d at 1009, n.8 (acknowledging that while the "testimony does not have the specificity as to local practice which is ordinarily given in medical malpractice cases, but it was available to the Court as part of the fact fabric in which to consider Seiler's testimony").

Just as in *McCusker*, Defendants' arguments focus on the absence of the magic words "standard of care" in Mr. Dannettel's report, but fail to examine his actual report and testimony or to acknowledge the complete "fabric" of that testimony and the facts surrounding it. Indeed, none of the Defendants actually asked Mr. Dannettel questions couched in terms of the "standard of care," and on those occasions when he was asked about the standards that governed Defendants' specific conduct in this case, and the grounds for those opinions, he testified extensively about these standards. What follows are just a few instances taken from two days of his testimony on these points,[3] which is not an exhaustive list by any means[4]:

- Dannettel testified that Richärd+Bauer should never have specified Precision Foam's panels "that are going to be used on a high-end project as a total wall system"; or 50 foot panels with a stainless steel finish (Dannettel Dep. II at 102-03);

---

[3] *See* Dannettel Dep. (Apr. 15, 2019) cited as "Dannettel Dep. I" and Dannettel Dep. (May 31, 2019) cited as "Dannettel Dep. II."

[4] The testimony cited only pertains to R+B, W-T and Precision Foam inasmuch as they challenge his opinion in this regard. There is additional testimony as to these Defendants, as well as the others who do not challenge Mr. Dannettel's testimony or qualifications.

18

- Because Precision Foam offered a panel with a stainless steel finish, it was required to ensure it could manufacture the panel no matter who specified it, (Dannettel Dep. II at 21);

    o The "inherent problem … is that PFF offered a product that had a stainless steel finish [and] that's going to result in a buckling issue for a panel that's 50 feet long." (*Id.* at 23; 26-27; *see also* 33 (one of the causes of the failure is the "excessive length of the panels"); 34-35 (even though the architect specified stainless steel, the manufacturer offering that finish must be able to actually produce it));

    o "Regardless of how it's attached to a building … we wouldn't normally take a 50 foot panel and just hold it at the top and bottom. It's too far of a span." (*Id.* at 24);

    o The "manufacturer's design of the panel is defective … [i]n the sense that the stainless steel faced panel is unable to withstand solar thermal loading without buckling" (Dannettel Dep. II at 20-21; 22-24 (confirming various aspects of the panel that are contrary to Precision Foam's Product Data));

- Precision Foam "***had a duty to properly test … even from the ICC document***, that AC04 says … you need to address this ting of the thermal behavior. And I think that PFF didn't do, I think that ATI didn't do it on their behalf when they hired ATI, but I think there's evidence to show that that needed to be done." (Dannettel Dep. II at 58-59);

    o Identifying a common standard in the industry of a manufacturer to "demand a letter of sign-off" when it does not believe it can meet the specifications in order to request deviation from the project team (*Id.* at 74-75);

- Regarding the standards and duties on each of the parties for necessary testing and research of suitable panels, Dannettel testified as follows:

    I believe there's a layer of responsibility. In my opinion, it's not a single entity that's responsible for that. If I had to layer them or list them in some sort of priority, I would say that the manufacturer first needs to be aware of what test data that they've – they're able to provide based on what testing they've done, and they should know that they shouldn't really be

selling a manufactured product if it doesn't have the appropriate test data to go with it.

And then I think the next level of responsibility would be the design build or delegated design contractor.[5]  [T]hey're the one that really has the responsibility to make sure that the total façade in their scope is engineered.  So they would be the ones pulling these reports, doing the engineering, and submitting it to the design team for their review.

But I also feel that the design team has some responsibility to vet a certain amount of viability before they even get to hundred percent construction documents.  Before they bid something out, they should know that this is going down a path which is plausible.

(Dannettel Dep. I at 40-41.)

o Testifying extensively about the standards and responsibilities governing the Construction Manger regarding assessment of the constructability of the project from bid phase through installation. (Dannettel Dep. I at 118-28.)

• As to the engineering standards, Dannettel testified that comprehensive engineering required detailed "coordination" and "should have been done a single scope.  That's the point of our report, is that all the engineering for the entire panel installation should have been done under a single unified engineering responsibility."  (*Id.* at 37-38.)

o He explained that a "comprehensive engineering" standard was not coordinated properly:

"[N]ot only was the engineering for the metal panel system subdivided among two parties …, I think it was not fully and properly coordinated, and I think there were also gaps in what was

---

[5] Defendants also contend that Mr. Dannettel admitted that the project calls for a delegated design, but that argument is also misleadingly incomplete.  Indeed, Mr. Dannettel actually testified that the Specification provides a "poorly written specification for a delegated design role" and that "that if it was the architect's intent to have this as a delegated design, that their specification wasn't very clear about it, and then Whiting-Turner's language also didn't seem very clear about it."  (Dannettel Dep. I at 43 & Dep. II at 97-98.)

done as evidenced by clearly nobody looked at the thermal behavior of the panel."

(*Id.* at 56-57; 144-46 (confirming that the parties, including the building engineer working for Richärd+Bauer did not carry out the engineering required).)

o   Dannettel also testified that there was only "an isolated discussion with the project engineer (Ballard Engineering) when they were trying to convey the building movements back to the construction team, essentially posing the question are you sure that our building movements are okay for your product and its attachment to the building.  And no one seemed willing to answer that question...." (*Id.* at 37-38.)

• Extrapolating from a "single span to a multi-span configuration" (*i.e.* a 16' or shorter panel spanning one floor to a 50' panel spanning multiple floors) is inconsistent with the standards published by the International Building Code Council Evaluation Service ("ICC") in "*Acceptance Criteria for Sandwich Panels,* AC04" (Effective Date:  11/01/2009) (**Ex. 147**) (Dannettel Dep. I at 9-23 & Dep. II at 41-45; 60-61 (standards requiring separate, continuous span testing for 50' foot panels).)

o   The *Acceptance Criteria* stablishes a "standardized path of allowing manufacturers to pretest something as a product" and provide an "AC Report" to project managers for code inspectors and officials' product approvals. (*id.*)

o   Summarizing that "the opinion at its heart is based on what I know from experience is required of manufacturers to put forward their products for

21

construction, but the ICC document kind of wraps up all of these opinions with a nice bow." (*Id.* at 61-62.)

o Testifying particular that under § 4.3.7 of the Acceptance Criteria, the following testing is required:

> The load testing that's described here on 4.3 for the transverse test is what we call simply supported span. It's basically just a single height of panel that's just held at the top and held at the bottom. There's no intermediate supports, just top and bottom, so it's a single span.

> And then you apply a load to it and you get load test data and you can develop charts that describe the strength of the panel. So the importance of 4.3.7 is it says, essentially, if you want to provide charts that talk about the panel's capacity for multiple spans instead of a single span, then you need to do separate testing for that.

> (Dannettel Dep. I at 15.)

o The Acceptance Criteria provide that "substantial differences in temperature between facings of a panel with high coefficients of expansion require justification that this will not be detrimental to the panel integrity… you can engineer it or test it." (*Id.* at 17.)

  ▪ This section, among others governed Whiting-Turner's work because "they failed to require documentation to demonstrate its suitability on the bottom of page 29 of my report, first paragraph of the Whiting-Turner section."

• "Whiting-Turner is not a part of that subcontracting team, but in my view, they had the responsibility to make sure that that delegated design contract was executed properly, and that those engineering duties were performed by the subcontractor and their team." (Dannettel Dep. I at 101.)

22

- With regard to Richärd+Bauer, noting that the Architect specified panels that manifest inherent oil canning and that it should have studied the suitability of the panel for this application (*Id.* at 69-70.)

  > "[W]e even noted in the report that there don't appear to be any clear documents that talk about the acceptance or rejection of oil canning, and *the architect would have to look for adjacent industries like metal roofing or something like that in order to try to develop guidelines for approval or not*." (*Id.* at 71 (emphasis added).)

- Comprehensive engineering was required to either determine the appropriate place for back-cutting the V Channels or omitting them from the design (*Id.* at 30-31; 56-57; 84-86.)

  - Testifying that engineering was required to "determine the proper places to put the back cutting to alleviate thermal buckling." (*Id.* at 86.)

  - Precision Foam's Product Data recommended back-cutting, and Thomas Co. was required to follow Richärd+Bauer design and Precision Foam Product Data absent engineering validation to the contrary. (*Id.* at 35; 94.)

The bases of Mr. Dannettel's opinions about the standards and duties governing Defendants' work, and their breaches of those duties, derives from **(i)** more than 20 years of experience as a façade consultant who has worked with construction managers, architects, contractors and owners on innumerable façade projects; **(ii)** his training and education in architecture and that of the engineering team that co-authored his opinion; **(iii)** his separate experience as a façade contractor; and **(iv)** industry standards published by the International Building Code Conference Evaluation Service that were provided to Defendants.  These grounds and his expertise in the field are discussed more fully in Section II below.  For all of these

reasons, both Defendants' Motions for Summary Judgment and their motion to strike should be denied.

## II.   Defendants' Motion to Strike Mr. Dannettel's Expert Opinion and Testimony Is Equally Without Merit.

### A.   Mr. Dannettel is Qualified to Testify Under Federal Rule of Evidence 702.

Defendants' motions for summary judgment and Whiting-Turner and Precision Foam's Joint Motion to Strike Expert Report of Mark E. Dannettel contend that Mr. Dannettel is not qualified under Federal Rule of Evidence 702.  (D.I. 202 at 17.)  Defendants' arguments are without merit for the reasons that follow.

Federal Rule of Evidence 702 provides as follows:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a)  the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

*See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993).  Rule 702 "embodies a trilogy of restrictions on expert testimony: qualification, reliability and fit."  *Estate of Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003).  When an expert's testimony is challenged, "the district court has a 'basic gatekeeping obligation' to ensure that the expert's testimony 'is not only relevant, but reliable.'"  *Sonos, Inc. v. D & M Holdings Inc.*, 297 F. Supp. 3d 501, 507 (D. Del. 2017) (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999)).

24

      1.      <u>Mr. Dannettel's Extensive Experience as a Façade Consultant and Façade Contractor Qualify Him to Testify on Defendants' Obligations and Responsibilities.</u>

Qualification refers to the requirement that the witness possess specialized expertise. *Estate of Schneider*, 320 F.3d at 404. "The Third Circuit has interpreted the 'qualification' requirement liberally . . . holding that a broad range of knowledge, skills, and training qualify an expert as such." *Sonos,* 297 F. Supp.3d at 508 (citing *Calhoun v. Yamaha Motor Corp., U.S.A.*, 350 F.3d 316, 321 (3d Cir. 2003)). "An expert should not be excluded 'simply because the trial court does not deem the proposed expert to be the best qualified or because the proposed expert does not have the specialization that the court considers most appropriate.'" *Id.* (quoting *Pineda v. Ford Motor Co.*, 520 F.3d 237, 244 (3d Cir. 2008)). "[A]fter an individual satisfies the relatively low threshold for qualification, the depth of one's qualification may be the subject of vigorous cross-examination." *Johnson v. Big Lots Stores, Inc.*, 2008 WL 1930681, *14 (E.D. La. Apr. 29, 2008) (summarizing *Rushing v. Kansas City S. Ry. Co.*, 185 F.3d 496, 507 n. 10 (5th Cir. 1999)); *see also Martinez v. Alter Indus., Inc.*, 2005 WL 1862677, *3 (M.D. Fla. Aug. 3, 2005) (quoting *Rushing*, 185 F.3d at 507 ("As long as some reasonable indication of qualifications is adduced . . . qualifications become an issue for the trier of fact rather than for the court in its gate-keeping capacity.")).

All of the Defendants in this case erroneously suggest that Mr. Dannettel lacks sufficient expertise and training because he is not a licensed engineer or architect. Whiting-Turner and Precision Foam also contend that Mr. Dannettel should be disqualified because his qualifications are based on "his general experience as a façade consultant" and that he has never worked for a construction manager as advisor; does not have prior experience with similar SIP panels; lacks any training or experience to qualify him to testify on the responsibilities, duties, and roles of a

25

construction manager as advisor and SIP panel manufacturer; and is not a licensed architect or engineer.  (D.I. 202 at 16-17.)

Defendants overlook the fact that Mr. Dannettel's report was co-authored by Christopher E. Pinto, P.E., who is a licensed engineer in Delaware (among other states), supported by a team of three other Thornton Tomasetti engineers.   (*See* **Ex. 147** at 160, Curriculum Vitae of Christopher E. Pinto, P.E.; Dannettel Dep. I at 69 & Dep. II at 164.)  Mr. Pinto and this team of engineers provided the engineering calculations and analysis, and worked with Mr. Dannettel on the computer modeling discussed throughout his report.

Moreover, as reflected in Mr. Dannettel's curriculum vitae, which was provided to Defendants as part of his report, he obtained a Bachelor of Science Degree in Architecture from the University of Maryland and a Master of Science Degree in Architecture from Arizona State University.  He is a Principal of the international engineering firm, Thornton Tomasetti and possesses more than 20 of experience in façade consulting work around the world.  He is an associate member of both the American Society of Civil Engineering and the American Institute of Architects ("AIA").  He has authored numerous technical articles in the industry, and taught and lectured across the country and abroad.

As demonstrated in the Affidavit attached hereto, Mr. Dannettel has extensive experience working at architecture firms, an international engineering firm and a façade contractor.  (*See* Affidavit of Mark E. Dannettel, attached hereto as **Appendix A** ("Dannettel Aff.").)  Mr. Dannettel has worked as a façade consultant since 1998, and for a façade contractor from 2004 and 2007.  (App'x A, Dannettel Aff. at ¶¶16-19.)  Throughout his career, Mr. Dannettel has worked closely with owners, architects, construction managers, façade contractors, and

fabricators throughout the design and construction of buildings.[6]  His work involves all technical aspects of façade design, specification, detailing, fabrication, testing, and installation.  (*Id.* at ¶147.)

Mr. Dannettel focuses on prefabricated systems that are mechanically attached to building structures such as curtain walls, metal cladding, structural glass systems, stone cladding, precast concrete panels, tensioned fabrics, architectural steelwork,  and "megapanels," to name a few.  (*Id.* at ¶6.)  Mr. Dannettel evaluates a wide range of issues concerning building enclosures, including thermal performance, solar performance, light transmission and natural daylighting, weather integrity, acoustics, structural design and engineering, durability, and constructability.  (*Id.* at ¶7.)  Additionally, Mr. Dannettel has performed façade investigations for the majority of his career as well, which entail conducting investigations of design, material and construction defects, as well as addressing property losses due to storm damage, blast, fire, seismic events and construction accidents.  (*Id.* at ¶143.)

Mr. Dannettel is routinely engaged around the world by owners and architects to support the work of the architect in design and construction projects.  (*Id.* at ¶144.)  Mr. Dannettel has worked in each stage of façade design and construction from preliminary design phases through construction and post-construction defect analyses.   While each project is unique, Mr. Dannettel's typical engagements involve most of the following:

------

[6] Despite Whiting-Turner's claim now that a façade consultant lacks sufficient experience and expertise to address the issues in this case, in September 2013, Whiting-Turner's Project Manager actually recommended retaining a façade consultant for the Project. (Joshua George Dep. at 65-67; **Ex. 53**.)  Funds were even reserved in the Project's budget to retain a façade consultant for this purpose.  (**Ex. 53**.)

During the schematic design phase, Mr. Dannettel attends façade design meetings with the architect and other design consultants, reviews the architect's proposed design schematics for the building, and assists with exploring façade systems options and alternatives, selecting materials and addressing discusses durability and overall performance of the materials, components and systems. (*Id.* at ¶25.) Additionally, Mr. Dannettel provides input on the preparation of various deliverables for the 50% and 100% schematic design packages. He conducts preliminary research for systems and materials; assists with development of written narratives and selection of reference images for each of the major façade elements; and develops preliminary details to describe the primary façade systems. (*Id.* at ¶26.)

During the design development phase, Mr. Dannettel also attends façade design meetings, and reviews architectural drawings on an ongoing basis. He provides comments for the façade scope defining the basic façade systems, addressing the likely maximum spans for façade structural elements and other key design parameters. (*Id.* at ¶28.) Mr. Dannettel carries out wind load analysis for the building's exterior façade surfaces, per ASCE-07, to determine "cladding pressures" for the exterior glazing; and coordinates with the building structural engineer for consistency. (*Id.* at ¶29.) Mr. Dannettel assists design team, including architects, in reviewing and coordinating weather and energy performance criteria for the façades, air/water management, thermal transfer, solar heat gain through glazing, and visible light transmittance. (*Id.* at ¶31.) He also oversees the review and coordination of sustainability consultants and M.E.P. consultants regarding overall energy performance of the building. (*Id.* at ¶32.) He provides recommendations of framing sizes, depth of cladding zones, glass panel sizes and make-ups, movement joints. (App'x A, Dannettel Aff. at ¶33.) Mr. Dannettel also assists the review and coordination of the architect with the structural engineer for the building, regarding

28

wind loads, inter-story drift, imposed loads, connection design, differential movements of slabs and other issues.  (*Id.* at ¶34.)

Lastly, Mr. Dannettel develops performance specifications for the delegated-design façade work (such as that alleged in the instant case), including introductory narratives for each major façade system on the building.  (*Id.* at ¶35.)  These specifications address the technical aspects of the façade contractor's work, including all phases of their work, such as bidding, detailed design and engineering, shop drawing development, visual mock-up reviews, mock-up testing, shop fabrication, fabrication testing, field installation, field testing, and other forms of quality control.  (*Id.*)

During the construction document phase of projects, Mr. Dannettel attends façade design meetings; provides ongoing reviews of architectural drawing sets; assists in finalizing the detailing of the façade systems and materials, including recommending final selection of materials, finishes, and components; and provides further detailed design development for components and connection details.  (*Id.* at ¶37.)  He also assists the architect to finalize performance specifications for the delegated-design façade work, and researches project-specific technical issues and determines relevant requirements, criteria, and procedures.  (*Id.* at ¶38.)

During the contractor bid phase, Mr. Dannettel helps develop lists of qualified façade contractors to bid, and reviews the qualifications of contractors proposed by the owner, general contractor or construction manager.  (*Id.* at ¶40.)  Mr. Dannettel assists in preparing responses to technical questions from bidding contractors and suppliers.  (*Id.* at ¶41.)  He reviews technical proposals from bidding contractors as may be required by the specifications.  (*Id.* at ¶42.)  These technical proposals include sample shop drawings and engineering, QA/QC manuals, preliminary project-specific detailing, history of contractor's prior work, qualifications for

29

project managers, site foremen, and design and engineering teams.  (App'x A, Dannettel Aff. at ¶42.)  Mr. Dannettel also attends bid interviews with the owner, architect, general contractor, and construction manager, to evaluate each of the bidding façade contractors, and creates a technical summary and evaluation for each of the bidding façade contractors, and provide relative recommendations for selection.  (*Id.* at ¶43.)

During the construction administration phase, Mr. Dannettel attends design coordination meetings at the site; reviews and comments on façade submittals, including shop drawings, structural calculations, manufacturer's material data, material samples, test results, and warranties; and reviews and comments on submittals pertaining to performance mock-up testing, including lab qualifications, proposed test procedures and sequences, transducer layouts, mock-up shop drawings and structural calculations.  (*Id.* at ¶45.)  He also attends and participates in performance mock-up testing of the façade system at accredited laboratories, and prepares written observation reports and evaluates final laboratory test reports.  (*Id.* at ¶46.)  Mr. Dannettel also conducts periodic site inspections of exterior façade construction, and prepares written reports that make recommendations for further action.  (*Id.* at ¶47.)  Lastly, Mr. Dannettel carries out final site inspections to review punch list items with the architect or owner, provides written comments and assists with resolving any critical issues.  (*Id.* at ¶48.)

It has become increasingly common for facade consultants to be engaged by general contractors and construction managers.  Mr. Dannettel has been retained to provide general contractors and construction managers with the following consulting services.  (*Id.* at Section III.B.)  When Mr. Dannettel is engaged by the general contractor or construction manager for a standard design-bid-build project, he provides peer review of construction documents produced by the design team, BIM modeling of design team's construction documents, BIM modeling of

30

subcontractor's shop drawings, clash-detection and geometric coordination of trades, technical review of trade interface details, peer review of subcontractor's design and engineering submittals, constructability review, and onsite review of quality control for subcontractor's installation work.   (App'x A, Dannettel Affidavit at ¶¶ 112, 114.)   When Mr. Dannettel is engaged by the general contractor for a design-build project, the scope of facade consulting services is likely to follow the scope of services provided to owners and/or architects described above.  (*Id.* at ¶¶ 113, 114.)

Mr. Dannettel routinely works with façade contractors, like Thomas Co., on delegated design and engineering work, which includes the development of shop drawings and structural engineering submittals.  (*Id.* at ¶¶ 126, 129.)

While Mr. Dannettel worked as Team Leader and Executive Designer for a specialist façade contractor, he participated in preparing bid submittals and design proposals, directed the delegated design and engineering, directed development of shop drawings, fabrication drawings, and erection drawings, oversaw procurement, fabrication, testing, and assembly of materials, and directly oversaw critical stages of installation work.  As part of his role, Mr. Dannettel has interfaced with architects, engineers, general contractors, fabricators, suppliers, and installers. Mr. Dannettel has considerable factory and site experience in this position, providing direction and guidance for machinists, iron-workers, and glaziers (*Id.* at ¶¶ 153, 155.)

Mr. Dannettel has worked on literally dozens of façade projects around the world as evidenced by an eight-page list of representative projects accompanying his curriculum vitae. Mr. Dannettel's vast experience uniquely qualifies him to opine on the following:   **(i)** Defendants' obligations and responsibilities for the OSCAR Facility project' **(ii)** appropriate due diligence required to evaluate and select a façade system and materials; **(iii)** design development

and the preparation of design drawings and shop drawings; **(iv)** the development of performance specifications for delegated designs; **(v)** façade contractor and fabricator qualifications; **(vi)** the required structural engineering analysis, mock-up, fabrication and field testing; **(vii)** project-specific technical issues; **(viii)** the performance and durability of the façade system and materials; and **(ix)** site inspections during construction of the exterior façade.[7]

Defendants' allegation that Mr. Dannettel's lack of experience with these particular SIP panels disqualifies him as an expert witness is misleading.  (Dannettel Dep. II at 100.)  Mr. Dannettel explained why he does not handle these particular SIPs:

> So I haven't done SIP panels and SIP panels are not normally used for the type of commercial construction that I normally engage with, which would include a building like this, but my suspicion is that because SIP panels are used for kind of a lower grade of construction like warehouses, that would never have a façade consultant involved with a cheap job like that, like for a warehouse, that would really just be the architect and the engineer. So I'm suspecting that the common practice is that the design team just fully engineers and details that based on manufacturer's

---

[7] Whiting-Turner and Precision Foam attempt to impugn Mr. Dannettel's credibility by inaccurately asserting that Mr. Dannettel "wears two hats on this project: one as DSU's purported expert; and the second, as its façade consultant for the redesigned facade" and insinuating that he has a conflict of interest.  (D.I. 202 at 13 n.12.)  While counsel for DSU indicated that DSU considered retaining Mr. Dannettel as a façade consultant for the remediation, Mr. Dannettel has not been retained at this time nor has Mr. Dannettel submitted a proposal for such work.  (Dannettel Dep. at 190, Apr. 15, 2019.)  During his deposition, Mr. Dannettel confirmed that DSU has not retained Thornton Tomasetti to provide façade consulting services for the remediation.  (*Id.*)

Additionally, without any basis whatsoever, Whiting-Turner and Precision Foam offensively accuse Mr. Dannettel of "trying to maximize the cost to redesign and redo the OSCAR façade, as it will result in Thornton Tomasetti and Dannettel reaping further monetary reward out of the Project."  (D.I. 202 at 13 n.12.)  In fact, it was Mr. Dannettel who recommended that the remediation design team consider using polished aluminum panels rather than stainless steel, which substantially reduced the cost of the remediation.  (*Compare* **Ex. 147** at 181, Remediation Cost Estimate at 4 (Feb. 21, 2019) (listing stainless steel panels at $127.26 per panel) *with* Remediation Cost Estimate at 2 (June 27, 2019) (listing aluminum panels at $57.67 per panel), attached hereto as **Appendix B**).

> information, and the installer is really just an installer, but I don't
> know that for a fact if that is standard practice for the SIPs.

(*Id.*)  Mr. Dannettel's experience is in high-end, architectural façades such as the one that was

intended for this project.  The SIPs approved by Richärd+Bauer and chosen from Precision Foam

are for warehouse and industrial applications and were unsuitable for this project from its

inception.  Thus, Mr. Dannettel is not experienced in these particular panels because they are not

used in high-end architectural applications, but in warehouses and industrial freezer units.  (*See*

Dannettel Dep. at 102-03.)

2.  <u>Mr. Dannettel's Testimony is Based on Sufficient Facts and Data.</u>

Whiting-Turner and Precision Foam incorrectly assert that Mr. Dannettel's testimony and

report were not based on sufficient facts or data because he "did not rely on the contracts, and he

did not perform any forensic or destructive testing, or product analysis, on the PFF panels."  (D.I.

202 at 17-18.)  As Mr. Dannettel's report and testimony demonstrate, Thornton Tomasetti

engaged in a thorough cause and origin analysis of the failure of the Precision Foam panels.  At

Thornton Tomasetti's direction, Intertek conducted a thermal study for a period of 14 days in

July 2018, using thermocouple sensors installed on the stainless steel facings of the panels

throughout the exterior and interior of the building.  Thornton Tomasetti then conducted an

extensive engineering analysis of the Precision Foam composite panels to determine the cause

and origin of the failure.  This analysis included extensive computer modeling to assess various

stresses the panels are subject to including solar exposure, thermal variations, and wind loads.

Thornton Tomasetti also engaged in a thorough review of the design, engineering, and

construction of the OSCAR Facility contained in documents produced by all parties.  Based on

the results of extensive independent engineering analysis, Thornton Tomasetti determined the

33

panels were failing due to the effect of thermal loads.  There was no need to conduct material testing as Thornton Tomasetti determined the cause and origin of the panel failure.

       3.     Mr. Dannettel's Testimony is the Product of Reliable Principles and Methods that Were Properly Applied to the Facts of this Case.

Whiting-Turner and Precision Foam assert that Mr. Dannettel's expert report and opinions are not reliable because Mr. Dannettel does "not state whether either Whiting-Turner or Precision Foam's acts or omissions conclusively, or within any reasonable degree of certainty, actually caused the alleged defects."  (D.I. 202 at 19.)

The Court of Appeals for the Third Circuit considers the following non-exhaustive factors when evaluating the reliability of a particular methodology:

> (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.

*Hologic, Inc. v. Minerva Surgical, Inc.*, 325 F. Supp. 3d 507, 520 (D. Del. 2018) (citation omitted).  "When the methodology is sound, and the evidence relied upon sufficiently related to the case at hand, disputes about the degree of relevance or accuracy (above this minimum threshold) may go to the testimony's weight, but not its admissibility." *Id.* at 521 (quoting *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 852 (Fed. Cir. 2010), *aff'd*, 564 U.S. 91 (2011)).  Indeed, "in most cases, objections to the inadequacies of a study are more appropriately considered an objection going to the weight of the evidence rather than its admissibility." *Hemmings v. Tidyman's Inc.*, 285 F.3d 1174, 1188 (9th Cir. 2002).

Mr. Dannettel's testimony is the product of reliable principles and methods. Mr. Dannettel applied standard methods to conduct an extensive engineering analysis of the Precision Foam composite panels to determine the cause and origin of their failure. Additionally, Mr. Dannettel thoroughly reviewed all architectural, structural, and design drawings, Precision Foam's Product Data, email correspondences throughout the project and technical standards. (**Ex. 147** at 40 (Appendix A to Thornton Tomasetti's Expert Report)). Contrary to Whiting-Turner and Precision Foam's assertions, the report contains a comprehensive conclusion section articulating Whiting-Turner and Precision Foam's failures that fell below the standard of care. (*Id.* at §§ 4.3.3 & 4.3.7.) By way of example, with respect to Whiting-Turner, Thornton Tomasetti concludes:

> WT failed to require documentation to demonstrate its suitability and fitness for use on a project such as the OSCAR Facility. WT failed to identify the methods available to contract the exterior wall panel work, and to evaluate and determine whether the exterior wall panel work could effectively be executed as a delegated design contract.

> WT failed to effectively prequalify the exterior wall panel contract bidders in order to ensure the bidders possessed sufficient experience with the exterior wall panel system and product, and to determine if they were qualified to carry out delegated design responsibilities. . . .

> Upon realizing that the exterior wall panel contractor did not intend to carry out the role of a delegated design contractor, WT failed to take the necessary steps to correct the situation or re-direct the delegated design responsibilities.

(*Id.* at § 4.3.3.) With respect to Precision Foam, Dannettel opines:

> PFF failed to properly verify the performance and appropriateness of its wall panel product for the intended application through engineering and testing. We do not see any evidence that PFF performed an engineering analysis to properly evaluate compressive buckling stresses in the facings due to thermal stress. We do not see any evidence that the wall panels

35

were tested structurally for use in continuous-span applications involving intermediate supports with back-cutting of the interior facing. . . .

PFF failed to properly verify the performance and appropriateness of its wall panel product when faced with an optional stainless steel finish.  We do not see any evidence that PFF performed proper engineering analysis or testing to evaluate the stainless steel material for stress and potential buckling as a consequence of heating (and related expansion) due to solar exposure and other environmental conditions.  This product with a stainless steel finish was inappropriate for the OSCAR Facility application.

PFF published product literature containing numerous errors, omissions and inaccurate statements and thereby failed to accurately represent critical engineering information regarding their product.

(*Id.* at § 4.3.7.)  At best, Defendants' objections to Mr. Dannettel's testimony are "appropriately considered an objection going to the weight of the evidence rather than its admissibility." *Hemmings*, 285 F.3d at 1188.

Additionally, in a halfhearted attempt to discredit Thornton Tomasetti's methodology and the data on which it relied, Whiting-Turner and Precision Foam comment that Mr. Dannettel and his team "did not perform any forensic or destructive testing" on Precision Foam's panels.  (D.I. 202 at 17.)  Defendants make this blanket assertion without reference to *any* expert opinion regarding the basis for an allegation that such testing is necessary.  Indeed, Precision Foam's expert neither challenges the methods Thornton Tomasetti used nor his conclusions regarding the thermal differentiation being the cause of the deformations, and neither discusses nor identifies what type of forensic or destructive testing would facilitate a cause and origin investigation into the panel failure in its Expert's report.  (**Ex. 169**.)  Notably, Precision Foam's expert conducted no testing of any kind at all.  Even more notably, Whiting-Turner did not even designate an

36

expert to conduct any testing or provide any opinion, but only adopted the opinion of others. The Court should disregard Defendants' assertions provided without any basis whatsoever.

For the foregoing reasons, this Court should deny Defendants' Motion to Strike the Expert Report of Mark E. Dannettel and, in the alternative, Motion *in Limine* to exclude expert report and testimony of Mr. Dannettel in support of DSU's claims against Whiting-Turner and Precision Foam.  To the extent Defendants' Motions for Summary Judgment rely on the contention that Mr. Dannettel is not qualified to testify for the reasons discussed above, those motions should also be denied.

### III.   DSU is an Intended Third-Party Beneficiary to the Subcontracts Between Thomas Co., Czar Engineering and Precision Foam.

The contracts Thomas Co. entered into with both Czar Engineering and Precision Foam confer upon DSU, as the Owner, a direct right of action against Czar Engineering and Precision Foam through the third-party beneficiary doctrine.  "'It is well settled in Delaware that a third-party may recover on a contract made for his benefit. . . . But in order for there to be a third-party beneficiary, the contracting parties must intend to confer the benefit.'"  *Pierce Assocs., Inc. v. Nemours Found.*, 865 F.2d 530, 535 (3d Cir. 1988) (quoting *Ins. Co. of North America v. Waterhouse,* 424 A.2d 675, 679 (Del. Super. 1980)).  "The intent to confer a third-party beneficiary benefit is to be determined from the language of the contract."  *Id.*  As *Pierce* instructs, the operative contracts are the subcontracts that Thomas Co. entered into with Czar Engineering and Precision Foam.  *Id.*

Czar Engineering and Precision Foam entered into subcontracts with Thomas Co. knowing they were for the benefit of DSU.  Czar Engineering and Precision Foam's contracts are reflected in Purchase Orders issued to each them by Thomas Co., and contract clearly indicates

that their work is performed for the OSCAR Facility, as well as DSU as the Owner.  (*See* **Ex. 2** at 1-8; **Ex. 8**.)  each of the Purchase Orders also provide the following:

> THIS ORDER IS COMPLETE WITH ALL THE ITEMS NECESSARY [sic] AND INCIDENTAL THERE TO IN STRICT ACCORDANCE WITH THE ENTIRE CONTRACT DOCUMENTS PREPARED [sic] THE OWNER AND/OR THEIR CONSULTANT, INCLUDING WITHOUT LIMITATION: THE GENERAL, SPECIAL AND OTHER CONDITIONS, ALL SPECIFICATIONS, DRAWINGS, AND INVITATIONS FOR BIDS, BULLETINS, ADDENDA AND MODIIFCATIONS THERETO. . . .

(**Ex. 2**; **Ex. 8** (capitalization in original.))  Thus, each subcontractor subject to performing its work in strict compliance with the contract documents and General Conditions prepared by the Owner.  Czar Engineering had the drawings and specifications for the Panel Wall System, and Precision Foam was provided the Specifications on November 18, 2013, when Precision Foam bid the job.  (**Ex. 11**; **Ex. 156;** Paul Czar Dep. at 14-15, 20, 99-100.)  Additionally, neither Czar Engineering nor Precision Foam's subcontracts disclaim the creation of a third-party beneficiary relationship between the owner and subcontractor.  (**Ex. 2**; **Ex. 8**.)

Czar Engineering asserts that DSU is not a third-party beneficiary to its subcontract because §1.1.2 of the General Conditions (**Ex. 48**) disclaims contractual relationships between the owner and subcontractors.  (D.I. 216 at 7.)  Precision Foam similarly asserts that DSU is not a third-party beneficiary to its subcontract agreement because the subcontract does not contain terms "approaching the detail of the prime contract between DSU and TCI" and nothing in the subcontract confers a benefit to DSU.  (D.I. 206 at 9-10.)  Section 1.1.2 of the General Conditions provides, in pertinent part, as follows:  "The Contract Documents shall not be construed to create a contractual relationship of any kind . . . (5) between the Owner and a Subcontractor or Sub-subcontractor…."  However, "Contract Documents" is an expressly

defined term in Article 1 of the prime contract between DSU and Thomas Co. as "this Agreement, Conditions of the Contract (General, Supplementary and other Conditions), Drawings, Specifications, Addenda issued prior to execution of this Agreement, all of which form the Contract, and are as fully a part of this Contract as if attached to this Agreement or repeated herein." (**Ex. 139**; *see also* **Ex. 48** at Article 1.1.1 (definition of Contract Documents is contained in the contract between the Owner and Contractor.)) The "Contract Documents" do not include subcontracts between Thomas Co. and its subcontractors. (**Ex. 139**, Art. 1.) Section 1.1.2 of the General Conditions only precludes the *prime contract* between DSU and Thomas Co. from creating a contractual relationship between DSU and any subcontractors. The General Conditions do not preclude a subcontract from creating a contractual obligation on the part of subcontractors to DSU as a beneficiary of those contracts.

Czar Engineering also relies exclusively on *Pierce Assoc. Inc. v. Nemours Found.,* 865 F.2d 530 (3d Cir. 1988) in this regard. As *Pierce* instructs, however, the operative contract is the one between the contractor and its subcontractor for purposes of a third-party beneficiary analysis. The contract between Thomas Co. and Czar Engineering contains **no** provision similar to § 1.1.2 of the General Conditions. Unlike this case, the subcontract between Gilbane, the general contractor, and Pierce, the mechanical services subcontractor, repeatedly incorporated the terms of the General Conditions including § 1.1.2. *Id.* at 537. Even if the General Conditions were expressly incorporated into Czar Engineering's subcontract, the fact still remains that its subcontract does not constitute a Contract Documents governed by § 1.1.2. Therefore, DSU is an intended third-party beneficiary of Czar Engineering and Precision Foam's subcontracts and the obligations under those agreements. As such, DSU has a direct right of action against Czar Engineering and Precision Foam.

39

IV.     **DSU is Entitled to Recover Its Costs to Remediate the Panel Wall System.**

Under Delaware law, the cost of repairs is the appropriate measure of damages in contract and tort cases.  Delaware applies the following general rule in construction defect cases: "'if a party to a construction contract fails to perform its obligations under the contract, the aggrieved party is entitled to damages measured by the amount required to remedy the defective performance unless it is not reasonable or practical to do so.'"  *Council of Unit Owners of Sea Colony E., Phase III Condo., on Behalf of Ass'n of Owners v. Carl M. Freeman Assocs., Inc.*, 564 A.2d 357, 361 (Del. Super. Ct. 1989) (quoting *Farny v. Bestfield Builders, Inc.*, Del. Super., 391 A.2d 212, at 214 (1978); *see also Gary Eberhard v. A± Floor Store, Inc.*, No. 99-03-0065AP, 2000 WL 33275022, at *2 (Del. Com. Pl. Feb. 1, 2000) (unreported) (applying the cost of repair as the appropriate measure of damages); *Carey v. McGinty*, No. CIV.A. 86C-JL17, 1988 WL 55336, at *5 (Del. Super. Ct. May 18, 1988) (unreported) (concluding that the cost of the repairs was reasonable measure of damages for a failed bulkhead).   "If the defect is remediable from the practical standpoint, recovery generally will be based on the market price of completing or correcting the performance[.]" *Council of Unit Owners of Sea Colony*, 564 A.2d at 361.

The proper measure of damages is the cost of the repair even where the repair estimate is "millions of dollars."  In *Council of Unit Owners of Sea Colony*, a condo association sued the designers and contractors for defects in the design and construction of the roof, walls, concrete balconies, walkways and sliding glass doors of a condominium building. *Id.* at 359. The construction of the condominium was substantially complete in 1975, and the plaintiff filed suit in 1987.  *Id.*  The estimated cost of repair was $13,000,000 – 15,000,000.  *Id.*

40

The plaintiff moved *in limine* to prevent defendants from introducing evidence of "any diminution of value and/or useful life theories as a means of reducing plaintiff's damage award." *Id.* at 358. The plaintiff asserted that the proper measure of damages was the full cost of the repair without reduction or offset based on a lack of diminished value or useful life. *Id.* The defendants argued that the diminution or loss in value of the condominium, if any, was the appropriate and reasonable measure of damages, or alternatively, that the costs of repair should account for the expired useful life of the condominium and any increase in the value of the building from the repairs. *Id.* at 361. The defendants essentially argued, as do Defendants in the instant case, that the repairs constituted a betterment of the condominium's value.

Just as Defendants contend in this case, the defendants there claimed that "the cost of repairs . . . would constitute a virtual demolition and reconstruction of the exterior of the Condominium, thereby causing economic waste." *Id.* The Court rejected this argument inasmuch as it was unpersuaded by the defendants' authority, which "dealt with abandoned, heavily damaged structures having no intrinsic value other than aesthetics." *Id.* The Court granted the plaintiff's motion *in limine* on the basis that the cost of repairs is the appropriate measure of damages. *Id.* at 364. In addition to declining to apply the useful life theory to the damages sought because it would afford "the defendants too much of a benefit," the Court also found that there was no evidence in the record that the $13-15 million repairs result in economic waste. *Id.* at 362-63. The Court, therefore, held that "[e]ven if consideration of 'economic waste' was mandated in Delaware, on the current record – and in arguments in support thereof – economic waste has not been shown and therefore the value rule does not have to be applied." *Id.* at 362.

41

Whiting-Turner contends that DSU is not legally entitled to repair costs because they do not constitute its purported "expectation damages."[8] As in *Unit of Council Owners of Sea Colony*, Whiting-Turner suggests that the costs of DSU's repair constitute "an uncontracted-for enhancement to the project" that places the University in a better position than its original contract. (D.I. 210 at 17.) Whiting-Turner contends that DSU should be limited to the cost of replacing 15 deformed panels with <u>the same</u> panels. (*Id.* at 18.) Whiting-Turner asks this Court to apply a "betterment defense," which, to DSU's knowledge, a Delaware court has never applied in any construction case. (*Id.*)

Defendants point to no case where a Delaware court applied this purported betterment rule, and Delaware law does not mandate the consideration of economic waste. *See Council of Unit Owners*, 564 A.2d at 362. Additionally, Defendants improperly raise this issue in their motions for summary judgment. *See Shipman v. Hudson*, No. 88C-JN32, 1995 WL 109009, at *5 (Del. Super. Ct. Feb. 17, 1995) ("Delaware law allows for the factfinder to consider a substitute remedy which will produce a result similar in value to the result for which the aggrieved party contracted.") The majority of the cases cited by Defendants address this issue on appeal of a judgment entered after trial, not at a summary judgment posture. *See, e.g.*, *Fleming v. Scott*, 348 P.2d 701 (Colo. 1960) (appeal of a jury verdict); *Dornfried v. Granquist*, No. CV000502628, 2003 WL 1996024, at *1 (Conn. Super. Ct. Mar. 27, 2003) (trial court order post-trial); *Magnum Constr. Mgmt. Corp. v. City of Miami Beach*, 209 So. 3d 51 (Fla. Dist. Ct.

---

[8] DSU diligently explored options to repair the OSCAR Facility, and provided the updated cost estimate to all parties on September 4, 2019. *See* **App'x B,** Remediation Cost Estimate. This estimate is DSU's final sum certain damages figure, and incidentally, reduces the damages claimed by approximately $1 million. DSU disagrees with Whiting-Turner's contention that it somehow violated Fed. R. Ci. P. 26(e), and there was no unfair surprise as all parties were informed of the forthcoming revision. DSU will supplement its Answers to Whiting-Turner's Interrogatories with this information as well.

App. 2016) (appeal from bench trial); *Lochrane Eng'g, Inc. v. Willingham Realgrowth Inv. Fund, Ltd.*, 552 So.2d 228, 230 (Fla. Dist. Ct. App. 1989) (appeal from bench trial); *Grossman v. Sea Air Towers, Ltd.*, 513 So.2d 686 (Fla. Dist. Ct. App. 1987) (appeal from jury verdict); *Temple Beth Sholom & Jewish Ctr., Inc. v. Thyne Const. Corp.*, 399 So.2d 525 (Fla. Dist. Ct. App. 1981) (appeal of a jury verdict); *St. Joseph Hosp. v. Corbetta Const. Co.*, 316 N.E.2d 51 (Ill. App. 1974) (appeal from two jury trials); *State Prop. & Buildings Comm'n of Dep't of Fin. v. H. W. Miller Const. Co.*, 385 S.W.2d 211 (Ky. 1964) (reversing trial court's grant of a motion for a directed verdict, remanding the case for a new trial, and holding that the question of the reasonableness of plaintiff's damages should be submitted to the jury); *Bachman v. Parkin*, 471 N.E.2d 759 (Mass. App. Ct. 1984) (appeal from bench trial); *Oakwood Villa Apartments, Inc. v. Gulu*, 157 N.W.2d 816 (Mich. App. 1968) (appeal post bench trial); *Martin v. Phillips*, 122 N.H. 34, 36, 440 A.2d 1124, 1125 (N.H. 1982) (appeal of master's recommendations post-trial); *Cmty. Television Servs., Inc. v. Dresser Indus., Inc.*, 435 F. Supp. 214 (D.S.D. 1977) (post-trial motions); *Harley Paws, Inc. v. Mohns, Inc.*, 639 N.W.2d 223 (Wis. 2001) (appeal from bench trial); *Hollon v. McComb*, 636 P.2d 513, 515 (Wyo. 1981) (appeal from trial); *see also Club Lane Ass'n v. Armstrong*, No. 80C-JN-99, 1983 WL 879124, at *2 (Del. Super. Ct. Apr. 20, 1983) (trial court order post-trial).

Thomas Co. similarly argues that DSU's remediation costs constitute economic waste and that the Court should use some undisclosed substitute measure of damages – without proposing one – to reach an allegedly reasonable result.  (D.I. 218 at 19.)  Thomas Co. primarily relies on *Club Lane*, to support its contention that the Court should diverge from the measure of damages typically applied in construction defect cases to an undefined substitute.  (D.I. 218 at 20 (citing 1983 WL 879124 at *1).)  *Club Lane* is not a case where the Court evaluated multiple

measures of damages and opted to award the lesser measure.  Indeed, as the Court indicated, the defendants did not "seriously controvert" the evidence of damages offered by the plaintiff, nor did they offer any evidence of their own.  *Club Lane*, 1983 WL 879124, at *2.  Consequently, the Court adopted plaintiff's expert's damages estimate in its entirety, and awarded the plaintiff damages in that amount.  *Id.* at *5.

No Defendant designated an expert to opine on an estimated diminution or loss in value to the OSCAR Facility from the defective Panel Wall System.[9]  No Defendant offered any evidence of an alternative damages measure.  Other than a vague reference to the idea of replacing some of the panels, no Defendant provides any quantifiable substitute measure of damages even if replacing only the deformed panels were a feasible option.  No Defendant designated an expert to opine as to how a perceived solution of replacing individual panels could even work with the current panel structures and integrated connection and drywall system.

Any comparison between the original cost of the Panel Wall System contract and the cost of the remediation to support the claim that the cost of remediation is disproportionate, or that the proposed remediation constitutes a betterment, is equally misleading.  As the evidence shows, the panels in this system are defective because Defendants did not engineer the effect of thermal loads on them and they cannot withstand the thermal and solar loads imposed

---

[9] Richärd+Bauer's Expert dedicates a paragraph in the conclusion section of its report that "IMP panels and stainless steel exterior cladding have been in use for years.  Thus, there would be no need to design a system which would require removal or replacement as suggested in other reports. The choice to use stainless steel as an exterior cladding material as previously discussed follows a long history."  (*See* **Ex. 170,** Richärd+Bauer Expert Report, at 12 ¶ 3.)  Mr. Breck calculated no costs nor conducted any critical analysis of DSU's remediation plan, or whether placing the exact same panels on this building that failed is appropriate.  Instead, the only basis for his opinion is how long stainless steel material generally has been in use.  This haphazard lack of due diligence and investigation is one of the primary reasons the panels failed in the first place.

44

(particularly since they are 50 feet tall and span multiple floors).  These facts are undisputed, and Defendants' own experts agree.  (**Ex. 169**, Simpson Gumpertz & Heger Inc. Report submitted on behalf of Precision Foam Fabricators, Inc., at 29 ("Precision Foam Expert Report"); Precision Foam Expert, Dean Rutila Dep. at 36, July 29, 2019 ("Rutila Dep."); **Ex. 170**, Breckstone Architecture Report submitted on behalf of Richärd+Bauer, LLC, at 14-15 ("Richärd+Bauer Expert Report"); Richärd+Bauer Expert, Todd Breck Dep. at 74-75, Aug. 1, 2019 ("Breck Dep."); Richärd+Bauer Corp. Des., Stephen Kennedy Dep. at 152-153 ("Kennedy Dep."); **Ex. 175**, Czar Expert Report, at 5; Czar Engineering Expert, Michael Johannes Paul Dep. at  29, August 2, 2019 ("Paul Dep.").)

Moreover, the Precision Foam panels were designed and intended for cold storage and industrial freezer units, not the highly visible, architectural application for the OSCAR Facility's exterior façade.  As reflected in correspondences throughout the project and Defendants' testimony, a 50-foot tall continuous span panel with a thin, stainless steel surface is unsuitable and subject to failure from the start.  (*See* **Ex. 9**; **Ex. 17**; **Ex. 19**; **Ex. 23**; **Ex. 54**; **Ex. 55**; Whiting-Turner Corp. Des., Joshua George Dep. at 87; Richärd+Bauer Corp. Des., Kennedy Dep. at 99; Thomas Co. Corp. Des., George Thomas Dep. at 46; Thomas Co. Corp. Des., James Hagel Dep. 246-252, Apr. 16, 2019.)  This is precisely why the remediation plan does not utilize 50 foot spans, but much shorter, controllable panel heights that are "stick built" with adequate supports to control thermal movements.  (*See* **Ex. 147** at 188, Remediation Cost Estimate Cover Letter.)

While it is certainly in Defendants' interest to limit replacement to presently deformed panels alone because it represents the cheapest possible alternative, that approach is an entirely inappropriate remediation of the problem.  Because the original panels (both inherently and as

engineered and designed) are uniformly defective across the entire façade, a proper remediation requires a different panel.  The panels cannot be replaced with the same stainless steel, 50-foot panels in the existing clip system because they experience precisely the same deformations at issue here.  (Dannettel Dep. II at 116-18.)  Mr. Dannettel testified that "[t]here's a very high probability that these panels did not work and basically will not ever work in the configuration that they're in."  (*Id.* at 117; 91 & 110 (single-span panel is far more appropriate than multi-span, "monolithic" panels like those originally installed.))  He further testified that "it's a professional opinion . . . [a]s a façade consultant, I wouldn't recommend this to a client to go back and rebuild what was there the first time."  (*Id.* at 118.)  Lastly, he testified that "[i]t's a very complicated removal process and replacement process.  I'm not fully convinced of how plausible it is to even replace the panels to begin with without some kind of adverse effect on something else." (Dannettel Dep. I at 111.)

Even if replacing individual panels in the existing system did not invite precisely the same failure at issue in this case, the façade would become an inconsistent mish-mash of panel surfaces and types, not the uniform, polished "prism" for which DSU bargained.  Replacing the deformed panels on two sides of the building while leaving others creates an inconsistent façade from side-to-side and panel-to-panel that was never the design intent or bargain.  Thus, if DSU were to replace all of the panels on only one side of the building, those panels will be physically and visually different than the panels on the other two sides of the prism.

While 15 panels on one side are currently deformed, the remaining panels as installed are nevertheless defective because neither the design nor installation of the panels accounted for the thermal movement of the metal, and those panels suffer from the same potential to manifest buckling defects in the years to come.  No Defendant disputes that thermal movement from

environmental conditions caused the panel deformations.  (**Ex. 169**, Precision Foam Expert Report at 29; Rutila Dep. at 13; **Ex. 170**, Richärd+Bauer Expert Report at 9, 14-15; Breck Dep. at 37-38; **Ex. 175**, Czar Expert Report at 5; Paul Dep. at  29.)

Solely on the basis of the passage of time, Defendants also assume that because the majority of the panels on the other sides of the building have not yet failed, they will not fail. Dannettel testified, however, the passage of time is not the issue and provides no evidence that the panels will continue to perform as intended.   Indeed, under the right environmental conditions, additional panels will exhibit the same buckling failures.  (*See* **Ex. 147**, Thornton Tomasetti Export Report at 16-21 (discussing the solar orientation and environmental factors that caused the exterior stainless steel facing of the Panel Wall System to buckle under the effect of differential thermal loads, and providing diagrams regarding the same).)  Dannettel explained as follows:

> I would say that we don't see this as a time-based failure. We see it as an environmental-based failure relative to each individual panel, and there's no way for us to predict exactly what that environmental limit is going to be that's going to trigger that failure for that individual panel.
>
> What's the exact threshold for that particular panel, we – no one can really know that answer.  But since one of them has already failed, we think that the amount of solar gain that is getting on the west side is clearly enough to fail the panels.  And so since one of them is failed, we suspect that the others are very near failing.
>
> And plus, we can see the amount of distortion the – call it elastic buckling – elastic is buckling that can happen and then un-happen, right – elastic is when something stretches, but can return back to its normal state because it hasn't plastically deformed, which is permanent.
>
> So on the east side, we have plastic deformations, which are these permanent deformations of these very acute lines, right?

47

> We only have one of those on the west, but on the west, we still have lots of elastic deformations of those panels.
>
> So we know they're all under stress, it's just a question of whether they have reached that critical stress where they have a plastic permanent deformation.  [I]t could be that extra hour of sunlight just the right day at the right ambient temperature that could trigger a whole lot of those on the west to go, we don't know.

(Dannettel Dep. at 138-39.)  DSU has no recourse when other panels buckle in the future from thermal movements from sufficient solar gain on any particular day under the right environmental conditions.

Defendants agreed to design, engineer and construct a highly polished and reflective façade to emulate a prism for DSU's state-of-the-art optical science facility.  Defendants failed to do so, and DSU is left holding the proverbial bag of fixing the problem in a manner that is consistent with its original intent for this marquee facility.  Defendants' purported approach to that remediation is as faulty and defective as their approach to the original project, and it is not a basis on which summary judgment can be granted as a matter of law.

For these reasons, DSU is entitled to seek damages in the amount of the costs of repairing this completely defective system and to present evidence of those costs to the jury.

## CONCLUSION

For all of the foregoing reasons, Plaintiff Delaware State University respectfully requests that this Court deny the Motions for Summary Judgment filed on behalf of (i) Richärd+Bauer, LLP [D.I. 203]; (ii) Whiting-Turner Contracting Co., Inc. [D.I. 210] ("Whiting-Turner"); (iii) Precision Foam Fabricators, Inc. [D.I. 206] ("Precision Foam"); (iv) Thomas Co., Inc. [D.I. 218]; and (v) Czar Engineering, LLC [D.I. 216]; and deny Defendants Whiting-Turner and Precision Foam's Motion to Strike Expert Report of Mark E. Dannettel [D.I. 202].

48

Respectfully submitted,

/s/ James D. Taylor, Jr.
James D. Taylor, Jr. (#4009)
Charles E. Davis (#6402)
Saul Ewing Arnstein & Lehr LLP
1201 North Market Street, 23rd Floor
Wilmington, DE  19801
(302) 421-6800
(302) 421-6813 (facsimile)
james.taylor@saul.com
chad.davis@saul.com

Of Counsel:  Donald A. Rea (*admitted pro hac vice*)
Jillian K. Walton (*admitted pro hac vice*)
SAUL EWING ARNSTEIN & LEHR LLP
500 East Pratt Street, Suite 900
Baltimore, MD  21202-3133
(410) 332-8680
(410) 332-8078 (facsimile)
don.rea@saul.com
jillian.walton@saul.com

Dated: September 20, 2019        *Counsel for Plaintiff Delaware State University*

49