**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

DELAWARE STATE UNIVERSITY,    :
    :
              Plaintiff,    :
    :
    v.    :    C. A. No. 15-1144-LPS-MPT
    :
THOMAS COMPANY, INC., LIBERTY    :
MUTUAL INSURANCE COMPANY,    :
RICHÄRD+BAUER, LLP, CZAR    :
ENGINEERING, LLC, and PRECISION    :
FOAM FABRICATORS, INC.    :
    :
AND    :
    :
WHITING-TURNER CONTRACTING, CO., :
    :
AND    :
    :
ANTHONY P. ASHFORD,    :
    :
              Defendants.    :

## <u>MEMORANDUM OPINION</u>

This Memorandum Opinion addresses several motions submitted by the parties in what began in state court as a simple two-sided action based on alleged non-payment due under a contract which was removed to this court. Over the years, the case was stayed, informal settlement discussions held, formal mediations with the court and with an outside expert conducted, parties incrementally added and finally realigned; resulting in a case that has morphed into a star-crossed constellation of eight parties asserting a plethora of claims, counter-claims, and cross-claims against and among each other. At this point, fact and expert discovery have concluded and the court's determinations herein resolve many issues in this long, but ongoing, saga.

I.     **PROCEDURAL HISTORY**

This action was initiated on December 11, 2015 by the filing of a Notice of

Removal in this court[1] of a complaint originally filed in Delaware Superior Court by

Precision Foam Fabricators, Inc. ("Precision Foam" or "PFF") against Thomas

Company, Inc. ("Thomas" or "TCI") and Liberty Mutual Insurance Company ("Liberty

Mutual") that sought sums allegedly due to Precision Foam for the fabrication of certain

insulated metal wall panels in connection with construction of the Optical Science

Center and Applied Research (the "OSCAR Facility" or "Project") at Delaware State

University ("DSU").[2]

On January 4, 2016, Thomas filed a Third-Party Complaint against DSU.[3]   On

February 19, 2016, Third-Party Defendant DSU answered, and filed a Counterclaim

against Thomas.[4]   DSU's Counterclaim, and other claims that followed, allege

significant defects in the panel wall installed at the OSCAR Facility.[5]   On February 27,

2017, Thomas filed a Fourth-Party Complaint against Czar Engineering, LLC ("Czar")

arising out of the defect allegations raised by DSU.[6]   On March 10, 2017, DSU filed a

Third-Party Complaint against Richärd+Bauer, LLC ("Richärd+Bauer" or "R+B"), the

architect for the OSCAR Facility and the panel wall, also arising out of the alleged

---

[1] D.I. 1.
[2] Id., Ex. A (Precision Foam Fabricators, Inc. v. Thomas Co., Inc., C.A. No.
N15C-11-115-CLS (Del. Super. Nov. 13, 2015)); see also D.I. 73 (Consent Motion to
Realign Parties) at 2 ¶ 1.
[3] D.I. 8; D.I. 73 ¶ 2.
[4] D.I. 15; D.I. 73 ¶ 2.
[5] Id.; D.I. 73 ¶ 3.
[6] D.I. 35; D.I. 73 ¶ 4.

defects in the panel wall.[7]  Various other cross-claims by the parties against and among

each other followed.[8]  On April 27, 2019, the parties filed a Consent Motion to Realign

Parties ("Motion to Realign")[9] and, contemporaneously, DSU filed a Second Amended

Complaint joining The Whiting-Turner Contracting Company ("Whiting-Turner" or "W-T")

and Anthony P. Ashford ("Ashford") as additional parties in connection with the defect

claims.[10]

The Motion to Realign suggested in the then-current posture that the defect

claims among and between the various parties predominated the litigation, and it was

no longer simply about payment allegedly due to Precision Foam.[11]  Because DSU's

defect allegations had become the heart of the litigation, and in light of the complex and

confusing posture of the parties at that juncture, the parties jointly requested they be

realigned to properly organize the practical posture of the parties and their claims

appropriately, and to simplify the procedural posture of the matter for the court and the

parties.[12]

The court ordered realignment of the parties on May 1, 2018, such that DSU is

plaintiff and counter-defendant to the extent any counterclaims are filed against it; and

Richärd+Bauer, Liberty Mutual, Thomas, Czar, Whiting-Turner, and Ashford are

---

[7] D.I. 40; D.I. 73 ¶ 5.
[8] D.I. 73 ¶ 6.
[9] D.I. 73.
[10] D.I. 74 (Third Party Second Amended Complaint ("SAC")).  Other than filing a *pro se* Answer to the SAC, *see* D.I. 89, and being deposed on March 15, 2019, *see* D.I. 243-7, Ashford has not meaningfully participated in this action.
[11] D.I. 73 ¶ 8.
[12] *Id.*

3

defendants, counter-plaintiffs, and cross-claimants, where appropriate.[13]

On February 21, 2019, the parties consented to this magistrate judge conducting all proceedings and entering a final order on case dispositive motions, and those motions were referred on in accordance with 28 U.S.C. § 636(c).[14]

On June 11, 2019, DSU filed a Consent Motion for Leave to File Amended Complaint for the limited purpose of adding defendant Thomas to SAC Count III (Negligence) which had been named in DSU's original negligence counterclaim and inadvertently omitted as such in the SAC.[15]  DSU's motion was granted on June 14, 2016,[16] making Delaware State University's Third Amended Complaint ("TAC")[17] its operative pleading.

The TAC asserts four causes of action:  Count I (Breach of Contract), Count II (Claim on the Performance Bond), Count III (Negligence), and Count IV (Unjust Enrichment).[18]

The co-defendants each broadly assert cross-claims against and among each other for indemnification and/or contribution.[19]  Thomas also asserts claims for breach

---

[13] So Ordered D.I. 73 Consent Motion (Docket Entry May 1, 2018); D.I. 73 at 3 (Wherefore clause).  In the separate discussions of each motion, the court may generally refer to DSU as "plaintiff" and the parties advancing or opposing the particular motion collectively as "defendant(s)" and/or "movant(s)."

[14] D.I. 147.

[15] D.I. 180.

[16] D.I. 181.

[17] D.I. 180-2.

[18] *Id.*  Count I is alleged against Richärd+Bauer, Whiting-Turner, Thomas, Precision Foam, Czar, and Ashford.  *Id.* ¶¶ 48-56.  Count II is alleged against Liberty Mutual.  *Id.* ¶¶ 57-60.  Count III is alleged against Thomas, Precision Foam, Czar, and Ashford.  *Id.* ¶¶ 61-69.  Count IV is alleged against Precision Foam, Czar, and Ashford. *Id.* ¶¶ 70-72.

[19] *See* D.I. 49 (PFF); D.I. 77 (R+B); D.I. 97 (W-T); D.I. 98 (Czar); D.I. 103 (TCI).

4

of contract, unjust enrichment, and breach of warranty against Precision Foam.[20]

Presently before the court are seven motions for summary judgment filed by DSU,[21] Richärd+Bauer,[22] Whiting-Turner,[23] Thomas,[24] Precision Foam,[25] and Czar.[26] Whiting-Turner and Precision Foam also filed a Joint Motion to Strike Expert Report of Thornton Tomasetti, Inc. and Mark E. Dannettel.[27]

## II.   BACKGROUND–STIPULATED FACTS[28]

1.  This case concerns Structural Insulated Panels or "SIPs" and their integration into an overall wall system that includes the SIPs, the design, construction and installation of the SIP connections to the building structure, and other related elements

---

[20] D.I. 103.

[21] D.I. 211.

[22] D.I. 203.

[23] D.I. 208.

[24] D.I. 207;  D.I. 217.  On July 9, 2020, DSU informed the court that it had settled its claims against TCI and Liberty Mutual, as well as TCI's claims against DSU (the "DSU-TCI Settlement").  D.I. 255.  On July 29, 2020, the court granted the voluntary dismissal of DSU's claims against TCI and Liberty Mutual, and TCI's claims against DSU (the "Settled Claims").  D.I. 257.  "The sole effect of this order is dismissal of the Settled Claims.  The action remains pending and unaffected with respect to the remaining claims."  *Id.*  At the time of the DSU-TCI Settlement, TCI had a pending motion seeking, *inter alia*, summary judgment that DSU's proposed repairs to the Panel Wall System constitute economic waste.  D.I. 217.  That part of TCI's motion is denied as moot.  DSU does not have a pending motion for summary judgment against TCI.

[25] D.I. 205.

[26] D.I. 215.

[27] D.I. 201.

[28] These facts are taken from the stipulated facts filed by all parties for purposes of the their respective summary judgment motions.  D.I. 195 ("Stipulated Facts").  The documents referenced therein are cited as "Stip. Ex." and designated by their deposition exhibit numbers inasmuch as all exhibits were consecutively numbered throughout the depositions.  *Id.* at 2 n.1.  The parties submitted their Joint Exhibits and Deposition Designations on October 4, 2019.  *See* D.I. 243; D.I. 243-1 through 243-19.  For consistency, citation to "Stip. Ex." is maintained throughout the discussion of the parties' respective motions.

(such as connectors, sealants, and the like) (collectively, the "Panel Wall System," or "Wall System") installed as part of constructing the OSCAR Facility, or Project, on DSU's main campus in Dover, Delaware.[29]

2.  This case also involves the structural design of the panel connections with the OSCAR Facility design.

3.  The OSCAR Facility is a three-story building that houses classrooms, laboratories, and research facilities.[30]

4.  The Wall System that comprises the exterior façade is comprised of composite panels consisting of the following:

>   (a) the exterior side of the panel is stainless steel with a mirrored finish;
>
>   (b) the interior side of the panel is galvanized steel that is corrugated and painted; and
>
>   (c) "sandwiched" between the exterior and interior panels is rigid, expanded polystyrene or "EPS" insulating foam that is glued to the interior and exterior metal sheets with 3M® bonding material.

5.  The panels are approximately 50 feet tall.

6.  The Wall System is connected to the facility's steel structure.

7.  On or about January 20, 2012, DSU retained R+B as the Architect of Record for the OSCAR Facility pursuant to a contract titled **AIA® Document B132™–2009,** **Standard Form of Agreement Between Owner and Architect,** *Construction Manager as Adviser Edition*.  (D.I. 243-1, Stip. Ex. 47.)[31]

---

[29] The building's exterior walls consist of a combination of glass "curtain walls" and the Wall System at issue.  D.I. 195 at 2 n.2.

[30] *See* D.I. 243-5 (OSCAR Facility photographs), Photograph 1-A.

[31] Throughout this opinion, all emphases are in the original document cited unless otherwise noted.

8.  As the Architect of Record, R+B prepared the architectural drawings for the facility, which include design drawings for the Wall System.  Portions of the Wall System drawings are attached as D.I. 243-1, Stip. Ex. 7, Drawing Pages A11.1 through A11.3.  (*See also*, A11.0 through A11.8.)

9.  R+B also issued Specification Section 07435 - INSULATED METAL WALL PANELS (Addendum 3, 11/14/2013) for the Wall System.  (*See* D.I. 243-1, Stip. Ex. 3, "Specification 07435".)

10.  R+B used Permatherm, Inc. ("Permatherm") as its basis of design for the panels, and Specification 07435 listed both Permatherm and PFF as acceptable panel manufacturers.

11.  Specification 07435 provides, in pertinent part:

- Part 1, General:  Construct panel system to provide for expansion and contraction of component materials without causing buckling, failure of joint seals, undue stress on fasteners, other detrimental effects to the panel system or adjacent building systems, or warping of faces of panel system.  (D.I. 243-1, Stip. Ex. 3 at DSU 006176.)

- General Paragraph 1.4 – Performance Requirements:  Design and construct panels to meet requirements as indicated.

  A.  Structural and Wind load Tests:

      1.  Design panel composition to resist wind load mandated by code, with deflection limit of L/240.

      2.  No permanent damage to panels or connections when subjected to 1.5 times the design wind pressures for both inward and outward.

  B.  Thermal Performance:

      1.  Panels shall produce no post manufacturing off gassing which could result in loss of future thermal resistance and

7

must have a certified Long Term R-Value (LTR) . . . . ¨

- Submittals Paragraph 1.5.D – "Engineered Drawings and Calculations:  For installed products indicated to comply with certain design loadings, include structural analysis data and design prepared by an independent third party signed and sealed by the qualified professional engineer responsible for their preparation."

- Quality Assurance Paragraph 1.6.A – "Manufacturer's qualifications:  Company specializing in manufacturing all required aspects of insulated metal panel production.

    1.  No less than 10 years' experience in the actual production of specified products.

                    *   *   *   *   *

    3.  Successfully completed not less than 100 comparable projects using this system."

- Quality Assurance Paragraph 1.6.B – "Installer's Qualifications:  Installer shall be responsible for installation of panel and support framing as specified . . . to comply with the following:  Wind load engineering to comply with code requirements."

- Quality Assurance Paragraph 1.6.D – "Mock-Up:  Provide a mock-up for evaluation of surface preparation techniques, detail interfaces with other materials, corner condition, edge conditions, and application workmanship."

- Products & Materials Paragraph 2.1.A – "Acceptable Manufacturers:

    a.  Permatherm, Inc.
    b.  Precision Foam Fabricators
    c.  Or prior approved equal."

- Paragraph 2.2.A – "Panel General Requirements:  Roll-formed exterior and interior steel sheet faces laminated to panel grade Type IX expanded polystyrene (EPS) foam core . . . Insulated wall panels shall be supplied in widths . . . [as] indicated on drawings. Panel lengths shall be factory cut to meet required site dimensions."

- Paragraph 2.2.A.1.a  – "See drawings for panel thicknesses."

8

- Paragraph 2.3.A.1 – "Interior face of wall panels shall be clad with 26 gauge prepainted G90 galvanized steel where indicated. Smooth face finish."

- Paragraph 2.3.B.2 – "Exterior face [indicated] to be polished stainless steel:  clad on weather exposed side with 26 gauge Type 316 stainless steel with #8 polished mirror finish."

- Paragraph 2.3.C.1 – "Metal skins shall be thermal-set to the Type IX EPS insulation.  Insulated panels shall be manufactured individually laminated, insuring uniform adhesion between metal skins and EPS insulation."

- Paragraph 2.3.D.1 – "Wall panels and ceiling panels shall consist of Type IX Expanded Polystyrene (EPS) insulation, density as indicated in drawings and as required for loading requirements of panels."

- Paragraph 2.3.H – "Fasteners:  Clips, anchoring devices, fasteners, and accessories for installation of panel system as recommended by panel manufacturer for the system specified."

- Installation Paragraph 3.2.A – "Install in accordance with manufacturer's instructions and industry standards."

- Adjusting and Cleaning Paragraph 3.4.B – "Replace damaged panels and other components of work, which cannot be repaired by finish touch-up or similar minor repair."

12.  On January 12, 2012, DSU and Whiting-Turner entered into a contract titled

**AIA<sup>®</sup> Document C132™ –  2009, Standard Form of Agreement Between Owner and Construction Manager as Adviser, AIA<sup>®</sup> Document A232™ – 2009,** *General Conditions of the Contract for Construction*, *Construction Manager as Adviser Edition*, and Section 00730 – SUPPLEMENTARY GENERAL CONDITIONS TO THE CONTRACT (DSU Designee Tr. 12).  (*See* D.I. 243-3, Stip. Ex. 94; D.I. 243-1, Stip. Ex. 48; and D.I. 243-3, Stip. Ex. 140, respectively.)

13.  Whiting-Turner conducted a "descope meeting" with Thomas on November

26, 2013.

14. DSU entered into a contract with Thomas on or about December 27, 2013

titled **AIA® Document A132™ – 2009,** *Standard Form of Agreement Between Owner*

*and Contractor, Construction Manager as Adviser Edition* for the Wall System. (*See*

D.I. 243-3, Stip. Ex. 139.)

15. On or about January 2, 2014, Thomas submitted a Performance Bond

issued by Liberty Mutual for the Wall System project. (*See* D.I. 243-3, Stip. Ex. 139-A,

**AIA® Document 312-A 2010, Performance Bond**, dated 12/20/2013 and 01/02/2014

transmittal letter.)

16. On or about January 15, 2014, Thomas made its initial submission of PFF's

Product Data to Whiting-Turner for review. (*See* D.I. 243-1, Stip. Ex. 33.)

17. On January 17, 2014, Whiting-Turner forwarded Thomas's Submittal

Number 07435-01-0 to R+B. (D.I. 243-1, Stip. Ex. 34.)

18. R+B reviewed the PFF Product Data and returned it to Whiting-Turner on

January 23, 2014. (*Id.*)

19. The PFF product materials submittal was "approved as noted" by R+B on

May 7, 2014. (D.I. 243-1, Stip. Ex. 6.) Those materials state, in part:

- Engineering Design Data, Section 2.1.1 – "Design and control of
  thermal movement, heat flow, water vapor transmission and air
  movement in environments where a high level of appearance and
  durability are essential. Precision Insulated Panels (hereinafter
  referred to as PIP) and liners offer systems that will satisfy these
  needs economically. The data contained herein should be used for
  selection and identification of insulating panel systems."

- Engineering Design Data, Section 2.1.2 – "The purpose of the
  design data in this bulletin is to assist the architect and/or engineer

10

when considering the use of the PIP.  However, the responsibility for the final design is that of the architect or engineer."

- Engineering Design Data, Section 2.6.1 – "Flatness of structural sandwich panels is affected by dimensional change of the facings. When the panel is subjected to a temperature differential, the contraction of the cold facing will cause warping of the panel.  A practice of cutting the interior skin at midpoint of girt is used to relieve the stress on panels required connection to intermediate girt lines."

- Engineering Design Data, Section 2.6.2 – Calculation for thermal expansion is provided.  "Actual measured deflections are generally less than predicted due to shear strain of the core; however, the predicted deflection should be used for design.  Addition of intermediate bracing, to restrain thermal flatness changes is generally not recommended."

- Engineering Design Data, Section 2.9.1 – "Effective design of connections should provide for the structural function as well as accommodate thermal movements.  In addition, the connections must prevent excessive moisture and air migration, resist heat gain and maintain acceptable appearance."

- Engineering Design Data, Section 2.13.2 – "Installation specifications apply generally to holding freezers and holding coolers unless otherwise note[ed]."

20.  On or about March 6, 2014, Czar issued a proposal to Thomas for engineering services in connection with the Wall System.  (D.I. 243-3, Stip. Ex. 130.)

21.  The shop drawings prepared by Ashford on Thomas's behalf did not include the "V" grooves, or channels, ("V-Channels") referenced in PFF's Product Data and R+B's construction documents.

22.  On September 8, 2014, there was an email discussion regarding the absence of V-Channels, in the shop drawings submitted by Thomas.  (D.I. 243-1, Stip. Ex. 44; D.I. 243-3, Stip. Ex. 129.)

23.  The V-Channels were not field cut in panels when Thomas installed them.

11

24.  Installation of the Wall System on the building commenced in September 2014.

25.  The first batch of panels was delivered to the site on September 30, 2014. (D.I. 243-3, Stip. Ex. 124 at 2.)

## PARTIES' MOTIONS

Because of its impact on the parties' motions for summary judgment, the court first discusses Whiting-Turner and Precision Foam's Motion to Strike, and then proceeds to the parties' motions for summary judgment.

### Whiting-Turner and Precision Foam's Joint Motion to Strike Expert Report of Thornton Tomasetti, Inc. and Mark E. Dannettel

Whiting-Turner and Precision Foam move pursuant to Federal Rule of Evidence 702 ("F.R.E. 702") to strike the FEDERAL RULE OF CIVIL PROCEDURE 26(b)(2) Expert Report of Thornton Tomasetti, Inc. and Mark E. Dannettel ("Thornton Tomasetti Report" or "Report") as it pertains to claims asserted by DSU against W-T and PFF ("Motion to Strike").[32]  Alternatively, they move *in limine* requesting the Thornton Tomasetti Report,

---

[32] D.I. 201.  Briefing on the motion is found at D.I. 202 (W-T and PFF Opening Brief); D.I. 231 (DSU Consolidated Answering Brief); and D.I. 237 (W-T and PFF Reply Brief).  On January 24, 2020, TCI filed a Notice of Adoption of the Motion to Strike and the movants' opening brief in support thereof.  D.I. 251 ("Notice of Adoption").  On January 31, 2020, DSU filed a Response to the Notice of Adoption urging the court to reject TCI's filing as untimely under the Scheduling Order or, in the alternative, deny it for the substantive reasons set forth in DSU's original opposition.  D.I. 252.  Separately, DSU emphasizes the nature of the motion in its response:  "[t]hough titled a 'Motion to Strike,' it is indisputably a *Daubert* motion as it seeks to excluded expert evidence based on F.R.E. 702 and *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993) and its progeny."  *Id.* at 1 n.1.  The court does not disagree with DSU's characterization of the motion, however, consistent with the parties' references in briefing, the court uses "Motion to Strike" when discussing this motion.  With regard to TCI's filing, it is rejected as untimely.  It is also superfluous as it does nothing more than adopt the movants' positions without adding any substantive argument, and the court's determination that

12

and any testimony associated therewith by Dannettel or any other witness identified as providing expert testimony on behalf of DSU, be excluded from the evidence in support of DSU's claims against them.[33]

## I.      BACKGROUND–W-T and PFF Motion to Strike

DSU's OSCAR Facility is a three story structure with a triangular floor plan.[34] The OSCAR Facility's three sides generally face north, east, and west and are enclosed primarily by 50 ± foot tall insulated metal panels, commonly referred to as structural insulated panels ("SIPs" or "Panels").[35]  As installed on the Project, the Panels are composite, comprised of a 6 inch rigid foam core that is bonded between two metal facings.[36]  As specified by the Project architect of record, R+B, the Panels' exterior facings are thin (1/64th inches), 26 gauge polished stainless steel sheets.[37]  The Panels' exterior facings make up part of the OSCAR Facility's façade.[38]  The Panels' interior facings are thin (1/64th inches) 26 gauge corrugated and painted galvanized steel.[39]  As designed and specified by R+B, the Panels attached to the OSCAR Facility by "gravity load connections" that "hang" the Panels from the OSCAR Facility's third floor.[40]  The Panels are suspended from the OSCAR at the point of the gravity load

---

the Report does not meet the requirements of F.R.E. 702 removes the Report's application to all defendants.

[33] D.I. 201.

[34] D.I. 195 ¶ 3.

[35] D.I. 202-1, Ex. A, DSU 9575-77 (photographs of OSCAR Facility); D.I. 195 ¶¶ 1-5.

[36] D.I. 195 ¶ 4.

[37] D.I. 243-1, Stip. Ex. 3 § 2.3.B.

[38] D.I. 243-12 (George Dep.) at 43:7-15.

[39] D.I. 243-1, Stip. Ex. 3 § 2.3.A.

[40] D.I. 195 ¶¶ 8-9; D.I. 243-1, Stip. Ex. 7.

connection.[41]  Two "lateral connections," one above, and one below, the gravity connections, connect the Panels to the building while allowing for some horizontal movement to control wind forces that affect the Panels.[42]  As specified by R+B, the Panels served as both the exterior façade and as an insulated wall to which drywall was attached to create the interior of the OSCAR Facility.[43]  R+B used Permatherm as its basis of design for the panels, and Specification 07435 listed both Permatherm and PFF as acceptable panel manufacturers.[44]

DSU alleges design and construction defects relating to the construction of the insulated panel façade of DSU's OSCAR Facility.[45]  DSU contracted with W-T to serve as the Construction Manager ("CM") as Adviser for the Project.[46]  DSU contracted with TCI to furnish and install the metal panels and provide design/engineering services for the panel façade system, including all connections thereof.[47]  TCI, in turn, entered into a purchase order ("PO") with PFF to procure the panels.[48]

As pertinent to the Motion to Strike, DSU contends the metal panels failed by horizontally deforming or "buckling" on the exterior skin.[49]  DSU sued W-T for breach of contract, and PFF for breach of contract, negligence, and unjust enrichment.[50]  DSU

---

[41] D.I. 243-12 (George Dep.) at 123:2-5.
[42] D.I. 243-1, Stip. Ex. 7; D.I. 243-12 (George Dep.) at 123:10-19.
[43] D.I. 243-12 (George Dep.) at 44:22-45:13.
[44] D.I. 195 ¶ 10.
[45] D.I. 202 at 1.
[46] D.I. 195 ¶ 12.
[47] D.I. 202 at 1 (citing (D.I. 195 ¶¶ 10, 14; D.I. 243-1, Stip. Exs. 3, 48; D.I. 243-3, Stip. Exs. 139, 140)).
[48] *Id.*
[49] *Id.*
[50] *Id.*

retained Thornton Tomasetti, Inc. and its principal, Mark E. Dannettel ("Dannettel"),

(collectively, "Thornton Tomasetti") to issue the Report pursuant to FEDERAL RULE OF

CIVIL PROCEDURE 26(B)(2) with respect to, *inter alia*, the alleged responsibility of various

entities for the purported failures in the panels.[51]  W-T and PFF maintain neither the

Report and/or Dannettel meet the requirements of FEDERAL RULE OF EVIDENCE 702 and,

therefore, the Motion to Strike must be granted.[52]

## II.    GOVERNING LAW–W-T and PFF Motion to Strike

The admissibility of expert testimony is governed by FEDERAL RULE OF EVIDENCE

702, which provides:

> A witness who is qualified as an expert by knowledge, skill, experience,
> training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will
> help the trier of fact to understand the evidence or to determine a fact in
> issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; *and*
>
> (d) the expert has reliably applied the principles and methods to the facts
> of the case.[53]

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, the Supreme Court interpreted

Rule 702 to "confide[] to the judges some gatekeeping responsibility in deciding

questions of the admissibility of proffered expert testimony."[54]  The Third Circuit stated

---

[51] *Id.*; D.I. 243-3, Stip. Ex. 147 (Thornton Tomasetti Report).  The Report was authored by Dannettel and Christopher E. Pinto, P.E.  *Id.*

[52] D.I. 202 at 2.

[53] FED. R. EVID. 702 (emphasis added).

[54] 509 U.S. 579, 600 (1993) (Rehnquist, J., concurring in part and dissenting in part); *see also Pineda v. Ford Motor Co.*, 520 F.3d 237, 243 (3d Cir. 2008) (*Daubert*

that Rule 702 "embodies a trilogy of restrictions on expert testimony:  qualification, reliability and fit."[55]  The question of whether an expert's testimony is admissible based on his qualifications, reliability, and fit is committed to the court's discretion.[56]  The party proffering the expert bears the burden of demonstrating that the expert's opinion is reliable and fits the facts by a preponderance of the evidence.[57]

## III.   DISCUSSION–W-T and PFF Motion to Strike

### A.   Positions of the Parties–W-T and PFF Motion to Strike[58]

#### 1.   W-T and PFF

The movants contend Dannettel is not qualified to serve as an expert as relates to Whiting-Turner or Precision Foam, and, even if found to be qualified, he fails to meet any of the required elements because:  (1) Dannettel is not qualified to speak on the contractual obligations or responsibilities of Whiting-Turner or Precision Foam; (2) his opinion is not based on sufficient facts or data; and (3) his opinion is inherently unreliable, and, therefore, inadmissible.[59]

#### 2.   DSU

---

imposes upon the court a duty to act as a "gatekeeper" where the court must "ensure that 'any and all expert testimony or evidence is not only relevant, but also reliable.'") (quoting *Kannankeril v. Terminix Int'l, Inc.*, 128 F.3d 802, 806 (3d Cir. 1997)); *Sonos, Inc. v. D & M Holdings Inc.*, 297 F. Supp. 3d 501, 507 (D. Del. 2017) (When an expert's testimony is challenged, "the district court has a 'basic gatekeeping obligation' to ensure that the expert's testimony 'is not only relevant, but reliable.'") (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999)).

[55] *Estate of Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003).

[56] *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 749 (3d Cir. 1994).

[57] *Oddi v. Ford Motor Co.*, 234 F.3d 136, 144 (3d Cir. 2000).

[58] The parties' positions for each motion are taken from the argument summary, or argument sections of their respective opening briefs.

[59] D.I. 202 at 2, 16-20.

DSU argues the Motion to Strike should be denied because:  (1) Dannettel's extensive experience as a façade consultant and façade contractor qualify him to testify on defendants' obligations and responsibilities; (2) Dannettel's testimony is based on sufficient facts and data; and (3) Dannettel's testimony is the product of reliable principles and methods that were properly applied to the facts of this case.[60]

**B.   Analysis–W-T and PFF Motion to Strike**

      **1.   Whether Dannettel is Qualified to Opine on the Contractual Obligations or Responsibilities of Whiting-Turner or Precision Foam**

"Qualification refers to the requirement that the witness possess specialized expertise."[61]  The Third Circuit has "'interpreted [the qualification] requirement liberally,' holding that 'a broad range of knowledge, skills, and training qualify an expert as such,'"[62] but "ha[s] not pursued a policy of qualifying *any* proffered witness as an expert."[63]  "The basis of this specialized knowledge 'can be practical experience as well as academic training and credentials.'"[64]  The Third Circuit has "eschewed imposing overly rigorous requirements of expertise and ha[s] been satisfied with more

---

[60] D.I. 231 at 24-34.

[61] *Estate of Schneider*, 320 F.3d at  404.

[62] *Calhoun v. Yamaha Motor Corp., U.S.A.*, 350 F.3d 316, 321 (3d Cir. 2003) (quoting *Paoli*, 35 F.3d at 741).

[63] *Waldorf v. Shuta*, 142 F.3d 601, 625 (3d Cir. 1998) (quoting *American Tech. Resources v. United States*, 893 F.2d 651, 656 (3d Cir. 1990)).

[64] *Waldorf v. Shuta*, 142 F.3d 601, 625 (3d Cir. 1998) (quoting *Hammond v. Int'l Harvester Co.*, 691 F.2d 646, 653 (3d Cir. 1982)); *see also id.* ("[I]n considering the qualification of witnesses as experts, we stress that ordinarily an otherwise qualified witness is not disqualified merely because of a lack of academic training.") (citing *Hammond*, 691 F.2d  at 653 (determining that a witness could testify as an expert regarding a rollover protective structure on a tractor even though he did not have a formal degree in engineering or physics, but did have experience in the field)).

generalized qualifications."[65]  "[I]t is not necessary that the expert have expertise in the precise technology" at issue,[66] and "[a]n expert should not be excluded 'simply because the trial court does not deem the proposed expert to be the best qualified or because the proposed expert does not have the specialization that the court considers most appropriate.'"[67]

DSU contends Dannettel's education and general experience as a façade consultant demonstrate he is qualified to offer expert testimony in this case.[68]  The movants counter that Dannettel does not have the required specialized knowledge as it relates to W-T and PFF because he has never served as, or worked for, a construction manager ("CM"), has no prior experience with similar SIPs, lacks any education or training related to the duties of a CM or SIP panel manufacturer, and does not know the difference between a CM and a general contractor.[69]  The movants also argue that because Dannettel is not a licensed architect, is not registered as a professional engineer, and is not an engineer of any kind, he is precluded from testifying as an expert in Delaware.[70]

Addressing the last argument first, the movants rely on two unreported cases from the Superior Court of Delaware that discuss the qualifications required for an

---

[65] *Paoli*, 35 F.3d at 741 (citations omitted).

[66] *Sonos*, 297 F. Supp. 3d at 510 (citing *Paoli*, 35 F.3d at 741); *see, e.g.*, *Knight v. Otis Elevator Co.*, 596 F.2d 84, 87-88 (3d Cir. 1979) (holding that an expert could testify that unguarded elevator buttons constituted a design defect despite expert's lack of specific background in design and manufacture of elevators).

[67] *Sonos*, 297 F. Supp. 3d at 508 (quoting *Pineda v. Ford Motor Co.*, 520 F.3d 237, 244 (3d Cir. 2008)).

[68] D.I. 231 at 26.

[69] D.I. 202 at 16.

[70] *Id.* at 16-17.

expert to testify in Delaware state court.[71]  Those cases considered whether a proffered

expert who was not licensed in the field at issue was precluded from offering expert

testimony in view of certain Delaware state statutory licensing/registration

requirements.[72]  While acknowledging those requirements, the *Talley* court also stated

"[t]he Act was never intended to override the Court's gatekeeping function under D.R.E.

702 or affect the Court's analysis under *Daubert*."[73]  This court has also recently noted

that, in contrast to certain parties recognized by Delaware as subject to professional

negligence causes of action, e.g., architects and engineers, that require a license to

practice, "[e]xpert witnesses . . . are not required to hold a license to offer opinions or

testimony."[74]  Given the Third Circuit's clear statement that specialized knowledge can

be found without "academic training and credentials,"[75] and this court's recent

statement in *Verition*, the court rejects the argument Dannettel is precluded from

testifying because he is not a licensed architect or engineer.

DSU is ultimately unable, however, to demonstrate Dannettel has the required

specialized knowledge to offer his proffered testimony.  DSU suggests the movants

"overlook the fact that [the Report] was co-authored by Christopher E. Pinto, P.E., who

---

[71] *Id.* (citing *Talley v. Tri-State Waste Solutions, Inc.*, C.A. No. 05C-08-311-PLA, 2007 WL 1816356 (Del. Super. June 25, 2007); *Burkett-Woods v. Haines*, C.A. No. 02C-10-263-CLS, 2006 WL 1579770 (Del. Super. May 2, 2006)).

[72] *See Talley*, 2007 WL 1816356, at *3; *Burkett-Woods*, 2006 WL 1579770, at *3.

[73] *Talley*, 2007 WL 1816356, at *3.  *Talley* cited the same section of the Delaware code the movants cite.  *See* D.I. 202 at 17 n.16; *see also Burkett-Woods*, 2006 WL 1579770, at *1 ("D.R.E. 702 is identical to its federal counterpart, F.R.E. 702.").

[74] *Verition Partners Master Fund, Ltd. v. Cornell*, C.A. No. 19-377-CFC, 2020 WL 2917258, at *4 (D. Del. June 3, 2020) (citations omitted).

[75] *Hammond*, 691 F.2d  at 653.

is a licenced engineer in Delaware (among other states), supported by a team of three other Thornton Tomasetti engineers."[76]  Dannettel is the only DSU testifying expert witness.[77]  His qualifications are not implicated by the qualifications of others involved with the Report.  The suggestion that Dannettel can somehow rely upon the credentials of others associated with the Report to establish *his* qualification is provided without support and rejected.[78]

DSU also argues Dannettel's specialized knowledge is based on his education and extensive experience as a façade consultant.[79]  The court first notes Dannettel's degrees are in architecture rather than engineering.  DSU' argument that Dannettel's experience as a façade consultant and façade contractor qualifies him to testify on defendants' obligations and responsibilities relies almost exclusively on Dannettel's September 20, 2019 affidavit which comprises 253 paragraphs spanning forty-six pages, and was submitted contemporaneously with DSU's consolidated answering brief.[80]  The movants object to DSU's reliance on that affidavit because it was not included in the Thornton Tomasetti Report as mandated by FED. R. CIV. P. 26(a)(2), or

---

[76] D.I. 231 at 26.

[77] *See* D.I. 202 at 3 (citing D.I. 202-1, Ex. D (Kelly e-mail dated 04/02/2019 and D. Rea e-mail dated 04/04/2019)).

[78] *See, e.g.*, *Talley*, 2007 WL 1816356, at *3 ("The licensing status of [two other] . . . engineers employed by the same firm as [the proffered expert], has no impact on the Court's analysis of [the proffered expert's] qualifications.").

[79] Dannettel received a Bachelor of Science Degree in Architecture from the University of Maryland and a Master of Science Degree in Architecture from Arizona State University, is a principal of the international engineering firm Thornton Tomasetti, is a member of the American Society of Civil Engineering and the American Institute of Architects ("AIA"), author of numerous technical articles in the industry, and has taught and lectured across the country and abroad.  *See* D.I. 243-3, Stip. Ex. 147 (Dannettel's curriculum vitae attached to Report).

[80] *See* D.I. 231-1, App'x A ("Dannettel Affidavit").

disclosed in Dannettel's two days of deposition testimony, despite repeated questioning about his relevant qualifications and experiences.[81]

Rule 26(a)(2) requires a testifying expert's report contain, *inter alia*, "the witness's qualifications . . . ."[82]  The scheduling order provided for expert discovery to close August 23, 2019.[83]  The Thornton Tomasetti Report is dated March 1, 2019,[84] and Dannettel provided deposition testimony on April 15 and May 31, 2019.[85]  Unfortunately, other than stating their objection to DSU's reliance on the affidavit, the movants do not explicitly ask the court to disregard the affidavit or provide case citation upon which the court could rely to do so.  Had they done so, the court would have seriously considered the request because Dannettel's qualifications go to the heart of the Rule 702 analysis.

For instance, in *Doe v. Luzerne County*, the court declined to strike expert affidavits for failure to comply with Rule 26(a)(2)(B)(iii) & (vi) (inclusion of exhibits used to support opinions, and statement of compensation, respectively) with the court finding failure to fully comply with the rule did not prejudice the plaintiff "because the summary judgment motion can be decided without this information," and exclusion based on "remedial oversights would be an extreme and unwarranted sanction,"[86]  Here, the failure to include the information in Dannettel's Report now offered via his affidavit goes to the heart of the issue of his qualifications to testify as an expert.  Nevertheless, the

---

[81] D.I. 237 at 1-2 (citing D.I. 243-9 (Dannettel Dep. Vol. I) at 64:4-66:9; 129:22-130:1; 135:7-21; D.I. 243-10 (Dannettel Dep. Vol. II) at 14:10-18:10).
[82] FED. R. CIV. P. 26(a)(2)(B)(iv).
[83] D.I. 146 ¶ 4; D.I. 169; D.I. 177.
[84] D.I. 243-3, Stip. Ex. 147 at 1.
[85] D.I. 243-9; D.I. 243-10 (Dannettel Dep. Vols. I and II).
[86] C.A. No. 3:08-cv-1155, 2010 WL 2245578, at *4 (M.D. Pa. June 1, 2010).

court determines Dannettel's affidavit does not demonstrate he is qualified to offer his proffered testimony.

 DSU spends several pages of briefing reciting Dannettel's "extensive experience working at architecture firms, an international engineering firm and a façade contractor."[87]  Nowhere, however does DSU tie Dannettel's impressive resume to the specialized knowledge required to offer his proffered testimony.  The movants present unrebutted evidence suggesting he does not.

Dannettel acknowledges he has never served as, worked for, or been responsible for overseeing, a CM as Advisor, i.e., the position W-T held on the Project.[88]  He testified to not knowing if he ever worked on a project where there was a CM as Advisor, "if there is a construction manager on the project, the distinction of whether that's an adviser or a standard construction manager, would not be made to someone like me so I wouldn't know."[89]  Dannettel also stated he did not know the difference between the positions of a general contractor, or CM at Risk, and a CM as Adviser.[90]

DSU does not specifically address Dannettel's knowledge of the roles played by the various entity-positions.  His apparent lack knowledge indicates the absence of his specialized knowledge.

---

[87] *See* D.I. 231 at 26-31.

[88] *See* D.I. 243-9 (Dannettel Dep. Vol. I) at 64:25-65:25.

[89] *Id.* at 66:1-9.

[90] *Id.* at 137:7-12.  According to the movants, a CM at Risk or General Contractor enters into a contract with an owner to deliver a final and finished product, contracts directly all trades necessary to complete the final product, and is, therefore, responsible for the performance of the trade contractors that actually perform the work.  D.I. 202 at 13 n.13 (citing D.I. 202-1, Exs. E, F; *id.*, Ex. G (George Aff.) ¶¶ 4-6).

The movants also contend that, prior to the OSCAR Facility, Dannettel's lack of work on a project that specified, used, or contained a SIP panel system further demonstrates he is unqualified to testify here.[91]  The court agrees.  Dannettel testified he "never used these panels before.  I've never been involved in a project using these panels before."[92]  He also has no special training in the use or design of SIP panels or systems,[93] no experience with SIP panel manufacturing, and has never worked for a panel manufacturer like PFF.[94]

DSU's surprising response is not to counter, but rather emphasize, Dannettel's testimony that he lacks experience with the panels at issue.

> So *I haven't done SIP panels* and SIP panels are not normally used for the type of commercial construction that I normally engage with, which would include a building like this, but *my suspicion* is that because SIP panels are used for kind of a lower grade of construction like warehouses, that would never have a façade consultant involved with a cheap job like that, like for a warehouse, that would really just be the architect and the engineer.  So *I'm suspecting* that the common practice is that the design team just fully engineers and details that based on manufacturer's information, and the installer is really just an installer, but *I don't know that for a fact if that is standard practice for the SIPs*.[95]

Based on Dannettel's lack of experience with SIPs, and suppositions as to their use, DSU remarkably proclaims "Dannettel *is not experienced in these particular panels* because they are not used in high-end architectural applications, but in warehouses

---

[91] D.I. 202 at 14 (citing D.I. 243-9 (Dannettel Dep. Vol. I) at 64:4–11; D.I. 243-10 (Dannettel Dep. Vol. II) at 14:10–16, 15:10–13).
[92] D.I. 243-9 (Dannettel Dep. Vol. I) at 129:22-130:1.
[93] D.I. 243-10 (Dannettel Dep. Vol. II) at 14:17-23.
[94] *Id.* at 15:24-16:2, 16:23-25.
[95] D.I. 231 at 32-33 (emphasis added).

and industrial freezer units."[96]

Thus, the court determines Dannettel is not qualified to opine as to defendants' liability.

This determination is sufficient to grant the Motion to Strike.  The court will, however, discuss DSU's failure to meet its burden of demonstrating the additional Rule 702 restrictions on expert testimony.

### 2.      Whether Dannettel's Opinion is Based on Sufficient Facts or Data

The movants assert Dannettel's opinion is not based on sufficient facts or data. They do not take issue with the Report's identification that the cause of the panel-failure resulted from the panels being restrained in a way that failed to allow them to expand under the heat of the sun, and that the connections are the cause of that restraint.[97] Instead, they argue Dannettel's assignment of responsibility for that failure lacks a basis in science or his experience.[98]

The movants state that in assigning responsibility to PFF for the alleged panel failures, Dannettel did not rely on the contracts, and he did not perform any forensic or destructive testing, or product analysis, on the PFF panels.[99]  They contend Dannettel was unable to identify any product defect that caused the alleged panel failures.[100]  The

---

[96] *Id.* at 33 (emphasis added).
[97] D.I. 202 at 17.
[98] *Id.*
[99] *Id.* (citing D.I. 243-10 (Dannettel Dep. Vol. II) at 28:12-23; 56:7-10).  The movants suggest, and DSU does not argue otherwise, that the contracts/purchase orders are the source of any responsibilities they had to DSU and TCI.  D.I. 237 at 8 n.8.
[100] D.I. 202 at 17.

movants conclude that because Dannettel did not conduct any product analysis, combined with his purported lack of education, training, or experience in working with a SIP system or SIP manufacturing, that his opinions with respect to PFF are mere conjecture.[101]

DSU provides very little in support of this requirement.  In less than one page of argument, it merely states the Report and Dannettel's testimony demonstrates, "Thornton Tomasetti engaged in a thorough *cause and origin analysis of the failure of the Precision Foam panels*."[102]  The extent of that argument is as follows:

> At Thornton Tomasetti's direction, Intertek conducted a thermal study for a period of 14 days in July 2018, using thermocouple sensors installed on the stainless steel facings of the panels throughout the exterior and interior of the building.  Thornton Tomasetti then conducted an extensive engineering analysis of the Precision Foam composite panels to determine the cause and origin of the failure.  This analysis included extensive computer modeling to assess various stresses the panels are subject to including solar exposure, thermal variations, and wind loads.  Thornton Tomasetti also engaged in a thorough review of the design, engineering, and construction of the OSCAR Facility contained in documents produced by all parties.  Based on the results of extensive independent engineering analysis, Thornton Tomasetti determined the panels were failing due to the effect of thermal loads.  There was no need to conduct material testing as Thornton Tomasetti determined the cause and origin of the panel failure.[103]

As the movants note, DSU "does not provide a record citation for these enumerated studies and analysis[.]"[104]  The court's review of the Report reveals Intertek conducted a fourteen-day thermal study in July 2018, using thermocouple sensors

---

[101] *Id.* at 17-18.
[102] D.I. 231 at 33 (emphasis added).
[103] *Id.* at 33-34.
[104] D.I. 237 at 5 n.6.

installed on the stainless steel facings of the panels throughout the exterior and interior of the building.[105]  The only "studies" Thornton Tomasetti performed of the PFF panels to determine the cause and origin of the failure, were:  Element Analysis to determine the stresses in the Panels' stainless steel as attached to the OSCAR Building caused by differential temperatures; and three analyses to determine the stresses in the Panels' stainless steel facings due to differential temperature, but including relief-notches (V-Channels).[106]  As the movants indicate, however, Dannettel's testimony, shows that neither he nor Thornton Tomasetti:  (1) tested how or to what extent making the V-Channels might lead to structural failures in the panels;[107] (2) analyzed how the V-Channels could challenge the panels' abilities to support their own weight;[108] or (3) investigated either the beneficial or detrimental effects of making the V-Channels in the panels at places other than the second and third floor connections.[109] The movants also indicate neither DSU nor Thornton Tomasetti produced the electronic data and models that were requested to be produced in the Finite Element Analysis.[110]

As the movants note, "there is not a lot of dispute" that the panels were failing due to the effect of thermal loads[111] and the court finds DSU's mere statement "[t]here was no need to conduct material testing as Thornton Tomasetti determined the cause

---

[105] *See* D.I. 243-3, Stip. Ex. 147 at 13-14 § 3.1.5, 18 § 3.2.1; *id.*, App. C (Interteck Thermal Observation Report).
[106] *Id.* at 19-21 § 3.2.4 (Engineering Analysis of Composite Panel).
[107] D.I. 243-9 (Dep. Tr. Dannettel, Vol. I) at 86:14-88:7.
[108] *Id.* at 88:8-91:5.
[109] *Id.* at 86:14-88:7.
[110] D.I. 237 at 5-6 n.6.
[111] *Id.*

and origin of the cause and origin of the panel failure"[112] unpersuasive.  The court agrees with the movants that the Report is not based on sufficient facts or data to support Dannettel's opinion "assigning responsibility to *every company* involved in any way with the panels."[113]

The movants also contend Dannettel's conclusion that W-T contributed to the panel failures is deficient as he was unable to cite any supporting facts or data.[114]  W-T maintains its obligations to DSU are defined by its contract, but Dannettel testified that though he read the contracts at issue, he did not rely upon them in assigning responsibility, thereby creating responsibilities having contractual bases.[115]

DSU acknowledges the movants' argument that Dannettel did not rely on any parties' contract in assigning liability, but states that lack of reliance does not show his Report and testimony were not based on sufficient facts and data because Thornton Tomasetti engaged in the tests and analysis discussed above.[116]

The court agrees with the movants that Dannettel's opinion that defendants' failures may have contributed to the Panel's buckling never specifically states how

---

[112] D.I. 231 at 34.  DSU also defends the failure to conduct any forensic or destructive testing of PFF's panel's based on *the movants* failure to reference the expert opinion of any *other parties' expert* supporting the argument that such testing is necessary and/or specifically pointing to what testing or opinion of *PFF's expert* did, or did not, conduct or offer, as well as W-T's adopting the opinion of others in leu of designating its own expert.  *Id.* at 36-37.  The court does not understand the actions or opinions of other experts in this case as having a determinative impact on the court's analysis as to the sufficiency of Dannettel's Report under a Rule 702.  DSU has the burden of establishing *its* Report's compliance with Rule 702.

[113] D.I. 202 at 17; D.I. 237 at 6 (emphasis added).

[114] D.I. 202 at 17.

[115] *Id.* (citing D.I. 243-9 (Dannettel Dep. Vol. I) at 41:23-42:6; 44:5-16).

[116] D.I. 231 at 33 (citing D.I. 202 at 17-18).

those failures fell below the standard of care applicable to *any defendant*, including W-T

and PFF, or what those standards of care are.[117]  Despite DSU's contention that

Dannettel "did opine that *[all] Defendants* breached various standards of care and

duties governing their performance,"[118] and citation to several pages of testimony by

Dannettel in support,[119] the court rejects the sufficiency of that testimony.

DSU acknowledges the Report does not use the words "standard of care" with

regard to any defendant's purported failures, but relies on this court's opinion in

*McCuster v. Surgical Monitoring Associates, Inc.* to argue the failure to use those

"magic words" is not necessarily fatal to an expert's opinion.[120]  That opinion is not

persuasive based on the evidence presented here.  The court disagrees with DSU's

argument that *McCuster* is analogous to this case.[121]  In rejecting the defendant's

argument that its "conduct only *'possibly'* could have caused the injury at issue," the

court stated that, although the expert did not use the "magic words" "standard of care,"

she specifically testified the doctor's error was "the *only* possible explanation" for the

plaintiff-patient's injuries,[122] and that the doctor made "technical errors," which the

expert equated to a breach of the standard of care.[123]  As movants stress, Dannettel's

Report and deposition testimony, and affidavit, contain no similar assertion that

---

[117] D.I. 202 at 9 (emphasis added).

[118] D.I. 231 at 15-16 (citing D.I. 243-3, Stip. Ex. 147 at 23-27 §§ 4.0-4.3) (emphasis added).

[119] *Id.* at 18-23 (specifically referencing PFF, W-T, *and R+B*).

[120] *See id.* at 16-18 (citing *McCuster v. Surgical Monitoring Assocs., Inc.*, C.A. No. 01-891-KAJ, 2005 WL 348307 (D. Del. Feb. 7, 2005)).

[121] *Id.* at 16 (citing *McCuster*, 2005 WL 348307, at *4).

[122] *McCuster*, 2005 WL 348307, at *5 (emphasis added).

[123] *Id.* at *5 and n.11.

defendants' alleged "failures" or "responsibilities" were the "only explanation"; they were merely possible proximate causes of the Panel defects.[124]

The court concludes, therefore, DSU fails to meet its burden to show the Report and Dannettel's opinion are based on sufficient facts or data.

### 3. Whether Dannettel's Opinion is Product of a Reliable Methodology.

The movants assert Dannettel's opinion as to their liability is unreliable and fails to meet the *Daubert* standard because, in arriving at his opinions, Dannettel and the Report do not state that either W-T or PFF's acts or omissions conclusively, or within any reasonable degree of certainty, actually caused the alleged defects.[125]  They also reiterate that neither Dannettel's Report nor testimony assign any responsibility to W-T or PFF for failing to meet contractual obligations, or articulate what the standard is for the CM Advisers or a panel manufacturer's alleged duty of care, or that W-T or PFF did not meet that duty.[126]

An expert's opinion is typically reliable if it is "'based on the 'methods and procedures of science' rather than on 'subjective belief or unsupported speculation'; the expert must have 'good grounds for his or her belief.'"[127]  The purpose of this reliability requirement "is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level

---

[124] D.I. 237 at 7 and n.7.
[125] D.I. 202 at 19.
[126] *Id.*
[127] *Izumi Prods. Co. v. Koninklijke Philips Elecs. NV*, 315 F. Supp. 2d 589, 600 (D. Del. 2004).

of intellectual rigor that characterizes the practice of an expert in the field."[128]  As a

gatekeeper, the "district court must examine the expert's conclusions in order to

determine whether they could reliably follow from the facts known to the expert and the

methodology used."[129]  "[N]othing in either *Daubert* or the [F.R.E.] requires a district

court to admit opinion evidence that is connected to existing data only by the *ipse dixit*

. . . of the expert.  A court may conclude that there is simply too great an analytical gap

between the data and the opinion proffered."[130]

The Third Circuit considers the following non-exhaustive factors when evaluating

the reliability of a particular methodology:

> (1) whether a method consists of a testable hypothesis; (2) whether the
> method has been subject to peer review; (3) the known or potential rate of
> error; (4) the existence and maintenance of standards controlling the
> technique's operation; (5) whether the method is generally accepted; (6)
> the relationship of the technique to methods which have been established
> to be reliable; (7) the qualifications of the expert witness testifying based
> on the methodology; and (8) the non-judicial uses to which the method
> has been put.[131]

"When the methodology is sound, and the evidence relied upon sufficiently related to

the case at hand, disputes about the degree of relevance or accuracy (above this

minimum threshold) may go to the testimony's weight, but not its admissibility."[132]

Indeed, "in most cases, objections to the inadequacies of a study are more

---

[128] *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999).

[129] *Heller v. Shaw Indus., Inc.*, 167 F.3d 146, 153 (3d Cir. 1999).

[130] *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

[131] *Hologic, Inc. v. Minerva Surgical, Inc.*, 325 F. Supp. 3d 507, 520 (D. Del. 2018) (citation omitted).

[132] *Id.* at 521 (quoting *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 852 (Fed. Cir. 2010), *aff'd*, 564 U.S. 91 (2011)).

appropriately considered an objection going to the weight of the evidence rather than its admissibility."[133]

DSU cited the above block-quoted language from *Hologic* listing factors considered when a court evaluates the reliability of a particular methodology,[134] but did not discuss them other than to state: "Dannettel applied standard methods to conduct an extensive engineering analysis of the Precision Foam composite panels to determine the cause and origin of their failure. Additionally, Mr. Dannettel thoroughly reviewed all architectural, structural, and design drawings, Precision Foam's Product Data, email correspondences throughout the project and technical standards."[135] DSU then quotes sections of the Report listing conclusions with respect to W-T and PFF.[136] Having discussed the insufficiency of the Dannettel's Report and testimony to meet the facts and data requirement, including the standard of care applicable to the movants' respective contractual obligations and proximate cause of their actions with respect to the panel failures, the court likewise determines Dannettel's Report and testimony are not the product of a reliable methodology.

The party proffering the expert bears the burden of demonstrating that the expert's opinion is reliable and fits the facts by a preponderance of the evidence.[137] The court finds DSU fails to meet that burden with respect to each of the Rule 702 requirements.

---

[133] *Hemmings v. Tidyman's Inc.*, 285 F.3d 1174, 1188 (9th Cir. 2002).
[134] *See* D.I. 231 at 34.
[135] *Id.* at 35.
[136] *Id.* at 35-36.
[137] *Oddi v. Ford Motor Co.*, 234 F.3d 136, 144 (3d Cir. 2000).

IV.     **CONCLUSION–W-T and PFF Motion to Strike**

For the reasons discussed above, The Whiting-Turner Contracting Company and Precision Foam Fabricators, Inc.'s Joint Motion to Strike Expert Report of Thornton Tomasetti, Inc. and Mark E. Dannettel (D.I. 201) is **GRANTED**.

**Parties' Motions for Summary Judgment**

Because of the overlapping nature of the issues and arguments between and among the parties' motions for summary judgment, the court decides the motions in separate sections, grouping motions that lend themselves to consolidated analysis to the extent possible.  The court begins with a section discussing DSU, W-T, and R+B's cross-motions for summary judgment on DSU's breach of contract against those two defendants.  Next, the court addresses the summary judgment motions of Czar, TCI, and R+B.  The final section resolves PFF's motion for summary judgment on claims alleged against it by DSU, followed by PFF and TCI's cross-motions on TCI's breach of contract claim against PFF, and on the discrete issue of alleged damages relating to the first set of panels PFF produced and delivered.  That section concludes with the court's determination of PFF's motion for summary judgment on TCI's remaining claims against PFF.  As will become apparent, despite attempting to address common issues in each section of the opinion, there are instances of overlap within, and among, the sections.

**Governing Law–Parties' Motions for Summary Judgment**

A grant of summary judgment pursuant to FED. R. CIV. P. 56 is appropriate if materials on the record, such a deposition, documents, electronically stored

32

information, admissions, interrogatory answers, affidavits and other like evidence show

that there is no genuine issue as to any material fact, and the moving party is entitled to

judgment as a matter of law.[138]   The movant bears the burden of establishing the lack of

a genuinely disputed material fact by demonstrating "that there is an absence of

evidence to support the nonmoving party's case."[139]   "Facts that could alter the outcome

are 'material,' and disputes are 'genuine' if evidence exists from which a rational person

could conclude that the position of the person with the burden of proof on the disputed

issue is correct."[140]   "Where the record taken as a whole could not lead a rational trier of

fact to find for the non-moving party, there is no genuine issue for trial."[141]

This standard does not change because there are cross-motions for summary

judgment.[142]   Cross-motions for summary judgment:

> are no more than a claim by each side that it alone is entitled to summary
> judgment, and the making of such inherently contradictory claims does not
> constitute an agreement that if one is rejected the other is necessarily justified or
> that the losing party waives judicial consideration and determination whether
> genuine issues of material fact exist.[143]

"The filing of cross-motions for summary judgment does not require the court to

grant summary judgment for either party."[144]

---

[138] FED. R. CIV. P. 56 (a) and (c).

[139] *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

[140] *Horowitz v. Fed. Kemper Life Assurance Co.*, 57 F.3d 300, 302 n.1 (3d Cir.1995) (internal citations omitted).

[141] *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotations omitted).

[142] *Appelmans v. City of Philadelphia*, 826 F.2d 214, 216 (3d Cir. 1987).

[143] *Rains v. Cascade Indus., Inc.*, 402 F.2d 241, 245 (3d Cir. 1968).

[144] *Krupa v. New Castle County*, 732 F. Supp. 497, 505 (D. Del. 1990).

**Delaware State University's Motion for Partial Summary Judgment**

**Whiting-Turner Contracting Co.'s Motion for Summary Judgment**

**Richärd+Bauer, LLC's Motion for Summary Judgment**

DSU moves for summary judgment in its favor on its breach of contract claim against R+B and W-T.[145]  W-T moves for summary judgment in its favor on DSU's breach of contract claim against W-T, and/or to limit DSU's damages.[146]  R+B moves for summary judgment in its favor on DSU's breach of contract claim against R+B.[147]

I.    BACKGROUND–DSU, W-T, and R+B Cross-Motions for Summary Judgment on DSU's Count I (Breach of Contract)

DSU's breach of contract claim against R+B and W-T alleges breaches of various provisions of defendants' respective contracts with DSU related to the Project. As described above, DSU contracted with R+B to serve as the Architect for the Project, and with W-T to serve as the Construction Manager ("CM") as Adviser.[148]  Each contract required, *inter alia*, that W-T and R+B report errors, omissions, defects or deficiencies in the work to DSU as the Owner.[149]  DSU alleges both defendants

---

[145] D.I. 211 (Delaware State University Motion for Partial Summary Judgment). Briefing on the motion is found at D.I. 213 (DSU Opening Brief); D.I. 226 (R+B Answering Brief); D.I. 229 (W-T Answering Brief); and, D.I. 236 (DSU Consolidated Reply Brief).

[146] D.I. 208 (Whiting-Turner Contracting Co. Motion for Summary Judgment). Briefing on the motion is found at D.I. 210 (W-T Opening Brief); D.I. 231 (DSU Consolidated Answering Brief); and D.I. 239 (W-T Reply Brief).

[147] D.I. 203 (Richärd+Bauer, LLC Motion for Summary Judgment).  Briefing on the motion is found at D.I. 204 (R+B Opening Brief); D.I. 231 (DSU Consolidated Answering Brief); and, D.I. 233 (R+B Reply Brief).  R+B's motion also seeks summary judgment in its favor and against all other defendants on all cross-claims against R+B. The parties' arguments on those claims are addressed elsewhere in this opinion.

[148] D.I. 195, Stip. Fact 7; *id.* Stip. Fact 12.

[149] D.I. 213 at 1.

breached their contracts by failing to meet their respective reporting requirements.[150] W-T and R+B contend DSU's breach of contract claim fails due to the lack of expert testimony showing they breached their respective professional standards of care and/or the evidence shows each fulfilled their contractual obligations, or that questions of fact preclude summary judgment in favor of DSU.[151]

The specific contracts, documents, and provisions relevant to the parties' motions follow.

On R+B January 20, 2012, DSU and R+B entered into a contract titled **AIA® Document B132™–2009,** *Standard Form of Agreement Between Owner and Architect, Construction Manager as Advisor Edition*) ("DSU-R+B Contract").[152] Pursuant to its contract, R+B prepared the Design Drawings for the Panel Wall System designated as "100% Construction Documents."[153]  R+B also prepared the specification for the Panel Wall System, entitled "Specification 07435–INSULATED METAL WALL PANELS" (Addendum 3, 11/14/2013) ("Specification 07435").[154]  Section 1.6.A of Specification 07435 requires that the approved manufacturers possess certain qualifications and experience.

> Manufacturer's Qualifications:  Company specializing in manufacturing of all required aspects of insulated metal panel production.
>
> > 1.    No less than 10 years' experience in the actual production of specified products,

---

[150] *Id.*
[151] D.I. 210; D.I. 229; D.I. 204; D.I. 226.
[152] D.I. 195, Stip. Fact 7; D.I. 243-1, Stip. Ex. 47 (R+B Contract).
[153] D.I. 243-1, Stip. Ex. 7 (Design Drawings A11.1 through A11.3.).
[154] *Id.*, Stip. Ex. 3.

2.      Third party certification of Quality Control program and materials utilized, in compliance with rigid factory guidelines, which includes quarterly unannounced inspections by independent testing laboratories, capable of providing reports directly to code authority.

3.      Successfully completed not less than 100 comparable scale projects using this system.

4.      Company specializing in manufacturing factory continuous lamination of insulated metal panels with a minimum documented experience of ten years.

5.      Company specializing in on site manufacturing rigid foam insulation for the purpose of insulated metal panels with a minimum documented experience of ten years.[155]

Provisions of the DSU-R+B Contract relevant to the parties' motions include the following:

R+B's contract required it to oversee the services provided by other contractors, and to coordinate with those contractors and DSU as the Owner.

Section 2.3 provides:

The Architect shall provide its services in conjunction with the services of a Construction Manager as described in AIA Document C132 ™–2009, Standard Form of Agreement Between Owner and Construction Manager. The Architect shall not be responsible for actions taken by the Construction Manager.[156]

Pursuant to § 3.1.2:

The Architect shall coordinate its services with those services provided by the Owner, the Construction Manager and the Owner's other consultants. The Architect shall be entitled to rely on the accuracy and completeness of services and information furnished by the Owner, the Construction Manager, and the Owner's other consultants. *The Architect shall provide*

---

[155] *Id.*, Stip. Ex. 3 at DSU_006179-80.
[156] *Id.*, Stip. Ex. 47 § 2.3.

36

*prompt written notice to the Owner if the Architect becomes aware of any error, omission or inconsistency in such services or information.*[157]

DSU argues that although § 3.1.2 entitles R+B to rely on the accuracy of information provided by others, it is required to report known errors, omissions, and deficiencies in the work or submittals to DSU.[158]

R+B was required to provide "construction phase services," including conducting periodic site visits, and keeping DSU as Owner reasonably informed about the quality and progress of the Work.

Section 3.6.2.1 provides:

The Architect shall visit the site at intervals appropriate to the stage of construction . . . to become generally familiar with the progress and quality of the portion of the Work completed, and to determine, in general, if the Work observed is being performed in a manner indicating that the Work, when fully completed, will be in accordance with the Contract Documents. . . .  On the basis of the site visits, the Architect shall keep the Owner reasonably informed about the progress and quality of the portion of the Work completed, and report to the Owner and the Construction Manager (1) known deviations from the Contract Documents and from the most recent construction schedule, and (2) defects and deficiencies observed in the Work.[159]

DSU states R+B was required to review all submittals, including engineering submittals made by other contractors under any so-called "performance specifications."[160]

---

[157] *Id.*, Stip. Ex. 47 § 3.1.2 (emphasis added); *see also id.*, Stip. Ex. 47 § 3.1.1 ("The Architect shall manage the Architect's services, consult with the Owner and the Construction Manager, research applicable design criteria, attend Project meetings, communicate with members of the Project team and report progress to the Owner.").

[158] D.I. 213 at 4.

[159] D.I. 243-1, Stip. Ex. 47 § 3.6.2.1.

[160] D.I. 213 at 4.

Section 3.6.4.2 specifies:

[The] Architect shall review and approve or take other appropriate action upon the Contractor's submittals such as Shop Drawings, Product Data and Samples, but only for the limited purpose of checking for conformance with information given and the design concept expressed in the Contract Documents.  Review of such submittals is not for the purpose of determining the accuracy and completeness of other information such as dimensions, quantities, and installation or performance of equipment or systems, which are the Contractor's responsibility.[161]

In addition to R+B's obligation to report nonconforming or defective work to DSU, R+B had authority to reject such work, and an obligation to notify DSU of any rejection.[162]

Section 3.6.2.2 states:

The Architect has the authority to reject Work that does not conform to the Contract Documents and shall notify the Construction Manager about the rejection.[163]

Finally, R+B was required to perform its work according to the applicable professional standard of care, and was responsible for its own breaches of that standard.[164]

Section 2.2 provides:

The Architect shall perform its services consistent with the professional skill and care ordinarily provided by architects practicing in the same or similar locality under the same or similar circumstances.[165]

---

[161] D.I. 243-1, Stip. Ex. 47 § 3.6.4.2.
[162] D.I. 213 at 4 (citing D.I. 243-1, Stip. Ex. 47 § 3.6.2.2; D.I. 243-17 (Kennedy Dep.) at 206-07).
[163] D.I. 243-1, Stip. Ex. 47 §  3.6.2.2.
[164] D.I. 213 at 5 (citing D.I. 243-1, Stip. Ex. 47 §§ 2.2, 3.6.1.2).
[165] D.I. 243-1, Stip. Ex. 47 § 2.2.

Section 3.6.1.2 recites:

> The Architect shall be responsible for the Architect's negligent acts or omissions, but shall not have control over or charge of, and shall not be responsible for, acts or omissions of the Construction Manager, or the Contractor or of any other persons or entities performing portions of the Work.[166]

On January 12, 2012, DSU and W-T entered into a contract titled **AIA®**

**Document C132™ – 2009,** ***Standard Form of Agreement Between Owner and***

***Construction Manager as Adviser***; **AIA® Document A232™ – 2009,** *General*

*Conditions of the Contract for Construction*, *Construction Manager as Adviser*

*Edition*; and Section 00730–SUPPLEMENTARY GENERAL CONDITIONS TO THE

CONTRACT ("DSU-W-T Contract").[167]  DSU asserts, as it does with respect to the

DSU-R+B Contract, that the DSU-W-T contract obligated it to oversee the work of other

contractors and to coordinate communications and services with those contractors and

DSU as the Owner.[168]  According to DSU, W-T required all project communications flow

through it as the Construction Manager.[169]

Provisions of the DSU-W-T Contract relevant to the parties' motions include the

following:

Section 3.3.19 of W-T's contract provides:

The Construction Manager shall promptly review all Shop Drawings,

---

[166] *Id.*, Stip. Ex. 47 § 3.6.1.2.
[167] D.I. 195, Stip. Fact 12; D.I. 243-3, Stip. Ex. 94 (DSU-W-T contract); D.I. 243-1, Stip. Ex. 48 (General Conditions); D.I. 243-3, Stip. Ex. 140 (Section 00730).
[168] D.I. 213 at 5.
[169] *Id.* (citing D.I. 243-12 (George Dep.) at 157-58; D.I. 243-17 (Kennedy Dep.) at 166-67 & 175-76; D.I. 243-11 (Thomas Dep.) at 243; D.I. 243-7 (Ashford Dep.) at 22; D.I. 243-13 (Bartlett Dep.)).

Product Data, Samples and other submittals from the Multiple Prime Contractors for compliance with the submittal requirements of the Contract, coordinate submittals with information contained in related documents, and transmit to the Architect those that the Construction Manager recommends for approval.[170]

Pursuant to § 3.3.9:

The Construction Manager shall endeavor to obtain satisfactory performance from each of the Multiple Prime Contractors.  The Construction Manager shall recommend courses of action to the Owner when requirements of a Contract are not being fulfilled.[171]

As with R+B's contract, § 3.3.14 of W-T's contract required W-T to report defects

and deficiencies in any of the Work to DSU, and any rejection of nonconforming work.

*The Construction Manager shall determine in general that the Work of each Contractor is being performed in accordance with the requirements of the Contract Documents and notify the Owner, Contractor and Architect of defects and deficiencies in the Work.*  The Construction Manager shall have the authority to reject Work that does not conform to the Contract Documents and shall notify the Architect about the rejection.[172]

Finally, W-T's contract contains a parallel provisions to R+B's contract requiring

W-T to perform its work according to the applicable professional standard of care, and

that W-T was responsible for its own breaches of that standard.

---

[170] D.I. 243-3, Stip. Ex. 94 § 3.3.19; *see also id.*, Stip. Ex. 94 § 3.2.5 (requiring W-T to "review design documents during their development and advise the Owner and Architect on proposed site use and improvements, selection of materials, and building systems and equipment.  The Construction Manager shall also provide recommendations to the Owner and Architect on constructability . . . ."); *id.*, Stip. Ex. 94 § 3.2.8 (providing that "Construction Manager shall consult with the Owner and Architect and make recommendations whenever the Construction Manager determines that design details adversely affect constructability, cost or schedules."); *see also* D.I. 243-12 (George Dep.) at 90-91, 252-53 (acknowledging that W-T's review of submittals was for the purpose of ensuring their conformance with the Contract Documents and design).

[171] D.I. 243-3, Stip. Ex. 94 § 3.3.9.

[172] *Id.*, Stip. Ex. 94 § 3.3.14 (emphasis added).

Section 2.2 provides:

The Construction Manager shall perform its services consistent with the skill and care ordinarily provided by construction managers practicing in the same or similar locality under the same or similar circumstances.[173]

Section 3.3.15 states:

The Construction Manager shall be responsible for the Construction Manager's negligent acts or omissions, but shall not have control over or charge of, and shall not be responsible for, acts or omissions of the Contractor or Multiple Prime Contractors, Subcontractors, or their agents or employees, or any other persons or any other persons or entities performing portions of the Work.[174]

## II.     GOVERNING LAW–DSU, W-T, and R+B Cross-Motions for Summary Judgment on DSU's Count I (Breach of Contract)

To prove a breach of contract claim, the plaintiff must show:  (1) the existence of a contract, (2) breach of the an obligation imposed by that contract, and (3) the resultant damage to the plaintiff.[175]

Where professional negligence is the basis for a breach of contract claim, expert testimony is generally required to establish the standard of care applicable to that professional.[176]  In *Seiler*, the Delaware Supreme Court explained:

As a general rule the standard of care applicable to a professional can only be established by way of expert testimony.  *See Christian, supra.* However,

". . . if a layman is as competent as an expert to judge whether or not a particular design created an unusual risk, evidence by experts

---

[173] *Id.*, Stip. Ex. 94 § 2.2.
[174] *Id.*, Stip. Ex. 94 § 3.3.15.
[175] *VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 612 (Del. 2003) (citations omitted).
[176] *See Seiler v. Levitz Furniture Co. of Eastern Region, Inc.*, 367 A.2d 999, 1008 (Del. 1976) (citation omitted).

is inadmissible because their proof that the defendant followed standard practice would not necessarily show he was not negligent."  Comment, Architect Tort Liability In Preparation of Plans and Specifications, 55 Cal. L .Rev. 1361, 1364 (1967) (citations omitted).

That exception is consistent with the law of this State.  *Larrimore v. Homeopathic Hospital Ass'n of Del.*, Del. Supr., 4 Storey 449, 54 Del. 449, 181 A.2d 573 (1962).[177]

## III.   POSITIONS OF THE PARTIES –DSU, W-T, and R+B Cross-Motions for Summary Judgment on DSU's Count I (Breach of Contract)

DSU contends the undisputed facts demonstrate R+B and W-T materially

breached the clear and unambiguous terms of their respective contracts with DSU.[178]

DSU argues it is entitled to summary judgment in its favor because:

1.  As the Architect of Record and Construction Manager, R+B and W-T, were each obligated by their respective contracts to notify DSU of material errors, omissions, inconsistencies and defects in any of the work.

2.  As the Architect of Record, R+B was contractually obligated to prepare Design Drawings and Specification 07435 for the Panel Wall System.  In that capacity, R+B incorrectly approved PFF as a panel manufacturer without conducting any due diligence regarding whether the company or its product was

---

[177] *Id.*; *see also Brown v. Interbay Funding, LLC*, 417 F. Supp. 2d 573, 579 (D. Del. 2006) ("To state a claim for professional negligence, . . . , the standard of care applicable to a professional can only be established through expert testimony.") (citations omitted).  "Common law has created a local standard of care for professionals in which the fact finder evaluates whether the actions of the professional conform to the profession's standards of skill, care and competence, as adhered to by professionals who are in good standing in the community."  *Norfleet v. Mid-Atlantic Realty Co., Inc.*, No. Civ.A 95C-11-008WLW, 2001 WL 695547, at *5 (Del. Super. Apr. 20, 2001) (citing *Seiler*, 367 A.2d at 1007).  "Delaware has recognized professional negligence causes of action [against] lawyers, doctors, accountants, architects, engineers, insurance agents, and massage therapists . . . ."  *Verition Partners Master Fund, Ltd. v. Cornell*, C.A. No. 19-377-CFC, 2020 WL 2917258, at *4 (D. Del. June 3, 2020) (listing cases).  DSU does not appear to dispute the status of either W-T or R+B as "professionals" in the context of their contractual obligations.

[178] D.I. 213 at 2.

suitable for this application.

3.  Both R+B and W-T were on express notice that the PFF product was unsuitable for the specified application, but failed to either notify DSU of that fact or select another product.

4.  Both R+B and W-T repeatedly failed to notify DSU of material errors, omissions, inconsistencies and defects in the design, engineering, fabrication, and performance of the Panel Wall System.  R+B and W-T's failure to notify DSU constitutes a material breach of their respective contracts.[179]

R+B's opposition to DSU's affirmative motion, and its own affirmative motion, states R+B has a specialized "industry" contract with DSU which requires DSU to provide an expert opinion on industry customs and standards to assist the court in interpreting its contract, and determining whether R+B met the relevant standard of care before any legal conclusions can be rendered.[180]  Absent expert testimony, R+B maintains DSU cannot establish its *prima facie* case and, therefore, DSU's motion must be denied, and R+B's motion granted.[181]  R+B also argues there is no evidence of non-performance to support DSU's breach of contract claim.[182]  R+B contends, however, that even if DSU could prove its contract required R+B to do something it did not do, there is no evidence that any such failure to perform a contractual requirement caused any of the alleged damages.[183]

---

[179] *Id.*
[180] D.I. 226 at 1-2; D.I. 204 at 9-15.
[181] D.I. 226 at 2; D.I. 204 at 9-15.  In its Counter-Statement of Facts opposing DSU's affirmative motion, R+B emphasizes it is not asking the court to make findings of fact or accept R+B's, or W-T's, factual presentations as true; rather, R+B argues disputed facts are an additional reason that precludes summary judgment in DSU's favor.  D.I. 226 at 2 n.1.
[182] D.I. 204 at 15-16.
[183] *Id.* at 16.

43

W-T similarly argues DSU's motion must be denied for lack of expert testimony showing it breached the relevant standard of care, and/or because neither the facts nor its contract entitle DSU to judgment.[184]  W-T's affirmative motion asserts it is entitled to summary judgment on DSU's breach of contract clam because its contract contains specific disclaimers as to liability for actions of the architect (R+B) or the panel wall contractor (TCI), and reiterates that DSU's expert is not qualified to opine as to W-T's purported liability.[185]  Moreover, W-T contends evidence demonstrating it *did* perform its contractual obligations shows it is entitled to summary judgement.[186]  Separately, W-T argues that if DSU's breach of contract claim moves forward, it is entitled to summary judgment that the damages DSU seeks are excessive and must be limited to the cost of replacing the buckled panels with the same type of panels that were originally installed.[187]

## IV.   DISCUSSION–DSU, W-T, and R+B Cross-Motions for Summary Judgment on DSU's Count I (Breach of Contract)

According to W-T, DSU's corporate designee, J.D. Bartlett, testified that the following is a comprehensive list of its allegations pertaining to W-T:

> failed to perform its services consistent with the skill and care ordinarily provided by construction managers practicing in the same or similar locality in breach of § 2.2 of the Contract;
>
> failed to adequately review the design and construction documents or submittals and shop drawings, and advise DSU of the effectiveness and constructability of the panel wall system in breach of §§ 3.2.5, 3.2.8 and

---

[184] D.I. 229 at 1.
[185] D.I. 210 at 1.
[186] *Id.* at 2.
[187] *Id.* at 15-18.

3.3.19 of the Contract;

failed to notify DSU in a timely manner of these defects, as well as defects noted in the panels themselves such as buckling, folding, oil-canning and other material defects in the exterior surface of the panels;

failed to provide adequate onsite administration of the Contract or to properly inspect the panel wall system installed for the Project, and failed to identify material defects in the panel wall, including but not necessarily limited to the installer's failure to cut "V Channels" in the panels, which was not in compliance with the drawings, shop drawings, and/or specifications;

failed to ensure that the panel wall system was fabricated and installed in a nondefective and workmanlike fashion such that it did not suffer the material defects identified in the Complaint;

failed to properly monitor the performance of the parties fabricating and installing the panel wall system to ensure compliance with the Contract Documents, and failed to properly advise and consult with DSU in breach of §§ 3.3.3, 3.3.9, 3.3.14, 3.3.15, and 3.3.24; and

failed to stop the Work in order to address these material defects and issues in a  timely manner as it had the ability to do under the terms of the Contract Documents.[188]

DSU and W-T each argue summary judgment should be granted and/or denied

in their respective favors as to some, or all, of these allegations.

R+B sets forth the following averments against it from the TAC:[189]

---

[188] D.I. 210 at 2-3 (citing D.I. 243-13 (Bartlett Dep.) at 54:21-55:3; D.I. 243-3, Stip. Ex. 141, Ans. and Supp. Ans. 4 and 5; D.I. 180-2 ¶¶ 44-46, 55).

[189] D.I. 204 at 2-3.  With the exception of the title of R+B's Contract, R+B provided the emphasized terms in the following quoted paragraphs which it contends pertain to its performance and subjective determinations as a licensed architect that must be determined according to the standard of care.  D.I. 204 at 2 n.1.  R+B stresses this is the point of its motion:  to sustain the claims against R+B, expert opinion is required that identifies the standard of care, how R+B failed to meet it, and how that failure caused damages.  *Id.*  R+B asserts the claims cannot be sustained for lack of the required expert opinion.  *Id.*

a)  On January 20, 2012, DSU and the architectural firm Richärd+Bauer entered into that certain **AIA® Document B132™ -- 2009, Standard Form of Agreement Between Owner and Architect,** *Construction Manager as Advisor Edition* (the "Design Management Agreement") . . .;[190]

b) The . .  Agreement obligated R+B to **provide construction plans and specifications** . . .;[191]

c) . . . further obligated R+B to provide "construction phase services," including periodic **inspections** . . ., **evaluation** of the work performed during each phase and the provision of notice and information to DSU . . .;[192]

d) . . . was contractually obligated to conduct at least thirty-six (36) separate inspections . . . for the express purpose of particularly familiarizing itself with the progress and quality of the work performed, and **specifically determining** that **such work was performed in a manner consistent with** the . . . its plans, specifications, product recommendations and approvals;[193]

e) . . . obligated R+B to keep DSU **reasonably** informed regarding the quality of the work performed and to report any deviations from the contract documents or any defects or deficiencies observed in the performance of the work [(*See* § 3.6.1.2)];[194]

f) . . . obligated R+B to **review and approve** all shop drawings and submittals for the purpose of **determining** their conformity or nonconformity with the plans and specifications . . .;[195]

g) . . . obligated R+B to "perform its services **with the professional skill and care ordinarily provided by architects practicing in the same or similar locality** under the same or similar circumstances."  (§ 2.2, at p. 6)

---

[190] D.I. 180-2 ¶ 16.  R+B objects to the TAC's use of the term "Design Management Agreement" because the contract is not so named and this term does not appear in the contract.  D.I. 204 at 2 n.2.

[191] D.I. 180-2 ¶ 17.

[192] *Id.* ¶ 18.

[193] *Id.* ¶ 19.

[194] *Id.* ¶ 20.

[195] *Id.* ¶ 21.

[of **Exh. 47**]);[196]

h) The defects are due . . . to *flaws in the design and specifications prepared and approved by* R+B for the Project.  R+B failed to *adequately research* and specify panels that would not result in the defects experienced by the system as installed;[197]

i) The defects are also due . . . to R+B's failure to fulfill its . . . duties **(a)** to *inspect and report* on all design, specification, fabrication and installation defects as required; **(b)** to provide DSU with ongoing and *appropriate* information regarding the nonconforming work; and **(c)** to reject the nonconforming work;[198]

j) . . . R+B also failed to *review and properly approve or reject* relevant shop drawings, product data, samples and other submittals . . . for compliance . . . and to report to DSU regarding any deficiencies . . .;[199]

k) Defendants' *various defective performances*, either individually or in conjunction with each other, directly and proximately caused a defective and nonconforming panel wall system to be installed at the OSCAR;[200] and

l) The panel wall system is failing and will cost DSU millions of dollars to remediate, and will cause damages to the existing structure and other property as a result of remediation.[201]

DSU and R+B each argue summary judgment should be granted and/or denied in their respective favors as to some, or all, of these allegations.

Before delving into the relevant facts cited in support of the parties' respective positions on the merits, the court must address the threshold issue of whether expert testimony is required to support DSU's breach of contract claims against R+B and W-T.

---

[196] *Id.* ¶ 22.
[197] *Id.* ¶ 36.
[198] *Id.* ¶ 42.
[199] *Id.* ¶ 43.
[200] *Id.* ¶ 46.
[201] *Id.* ¶ 47.

DSU alleges W-T and DSU breached distinct provisions of their respective contracts.  In response to defendants' affirmative motions, DSU accuses defendants of lumping all their alleged breaches into one amalgam to argue a professional negligence standard of care applies to all.[202]  In opposition to that tactic, DSU asserts the standard of professional care applicable to claims founded on negligent conduct does not apply to commonplace breaches that are based on clear and unambiguous terms, i.e., defendants' obligation to report known errors, omissions, and defects in the work to DSU.[203]  Relatedly, DSU maintains even if a negligence standard was applicable to defendants' alleged breaches of their reporting obligations, expert testimony is not required because those breaches are so clear and obvious they fall within the common knowledge of a lay juror.[204]  For this related argument, DSU contends the facts of *Seiler* are analogous to those here and demonstrate the common knowledge exception is applicable to defendants' breaches.

At issue in *Seiler* was an architect's negligent design plans and specifications for a furniture store which failed to account for potential flooding.[205]  In defense to the plaintiff furniture store's allegation of negligence, the architect argued, *inter alia*, that "expert testimony was required to establish the standard of care to which he was bound."[206]  The Delaware Supreme Court rejected the argument and affirmed the trial

---

[202] D.I. 231 at 5.

[203] *Id.* at 5-8.

[204] *Id.* at 8-15.

[205] *Seiler v. Levitz Furniture Co. of Eastern Region, Inc.*, 367 A.2d 999, 1001-02 (Del. 1976).

[206] *Id.* at 1006.


court's finding against the architect: "the Trial Judge concluded that Seiler's mistake was so apparent that plaintiff was not obliged to produce expert testimony at trial to establish the bench mark by which his standard of care is measured. We agree."[207] The *Seiler* court reasoned:

> In the final analysis Seiler, by his own testimony, admitted that an investigation as to the possibility of flooding was necessary; he went on to say that he had investigated that possibility. The crux of the Superior Court decision is that in such investigation Seiler was "put on notice" that flood waters had topped Naamans Road on previous occasions and that he failed to design the warehouse accordingly. *Id.* at 1008.

Based on those facts, the Supreme Court held "[t]here is evidence to support the conclusion that Seiler knew or should have known of the flooding potential of the area and in accordance with settled law, we affirm it."[208]

DSU maintains that, to the extent a professional standard of care is applicable, the court's reasoning in *Seiler* governs the determination of whether the common knowledge exception applies here.[209]

DSU also cites *Jaeger v. Henningson, Duncan & Richardson, Inc.*[210] for the proposition that, in addition to their fundamental failure to report known errors and omissions, Federal law equally provides that defendants' failure to correct those errors

---

[207] *Id.* at 1008.

[208] *Id.* at 1009.

[209] D.I. 231 at 9.

[210] 714 F.2d 773, 775 (8th Cir. 1983).  In *Jaeger*, the Eighth Circuit applied South Dakota law on the issue of an architect's liability.  *Id.* (citations omitted).  As did *Seiler*, the Eighth Circuit observed that issue generally requires expert testimony, but noted the existence of a "common knowledge" exception that "permits juries to pass on issues of negligence that do not require a knowledge of professional skills."  *Id.* (citation omitted).

does not require expert testimony.[211]  There, plaintiffs alleged the project architect

"negligently failed to detect and correct the shop drawings providing for a 14-gauge

steel stairway landing pan" where the architect's design drawings and specifications

required a 10-gauge steel landing pan.[212]  The contract at issue required the architect to

review and approve certain drawings and submissions for conformance with other

documents;

> The Architect shall review and approve shop drawings, samples, and
> other submissions of the Contractor only for conformance with the design
> concept of the Project and for compliance with the information given in the
> Contract Documents.[213]

> Discussing the architect's failure to detect and correct an incorrect gauge of steel

on the shop drawings, the *Jaeger* court held:

> There is nothing so highly technical about the facts of this case which is
> not within the common experience or understanding of the average
> laymen.  The specifications called for the landing pans to be made from
> 10-gauge steel with angle stiffeners as required.  The shop drawing,
> however, provided that the landing pan in question should be made from
> 14-gauge steel without angle stiffeners or supports.  Moreover, we
> observe that there was expert testimony supporting the view that had the
> pan been built with 10-gauge steel and angle stiffeners, it would not have
> collapsed under circumstances similar to those of the accident in this
> case.[214]

The Eighth Circuit, therefore, concluded the action against the architectural firm was

one for negligent failure to supervise the shop drawings, and because a jury of lay

persons could determine whether failure to supervise an employee was negligent, the

---

[211] D.I. 231 at 13.
[212] *Jaeger*, 714 F.2d at 775.
[213] *Id.* at 775.
[214] *Id.* at 776.

case did not require expert testimony on the appropriate standard of care.[215]

DSU contends the provision in *Jaeger* is substantively the same as the review and approval requirements in R+B and W-T's respective contracts.[216]  Like *Jaeger*, DSU maintains the gravamen of the complaint against W-T and R+B is that they failed to (i) review and approve submittals from TCI for conformance with the contract documents or (ii) supervise its work and shop drawings to ensure that they conformed.[217]  DSU asserts the submittals and the shop drawings failed to conform to the contract documents in two material respects admitted by both defendants:  (1) no one provided the engineering of the panels for thermal loads required by R+B's Specification; and (2) the shop drawings omitted the V-Channels required not only by the design drawings but also PFF's Product Data.[218]

Lastly, DSU contends "as to the breaches *that do involve the application of a professional standard of care*, the expert opinion and testimony of Dannettel and his team are sufficient to present a genuine issue of material fact to the jury."[219]  In that regard, and specifically in response to defendants' cross-motions, DSU states there is a

---

[215] *Id.*  The court emphasized its previous distinction between actions against architects for negligence-in-preparing plans and actions for negligence-in-supervising plans, with only the former typically requiring expert testimony.  *Id.* (citations omitted). Because it found the gravamen of the complaints was a failure to supervise the shop drawings pursuant to the contract and that negligence was the proximate cause of plaintiffs' injuries, the court determined expert testimony on the appropriate standard of care was not required.  *Id.*
[216] D.I. 231 at 13 (citing D.I. 243-1, Stip. Ex. 47 (R+B Contract)  § 3.6.4.2; D.I. 243-3, Stip. Ex. 94 (W-T Contract) §§ 3.2.5 & 3.3.19).
[217] D.I. 231 at 14-15.
[218] D.I. 231 at 15.
[219] *Id.* at 2 (emphasis added); *id.* at 15-24.

dispute of fact as to whether the Specifications provided for a "delegated design" that absolves R+B of its obligations for the Panel Wall System.[220]  DSU asserts Dannettel's expert opinion explains "the engineering and design standards required to properly account for *the single most important issue resulting in the defects in these panels*."[221]

As to the additional allegations subject to defendants' motions that require expert testimony, DSU avers "[t]he report discusses ALL of the Defendants' failures to address thermal loads, comprehensive engineering, sufficient validation and verification of issues, and several other duties, as well as the facts showing that Defendants' deficient performance was the proximate cause of the resulting defects."[222]  DSU specifically references the sections of Dannettel's Report opining as to specific breaches by defendants of various standards of care and duties governing their performance,[223] as

---

[220] D.I. 231 at 2.

[221] *Id.* (emphasis added).  DSU emphasizes that separate from the question of whether the design was delegated to TCI or not, defendants' *failure to notify* DSU that no one was engineering the panels is the basis for its summary judgment motion.  *Id.* at 32-33 ("Even assuming the responsibility to design these panels properly was on [TCI's] shoulders, Defendants were on notice that [TCI] failed to fulfill that obligation.").

[222] *Id.* at 2.

[223] *Id.* at 15-16 (citing D.I. 243-3, Stip. Ex. 147 §§ 4.0-4.3).  DSU also singles out allegations that W-T lists in its opening brief as requiring expert testimony.  *Id.* at 2 (citing D.I. 210 at 13-14 (W-T arguing expert testimony was required on the following allegations but, even if the Motion to Strike was denied, the evidence shows that:  (1) W-T was not contractually obligated to require R+B provide documentation to demonstrate the Panel Wall System's suitability and fitness for use on the OSCAR Facility, because it had no design obligations; (2) W-T was not contractually obligated to identify the methods available to contract the exterior wall panel work, or to evaluate and determine whether the exterior wall panel work could effectively be executed as a delegated design contract; (3) W-T was not contractually obligated to prequalify the exterior wall panel contract bidders because DSU did not specify that any bidders had to be qualified under Chapter 69 of Title 29 of the Delaware Code; (4) W-T fulfilled confirmed at the descope meeting, and through further consultation, that TCI:  (a) was a responsive and responsible bidder qualified to perform the work; (b) bid to perform the

---

well as Dannettel's deposition testimony explaining his opinions.[224]

The court addresses the last category first, i.e., the allegations DSU identifies as presenting questions of fact in light of Dannettel's opinions expressed in his expert report. Because the court granted the Motion to Strike, no admissible evidence is available to create a question of fact it as to those allegations. Thus, summary judgment is granted in favor of R+B and W-T on those allegations.

With respect to DSU's allegation that R+B and W-T breached § 2.2 of their respective contracts, it is clear expert testimony is required to describe the relevant professional standards of care and how each defendant breached that standard. Section 2.2 provides that each defendant "shall perform its services *with the professional skill and care ordinarily provided by [architects/construction manages] practicing in the same or similar locality under the same or similar circumstances.*"[225] DSU's corporate designee testified DSU intended to rely solely on its expert report to support its claim that W-T breached § 2.2 of its contract.[226] In light of the court's grant of the Motion to Strike, the court grants W-T's motion for breach of contract with respect

---

entire contract, including the work outlined in Specification 07435; and (c) reviewed and understood the technical requirements of the drawings and specifications; (5) W-T clearly indicated in TCI's Scope of Work that TCI was responsible for all of the work and engineering delegated in the Specification; (6)  W-T took the necessary steps to ensure TCI and its subcontractors provided Panel engineering for the specific engineering lapses identified by R+B, and despite TCI's attempts to disclaim responsibility therefore; and, (7) W-T addressed the absence of V-Channels in TCI's shop drawings before TCI began installing any panels on the project, and provided R+B with TCI's response)).

[224] D.I. 231 at 18-23.

[225] *See* D.I. 243-1, Stip. Ex. 47 § 2.2; D.I. 243-3, Stip. Ex. 94 § 2.2 (emphasis added).

[226] D.I. 243-13 (Bartlett Dep.) at 81:3-22.

to § 2.2 and denies DSU's motion on this section.  For the same reason, R+B's motion is granted, and DSU's motion is denied, as to R+B's alleged breach of § 2.2.[227]

The court also addresses another specifically-alleged provision of R+B's contract to illustrate the legal support for the court's grant of summary judgment to R+B and W-T on each of the alleged breaches for which DSU relies on Dannettel's Report and testimony for support.  Section 3.6.2.1 of R+B's Contract require it perform "construction phase services," including periodic inspections of the work performed, to determine whether such work was performed in a manner consistent with the plans and specifications, and to keep DSU "*reasonably* informed" and report any deviations from the contract documents or any defects or deficiencies observed.[228]  R+B states there is no standard of care opinion on what its site visit inspections include, on what constitutes keeping DSU "reasonably" informed, and on what an architect would consider to be a deviation from the "performance specification" (delegated design) level plans and specifications.[229]

DSU responds that § 3.6.2.1 is not the section upon which *its* summary judgment motion is based, and reiterates that its motion against R+B is based on § 3.1.2, which does not contain the "reasonably" informed caveat; § 3.1.2 mandates the "Architect shall provide prompt written notice to the Owner if the Architect becomes aware of any

---

[227] *See* D.I. 180-2 ¶ 22 ("The Design Management Agreement obligated Richärd+Bauer to 'perform its services with the professional skill and care ordinarily provided by architects practicing in the same or similar locality under the same or similar circumstances.' (*See* [D.I. 243-1, Stip. Ex. 47] § 2.2[]).").

[228] D.I. 204 at 12 (citing D.I. 243-1, Stip. Ex. 47 § 3.6.2.1 (emphasis added)).

[229] *Id.*

54

error, omission or inconsistency in such services or information."[230]  In opposition to

R+B's affirmative motion on § 3.6.2.1, DSU contends that keeping the owner

"reasonably" informed regarding the work is not so highly technical and complex that it

requires exert testimony.[231]

R+B's reliance on the Delaware Superior Court's decision in *Oliver v. Bancroft

Const. Co.*,[232] applying *Seiler*, provides persuasive rebuttal to DSU's argument.  In

*Oliver*, the plaintiff tripped over the side of a newly-constructed concrete ramp, and was

injured.[233]  The parties opposing the relevant defendants' motions for summary

judgment argued:

> *[N]umerous provisions in the relevant contracts* demonstrate that the
> architectural firms assumed *oversight duties* for the project.  Additionally,
> it was the responsibility of the architects to respond to the construction
> manager's design questions, to *inspect* the renovations, and *to ensure
> that each phase of the construction process had been completed correctly
> as designed*.  Thus, they contend, if the ramp was not installed as
> originally designed, or if the ramp was negligently designed, the architects
> are liable. . . .[234]

No expert opined that either architect breached the applicable standard of

care.[235]  The court explained its finding that expert testimony was required to assist the

fact finder interpret the relevant contract provisions as follows:

> Certain terms are beyond the comprehension of lay persons.  For
> example, although the contracts may require the architect to *inspect* the
> project, *only an expert can provide guidance as to how often inspections*

---

[230] D.I. 231 at 7.
[231] *Id.* at 7-8.
[232] C.A. No. 09C-05-174-MMJ, 2011 WL 5042389 (Del. Super. Oct. 21, 2011).
[233] *Id.* at *1.
[234] *Id.* (emphasis added).
[235] *Id.* at *2.

> *are to be made, as well as the nature and extent of any inspection*.
>
> Even if plaintiff . . . can demonstrate that the architects had, or should have had, notice of the allegedly defective condition of the ramp, expert testimony is necessary to establish the professional standard of care.  *A lay person is unqualified to determine whether and when the architect should have been on notice, and what steps the architect may have been required to take to rectify the situation*.
>
> Other issues in this case are *whether the design was defective*, or *whether the construction was completed in accordance with the plans* prepared by the architect.  Again, these question require standard-of-care expert testimony.  *It is beyond the ability of an unassisted lay person to ascertain who is responsible for interpretation of design plans and how any construction professional should interpret the architect's design*.[236]

Because no expert opined that either architect breached any professional architectural standard of care, or that any alleged breach caused the injury, the court granted the architects' motion and dismissed the claims against them with prejudice.[237]

Here, the *Oliver* decision leads to court to conclude expert testimony is necessary to show R+B breached its professional standard of care with respect to § 3.6.2.1 of R+B's Contract.[238]  Because there is no admissible expert testimony to make that showing, R+B's motion for summary judgment is granted.  Section 4.2.3 of the Supplementary General Conditions to W-T's Contract contains similar language requiring W-T to keep DSU "reasonably informed" of certain deviations, defect, and deficiencies.[239]  To the extent DSU's breach of contract claim is based on that section, it

---

[236] *Id.* (emphasis added).

[237] *Id.* at *3.

[238] The court notes DSU does not make any attempt to distinguish *Oliver*, or otherwise argue why its reasoning does not apply to the contracts at issue here.

[239] D.I. 243-1, Stip. Ex. 48 § 4.2.3 ("The Construction Manager will determine *in general* if the Work observed is being performed *in accordance with the Contract* Documents will keep the Owner *reasonably informed* of the progress of the Work, and

56

is also dismissed for lack of expert testimony showing W-T breached its professional standard of care with respect to that provision.

Based on the above reasoning, and DSU's position that Dannettel's testimony and report raises questions of fact precluding a grant of R+B and W-T's motions, the court grants summary judgment in favor of R+B and W-T on their alleged breaches of contract that DSU avers are shown through Dannettel's now-stricken Report and testimony.  Those allegations are specifically found in §§ 4.3.1 (R+B) and 4.3.3 (W-T) of the Thornton Tomasetti Report, and examples from Dannettel's deposition testimony cited by DSU that purportedly demonstrate defendants' negligent acts.[240]

The court next turns to the category of breaches DSU contends does not require expert testimony, i.e., commonplace breaches of clear and unambiguous terms, or are within the common knowledge exception whereby a lay person would understand the alleged breach without the assistance of expert testimony.

DSU asserts expert testimony regarding a negligent breach of a standard of care is not required for every commonplace breach of contract.[241]  As to those breaches of contract, DSU argues defendants cannot impose an additional professional negligence standard where negligence is not the basis of the claim or defendants' liability.[242]  As an example of such breach, DSU posits that if a contractor fails to pay subcontractors, an

---

will report to the Owner and Architect (I) known deviations from the Contract Documents and the most recent Project schedule and (2) defects and deficiencies observed in the Work.") (emphasis added).

[240] *See* D.I. 243-3, Stip. Ex. 147 §§ 4.3.1, 4.3.3; D.I. 231 at 15-16, 18-23.
[241] D.I. 231 at 6.
[242] *Id.* at 1.

owner is not required to prove that it breached this straightforward obligation but also that it somehow breached a duty of care by doing so.[243]

DSU places W-T and R+B's alleged breaches of what it describes as the clear an unambiguous notice requirements in their contracts into the category not requiring additional proof that defendants "negligently" failed to provide any notice at all to DSU. DSU relies on the following specific sections from each defendants' contract requiring that they report errors, omissions, defects, deficiencies, or inconsistencies in the submittals, information, or services provided to DSU for that argument:

> **Richärd+Bauer Contract § 3.1.2**:  The Architect shall provide prompt written notice to the Owner if the Architect becomes aware of any error, omission or inconsistency in such services or information.[244]

> **Whiting-Turner Contract § 3.3.14**:  The Construction Manager shall determine in general that the Work of each Contractor is being performed in accordance with the requirements of the Contract Documents and notify the Owner, Contractor and Architect of defects and deficiencies in the Work.[245]

DSU states that, despite those requirements, each defendant repeatedly failed to notify DSU of material errors, omissions and defects in the submittals and performance regarding this Panel Wall System.  DSU submits the facts concerning their failures to report to DSU are undisputed.[246]

At least with respect to R+B's contract, the court agrees with DSU that the binary

---

[243] *Id.* at 6.  As another example, DSU contends if a contractor fails to perform work altogether, an owner is not subject to an additional burden to prove that the contractor was also negligent, but only that it was required to do the work and did not. *Id.*

[244] D.I. 243-1, Stip. Ex. 47 § 3.1.2.

[245] D.I. 243-3, Stip. Ex. 94 § 3.3.14.

[246] D.I. 213 at 31.

question of whether it provided the specified notice does not require expert testimony as to R+B's professional standard of care. R+B's Contract is explicit in requiring "*promp*t" "*written notice*" "*to the Owner [DSU]*" if it "becomes *aware*" of "*any* error, omission or inconsistency" of the relevant services or information. This is a different question than addressed in *Oliver* as to the timing and extent of inspections, or whether or when the architect was on notice, as well as what may have been required by the architect to rectify the situation.[247] There is no indication in *Oliver* that the architects' contracts included notice provisions that were allegedly breached. In contrast to *Oliver*, which was solely a professional negligence action, DSU alleges breach of contract claims, some aspects of which implicate professional negligence, but other aspects may not. Here, either R+B knew of "any error, omission or inconsistency" and it gave prompt written notice to DSU, or it did not. Such a straightforward question does not require expert testimony for its answer.

The court arrives at a different conclusion with respect to the less explicit notification provision of W-T's contract that DSU specifies was breached. W-T was required to "determine *in general*" whether each contractor's Work was "being performed *in accordance with*" contract document requirements, and "notify the Owner, Contractor and Architect" "of defects and deficiencies" in the Work.[248] Consistent with *Oliver*, expert testimony is required as to a CM as Advisor's professional standard of care. A lay person is unqualified to determine how a CM as Advisor would "generally"

---

[247] *See Oliver*, 2011 WL 5042389, at *2.
[248] *See* D.I. 243-3, Stip. Ex. 94 § 3.3.14.

determine whether work was "in accordance" with contract document requirements, as well as, when, and how, W-T was to "notify" DSU, the Owner, Contractor, and Architect of (some, any, all?) "defects and deficiencies in the Work."  Are whatever notifications that are required to be in the made same way and have the same timing when made to each entity?  Because there is no admissible expert evidence to assist the finder of fact in answering these questions, summary judgment is granted in favor of W-T and against DSU on the alleged breach of § 3.3.14 of its contract.[249]

Because the court determines the entirely of DSU's breach of contract allegations against W-T are beyond the common knowledge of a lay person and/or

---

[249] To the extent they may, or may not, overlap with alleged breaches the court specified, above, as requiring dismissal for lack of expert testimony on W-T's professional standard of care, the court comes to the same conclusion with regard to several other provisions of W-T's contract that DSU references, *see* D.I. 213 at 5-6; D.I. 231 at 13, and determines each are outside the common knowledge of a lay person as to whether a CM met the recited obligations.  These provisions include W-T contract provisions recited in: § 3.3.19 (CM "shall promptly review all Shop Drawings, Product Data, Samples and other submittals from the Multiple Prime Contractors for compliance with the submittal requirements of the Contract, coordinate submittals with information contained in related documents, and transmit to the Architect those that the Construction Manager recommends for approval."); § 3.2.5 (CM to expeditiously review the Architect's review design documents for *constructability* and "provide recommendations to the Owner and Architect on *constructability*"); § 3.2.8 (CM to "consult with the Owner and Architect and make recommendations whenever the Construction Manager determines that design details adversely affect *constructability*"); § 3.3.9 (CM to "endeavor to *obtain satisfactory performance* from each of the Multiple Prime Contractors [and] recommend courses of action to the Owner when requirements of a Contract are not being fulfilled"): and § 3.3.15 (CM "shall be responsible for the Construction Manager's negligent acts of omissions" in connection with its obligations).  The same conclusion is reached with respect to provisions not specified in DSU's briefing, but identified by its corporate designee as implicating W-T's obligations, i.e., § 3.3.3 (CM "shall provide on-site administration of the Contracts for Construction with the Architect as set forth below and in [the] . . . General Conditions of the Contract for Construction"), and § 3.2.24 (CM "shall assist the Architect in conducting inspections to determine whether the Work or designated portion thereof is substantially complete").

require expert testimony to support those allegations, W-T's motion for summary judgment is granted, and DSU's motion for summary judgment is denied.  In light of this determination, the court need not address W-T's separate argument seeking summary judgment limiting the amount of damages sought by DSU and it is denied as moot.

The court returns now to the parties' arguments as to R+B's alleged breach of its notification obligations that either do not implicate a professional standard of care or do not require expert testimony because they fall in the under the "common knowledge" exception as discussed in *Seiler* and *Jaeger*.

The court determines genuine issues of material fact preclude summary judgment in favor of either party.  DSU alleges R+B's complete failure to conduct any investigation of PFF's product before approving it as a manufacturer in Specification 07435, as opposed to the question of whether it conducted an "adequate" investigation, is not so "highly technical and complex" that a lay person could not understand a breach occurred.[250]  As supporting evidence of R+B's alleged failure, DSU cites the deposition testimony of R+B corporate designee Stephen J. Kennedy.[251]  R+B disputes the alleged facts, explaining why Kennedy's testimony does not unequivocally support DSU's assertions, and citing emails purportedly documenting and supplementing that testimony that raises questions of fact on the issue.[252]  DSU's allegation that the subsequent bidding process confirmed the PFF product was unsuitable and was not

---

[250] D.I. 213 at 7; D.I. 231 at 10.
[251] D.I. 213 at 8-9 (citing D.I. 243-17 (Kennedy Dep.)).
[252] D.I. 226 at 6-8.

reported to DSU[253] is likewise disputed by R+B's proffered evidence and argument to the contrary.[254] Similar factual disputes as to DSU's allegation that R+B's knew PF's product was not suitable for the architectural application specified[255] are shown by competing evidence and argument presented by R+B on that issue.[256] The court reaches the same conclusion with respect DSU's allegations concerning R+B's failure to notify it that no one engineered the panels as required by Specification 07435, [257] and that R+B ignored the absence of V-Channels, or "thermal breaks," purportedly required by the Design Drawings and PFF Product Data.[258]

## V. CONCLUSION–DSU, W-T, and R+B Cross-Motions for Summary Judgment on DSU's Count I (Breach of Contract)

For the reasons discussed above:

1. **Delaware State University's** Motion for Partial Summary Judgment (D.I. 211) is **DENIED**;

2. **Whiting-Turner Contracting, Co.'s** Motion for Summary Judgment (D.I. 208) is **GRANTED in part** and **DENIED in part as MOOT.**; and

3. **Richärd+Bauer, LLC's** Motion for Summary Judgment (D.I. 203) is **GRANTED in part** and **DENIED in part**.

---

[253] D.I. 213 at 9-10.
[254] *See* D.I. 226 at 8-11.
[255] D.I. 213 at 12-19.
[256] *See* D.I. 11-13.
[257] D.I. 213 at 19-25.
[258] *Id.* at 25-27. *See* D.I. 226 at 13-15 (R+B presenting evidence and argument raising genuine issues of material fact as to these issues). R+B's alleged failure to report deficiencies in the work, specifically exterior panel buckling, D.I. 213 at 27-28, is addressed by R+B raising questions of fact, *inter alia*, as to whether the referenced buckling referred to a certain unrelated "wrinkle" in an interior side of one of the panels. *See* D.I. 226 at 16-17.

**Czar Engineering, LLC's Motion for Summary Judgment**

**Thomas Company, Inc.'s Motion for Partial Summary Judgment**

**Richärd+Bauer, LLC's Motion for Summary Judgment**

Czar moves for summary judgment in its favor as to all claims asserted against it by DSU, R+B, Liberty Mutual, PFF, and Ashford.[259]  Czar also moves for partial summary judgment as to the claims of TCI limiting any liability to TCI in accordance with its contract.[260]

TCI moves for summary judgment that:  (1) Czar's limitation of liability clause is unenforceable; (2) the Panel Wall design was not delegated to TCI; (3) R+B's Panel Wall System was not constructible; and (4) DSU's proposed repairs constitute economic waste.[261]

R+B moves for summary judgment in its favor and against all other parties on all claims against R+B.[262]  The court has ruled, above, on R+B's motion for summary judgment as to DSU's breach of contract claim against R+B.  As relevant to this section of the opinion, the court considers R+B's motion for summary judgment in its favor as to

---

[259] D.I. 215 (Czar Engineering, LLC Motion for Summary Judgment).  Briefing on the motion is found at D.I. 216 (Czar Opening Brief); D.I. 224 (TCI Answering Brief); D.I. 225 (R+B Answering Brief); D.I. 231 (DSU Consolidated Answering Brief); and D.I. 241 (Czar Reply Brief).

[260] D.I. 215.

[261] D.I. 217 (Thomas Company, Inc. Motion for Partial Summary Judgment).  Briefing on the motion is found at D.I. 218 (TCI Opening Brief); D.I. 225 (R+B Answering Brief); D.I. 230 (Czar Answering Brief); D.I. 231 (DSU Consolidated Answering Brief); and D.I. 235 (TCI Reply Brief).

[262] D.I. 203 (Richärd+Bauer, LLC Motion for Summary Judgment).  Briefing on the motion is found at D.I. 204 (R+B Opening Brief); D.I. 227 (R+B Amendment to Opening Brief); D.I. 224 (TCI Answering Brief); D.I. 228 (W-T Answering Brief); and D.I. 233 (R+B Reply Brief).

the cross-claims against it by the other co-defendants.[263]

I.     **BACKGROUND–Czar, TCI, and R+B Motions for Summary Judgment**

The following facts relevant to the motions discussed in this section of the opinion are taken from the parties' stipulated facts, exhibits, and deposition excerpts.

As previously discussed, this case concerns Structural Insulated Panels or "SIPs" and their integration into the Panel Wall System that includes the SIPs, the design, construction and installation of the SIP connections to the building structure, and other related elements (such as connectors, sealants, and the like) installed as part of constructing the OSCAR Facility on DSU's main campus in Dover.[264]  Relevant to Czar's participation in the Project, this case also involves the structural design of the panel connections with the OSCAR Facility.[265]

DSU entered into a contract with TCI on or about December 27, 2013 titled **AIA® Document A132™–2009**, *Standard Form of Agreement Between Owner and Contractor, Construction Manager as Adviser Edition* for the Wall System (the "DSU-TCI Contract").[266]  The general terms and conditions governing the DSU-TCI Contract were the *AIA232-2009 General Conditions of the Contract for Construction, Construction Manager as Adviser Edition*,[267] and all modifications thereto found in "Section 00730–Supplementary General Conditions to the Contract."[268]

---

[263] D.I. 203; D.I. 204 at 16-19.
[264] D.I. 195, Stip. Fact 1.
[265] *Id.*, Stip. Fact 2.
[266] *Id.*, Stip. Fact 14; D.I. 243-3, Stip. Ex. 139.
[267] D.I. 243-1, Stip. Ex. 48.
[268] D.I. 243-3, Stip. Ex. 140.

The General Conditions governing DSU and TCI's relationship states:

§ 1.1.2 The Contract. [. . .] The Contract Documents *shall not* be construed to create a contractual relationship of any kind [. . .] (5) between the Owner and a Subcontractor [. . .], or (7) between any persons or entities other than the Owner and Contractor.[. . .][269]

On or about March 6, 2014, Czar issued a written subcontract proposal to TCI for engineering services in connection with the Panel Wall System, which TCI signed that day and returned along with a purchase order ("TCI-Czar PO").[270]   Czar's contract with TCI incorporates by reference, and physically includes, "CZAR ENGINEER, L.C.C. CONTRACT PROVISIONS" ("TCI-Czar Subcontract") which provides:

1. **CONTRACT** - These Contract Provisions and the accompanying Proposal and Fee Schedule constitute the entire Agreement of the parties, and supersede all prior negotiations, agreements, and understandings with respect to the subject matter of this Agreement. *These Contract Provisions shall take precedence over any inconsistency or contradictory provisions contained in any proposal, contract, purchase order, requisition, notice to proceed, or like document.*   The parties may only amend this Agreement by a written document duly executed by both parties.

[. . .]

13. **LIABILITY** - Czar Engineering, LLC and client each recognize the risks, rewards and benefits of the work that is the subject of this agreement. In recognition of this reality, *consultant and client agree that, to the fullest extent permitted by law, the total liability, in the aggregate, of the consultant*, and its agents, servants and employees, for all injuries, damages (including damage to the project itself), losses, expenses or claims whatsoever related to services provided by the consultant under this agreement, including but not limited to negligence, errors, omissions, Strict liability, breach of contractor any claim whatsoever, *shall not exceed six times the total fees paid to the consultant under this agreement, or*

---

[269] D.I. 243-1, Stip. Ex. 48 § 1.1.2 (emphasis added).
[270] D.I. 195, Stip. Fact 20; D.I. 243-1, Stip. Ex. 2; *see also* D.I. 243-11 (Thomas Dep.) at 81:9-21.

*S50,000*, whichever is greater.  Furthermore, consultant and client agree that the consultant's liability shall not exceed the available amount of the professional liability insurance coverage for the sub-consultant at the time that the claim is resolved either by settlement, arbitration award or final judgment.  Any requests by client that the sub-consultant increase its limits of professional liability insurance coverage must be made in writing to consultant within fourteen (14) days of the date of this agreement.

[. . .]

15.  **INDEMNIFICATION** - Czar Engineering, L.L.C. shall, *subject to the limitation of liability contained in Section 13*, indemnify the Client for any loss or damage caused solely by the professional negligence of Czar Engineering, L.L.C. in performance of the services under this Agreement.[271]

The purchase order that TCI emailed back to Czar after signing the contract

contains the language as follows:

THIS ORDER IS COMPLETE WITH ALL THE ITEMS NECCESSARY [sic] AND INCIDENTAL THERE TO IN STRICT ACCORDANCE WITH THE ENTIRE CONTRACT DOCUMENTS PREPARED [sic] THE OWNER AND/OR THEIR CONSULTANT, INCLUDING WITHOUT LIMITATION: THE GENERAL, SPECIAL AND OTHER CONDITIONS, ALL SPECFICIATIONS, [sic], DRAWINGS, AND INVITATIONS FOR BIDS, BULLETINS, ADDENDA AND MODIFICATIONS THERETO.  *NO OTHER CHANGES WILL BE ACCEPTED EXCEPT THOSE STATED HEREIN* AND AS PER THE CONTRACT DOCUMENTS.  PROVIDE WRITTEN DOCUMENTATION INDICATING IMPACTS FOR CHANGES AND REVISIONS, WHEN REQUESTED.[272]

TCI's Corporate Designee, George J. Thomas, testified that, pursuant to the TCI-

Czar Subcontract, Czar provided engineering calculations and design detailing for the

connections which held the Panels to the exterior of the building.[273]  TCI also entered

---

[271] D.I. 243-1, Stip. Ex. 2 at "CZAR ENGINEER, L.C.C. CONTRACT PROVISIONS" ¶¶ 1, 13, 15 (emphasis added).
[272] D.I. 243-1, Stip. Ex. 2 (emphasis added).
[273] D.I. 216 at 5 (citing D.I. 243-11 (Thomas Dep.) at 81:9-82:20, 260:17-262:4).

into agreements with Ashford to provide computer aided design drafting services and separately with PFF to manufacture and supply the SIPs.[274]

Czar had no other contract with any other party involved in the Project.[275]

In addition to its contract with TCI, DSU also entered into written agreements with R+B to provide overall design services, and W-T to provide construction management services for the Project.[276]

The original cost of the SIPs was $749K.[277]  Sometime early in 2015, following installation of the SIPs but before full construction of the building was completed in the summer of 2015, some Panels began to exhibit deformations.[278]  The condition of the building façade has existed for over four years since the problems were noted, though the conditions have progressed.[279]  There were no personal injuries that resulted from the alleged defects.  No water intrusion has been noted, but Bartlett testified he believed advanced study would be required to make a definitive determination.[280]  The building is occupied and being used for its intended purpose.[281]  No equipment has been damaged because of the alleged defects.[282]  DSU's corporate designee agreed that there have been no resulting effects from the panels' present condition "other than

---

[274] *Id.*
[275] *Id.*
[276] *Id.*
[277] D.I. 243-3, Stip. Ex. 96.
[278] D.I. 243-13 (Bartlett Dep.) at 98:4-18; D.I. 216 at 5.
[279] *Id.* (Bartlett Dep.) at 98:19-99:7.
[280] *Id.* (Bartlett Dep.) at 99:11-100:2.
[281] *Id.* (Bartlett Dep.) at 100:3-14.
[282] *Id.* (Bartlett Dep.) at 101:8-10.

it doesn't look good."[283]

## II.   DISCUSSION–Czar, TCI, and R+B Motions for Summary Judgment

### A.   Positions of the Parties–Czar, TCI, and R+B Motions for Summary Judgment

#### 1.   Czar

Czar argues it is entitled to summary judgment because:

1. As to DSU's Count I (Breach of Contract), there is no contract between DSU and Czar, and the General Conditions governing the Project expressly state that DSU is not a third-party beneficiary of the agreement between Czar and TCI;[284]

2. As to DSU's Count III (Negligence), the Economic Loss Doctrine precludes any tort claims, and no exception applies;[285]

3. As to DSU's Count IV (Unjust Enrichment), DSU's relationships with all co-defendants are governed by valid contracts;[286]

4. As to all cross-claims for contribution, the co-defendants are not tort-feasors as there is no underlying tort–merely alleged breaches of contractual obligations;[287] and

5. As to all indemnification claims asserted by all defendants, with the exception of TCI, there are contracts between them.[288]

6. Czar also argues it is entitled to partial summary judgment limiting its liability

---

[283] *Id.* (Bartlett Dep.) at 102:13-19.
[284] D.I. 216 at 2.
[285] *Id.*
[286] *Id.*
[287] *Id.*
[288] *Id.*

because the TCI-Czar Subcontract expressly limits Czar's ultimate liability to $50,000.[289]

### 2.   DSU

DSU argues Czar's motion should be denied because as DSU is an intended third-party beneficiary of its subcontracts with TCI.[290]

### 3.   TCI

TCI argues that Czar's motion for summary judgement seeking enforcement of its limitation of liability provision should be denied because the provision is void under 6 *Del. C.* § 2704 which prohibits the enforcement of an agreement, relative to the construction of a building, "purporting" to indemnify or hold a contracting party harmless, as against public policy.[291]  TCI also affirmatively moves for summary judgment that Czar's limitation of liability provision is void under § 2704 and/or that provision is ambiguous.[292]

Additionally, TCI affirmatively moves for summary judgment in its favor that:

1.   The Panel Wall System Design was not delegated to TCI;[293]

2.   R+B's Panel Wall System was not constructible;[294] and

3.   DSU's proposed repairs constitute economic waste.[295]

### 4.   R+B

R+B opposes Czar's motion asserting Czar's purported limitation of liability is

---

[289] *Id.*
[290] D.I. 231 at 4.
[291] D.I. 224 at 1.
[292] D.I. 217; D.I. 218 at 1.
[293] D.I. 218 at 2-5, 9-15.
[294] *Id.* at 5-6, 16-17.
[295] *Id.* at 7, 19-20.

untenable–contractually, statutorily, under applicable precedent, and as a violation of public policy.[296]

R+B also affirmatively moves for summary judgment in its favor on all cross-claims asserted against it.[297]  R+B argues no defendant can sustain a *prima facie* cross-claim against it because they are not supported by required expert opinion on the standard of care, the economic loss doctrine bars the cross-claims in tort, and R+B's contract was with DSU such that there are no cognizable cross-claims sounding in contract.[298]  R+B's Amended Opening Brief contends it is entitled to summary judgment on W-T's cross-claim for Implied in Contract Indemnification because there is no relationship between R+B and W-T on which the cause of action is based.[299]

### B.    Analysis–Czar, TCI, and R+B Motions for Summary Judgment

The court first addresses Czar's arguments for summary judgment in its favor on DSU's breach of contract (Count I), negligence (Count III), and unjust enrichment claims (Count IV).  Following resolution of DSU's claims, Czar's arguments for summary judgment in its favor on all contribution and indemnification cross-claims are addressed. Next the court resolves Czar and TCI's cross-motions for summary judgment on Czar's limitation of liability.  Finally, as to Czar's motion, the court resolves R+B's arguments in

---

[296] D.I. 225 at 2.

[297] D.I. 203.

[298] D.I. 204 at 2.

[299] D.I. 227 at 1-3.  With respect to W-T's cross-claim for Implied Contract Indemnification, R+B originally argued there was no such cause of action.  D.I. 204 at 17-18.  After filing its opening brief, W-T made R+B aware that Delaware courts have recognized that cause of action, and R+B filed an amended opening brief making its current argument.  D.I. 227 at 1-3.

its affirmative motion that it is entitled to summary judgment on Czar's cross-claims asserted against R+B.  The court concludes this section of the opinion by addressing the remaining issues in the affirmative motions of TCI and R+B, respectively.

DSU's breach of contract claim alleges it "was an intended third-party beneficiary of the agreements reached between Thomas and its subcontractors and suppliers . . . Czar Engineering . . . for the products, services and ongoing information they were obligated to provide specifically for the benefit of DSU[.]"[300] and "[u]pon information and belief . . . Czar Engineering . . . was duly bound by the terms and conditions of [its] . . . agreement[], and such obligations extend to DSU as an intended third-party beneficiary of those agreements."[301]  Czar asserts it is entitled to summary judgment on that claim because there is no contract between DSU and Czar, and the General Conditions governing the Project expressly state that DSU is not a third-party beneficiary of the agreement between Czar and TCI.[302]

Whether a party is a third party beneficiary is a question of law for the court.[303] Because it is an issue of substance rather than procedure, it is governed by the state law of the forum.[304]  "'It is well settled in Delaware that a third-party may recover on a contract made for his benefit. . . .  But in order for there to be a third party beneficiary, the contracting parties must intend to confer the benefit.'"[305]  "The intent to confer a third

---

[300] D.I. 180-2 ¶ 52.
[301] *Id.* ¶ 53.
[302] D.I. 216 at 2.
[303] *Pierce Associates, Inc. v. Nemours Found.*, 865 F.2d 530, 535 (3d Cir.1988).
[304] *Id.*
[305] *Id.* (quoting *Ins. Co. of North America v. Waterhouse*, 424 A.2d 675, 679 (Del. Super. 1980)); *see also Hadley v. Shaffer*, No. CIV.A. 99-144-JJF, 2003 WL 21960406,

party beneficiary benefit is to be determined from the language of the contract."[306]   The

party attempting to assert third-party beneficiary status bears the burden of

demonstrating that status.[307]

Thus, the intent to confer third-party beneficiary status on DSU must be

determined from the language of the TCI-Czar Subcontract.  As in *Pierce*, however,

"[t]he language of a contract . . . cannot be divorced from the context in which it was

written.  Here, we are dealing with a general contract and a subcontract in the

construction industry."[308]

The court determines that DSU is not an intended third-party beneficiary of the

TCI-Czar Subcontract.

DSU argues Czar entered into its subcontract with TCI knowing it was for the

benefit of DSU.[309]  The reality that DSU would ultimately benefit from the TCI-Czar

---

at *5 (D. Del. Aug. 12, 2003) ("Under Delaware law, the intention of the contracting
parties is paramount in determining whether others have standing as third-party
beneficiaries." (citing *See E.I. DuPont & Co. v. Rhone Poulenc Fiber & Resin
Intermediates, S.A.S.*, 269 F.3d 187, 197 (3d Cir. 2001)).

[306] *Pierce*, 865 F.2d at 535 (citing *Oliver B. Cannon & Sons, Inc. v. Dorr-Oliver,
Inc.*, 336 A.2d 211, 215 (Del.1975); *Royal Indemnity Co. v. Alexander Indus., Inc.*, 211
A.2d 919, 920 (1965)).

[307] *See Corrugated Paper Prods., Inc. v. Longview Fibre Co.*, 868 F.2d 908, 910
(7th Cir. 1989) (applying New Jersey law, which, like Delaware law, "'focuses on
whether the parties to the contract intended others to benefit from the existence of the
contract, or whether the benefit so derived arises merely as an unintended incident of
the agreement'") (quoting *Broadway Maint. Corp. v. Rutgers, the State Univ.*, 447 A.2d
906, 909 (N.J. 1982)); *see also Beth Schiffer Fine Photographic Arts, Inc. v. Colex
Imaging, Inc.*, C.A. No. 10-cv-5321 (MHW), 2014 WL 1908500, at *4 (D.N.J. May 13,
2004) ("The party attempting to assert third party beneficiary status bears the burden."
(applying New Jersey Law) (citing *Corrugated Paper Prods.*, 868 F.2d at 910)).

[308] *Pierce*, 865 F.2d at 535.

[309] D.I. 231 at 37.

Subcontract does not establish that DSU was an intended third-party beneficiary of that contract.  "In *every* construction subcontract the owner is the one which ultimately benefits from its performance.  However, this does not create a third party beneficiary relationship."[310]

The *Pierce* court explained the usual industry practice in the construction field.

Typically when major construction is involved an owner has neither the desire nor the ability to negotiate with and supervise the multitude of trades and skills required to complete a project.  Consequently an owner will engage a general contractor.  The general contractor will retain, coordinate and supervise subcontractors.  The owner looks to the general contractor, not the subcontractors, both for performance of the total construction project and for any damages or other relief if there is a default in performance.

[…]

Thus the typical owner is insulated from the subcontractors both during the course of construction and during the pursuit of remedies in the event of a default.  Conversely, the subcontractors are insulated from the owner.  The owner deals with and, if necessary, sues the general contractor, and the general contractor deals with and, if necessary, sues the subcontractors.  These typical construction contract relationships have long been recognized.[311]

*Pierce* and the Delaware Supreme Court in *Oliver B. Cannon & Son, Inc. v. Dorr-Oliver, Inc.*, each noted this usual contractual relationship creates a "buffer"

---

[310] *Pierce*, 865 F.2d at 538 (emphasis added); *see also Hadley v. Shaffer*, No. CIV.A. 99-144-JJF, 2003 WL 21960406, at *5 (D. Del. Aug. 12, 2003) ("Thus, if it was not the promisee's intention to confer direct benefits upon a third party, but rather such third party happens to benefit from the performance of the promise either coincidentally or indirectly, then the third party will have no enforceable rights under the contract." (citing *Guardian Constr. Co. v. Tetra Tech Richardson, Inc.*, 583 A.2d 1378, 1386 (Del. Super. 1990)).

[311] *Pierce*, 865 F.2d at 535-36.

between the owner and subcontractors.[312]

Examining the DSU-TCI Contract and TCI-Czar Subcontract reveals no intent to create third-party beneficiary status on DSU with respect to Czar.

TCI's obligations to DSU are governed by the *AIA ® Document A132™--2009, Standard Form of Agreement Between Owner and Contractor, Construction Manager as Adviser Edition* for the Wall System, executed on or about December 27, 2013.[313] Article 1 of that contract incorporates the general terms and conditions enumerated by the *AIA232-2009 General Conditions of the Contract for Construction, Construction Manager as Adviser Edition* ("DSU-TCI Contract").[314]  The general conditions which govern the DSU-TCI relationship state:

> **§ 1.1.2 The Contract**. [. . .] The Contract Documents shall not be construed to create a contractual relationship of any kind […] (5) between the Owner and a Subcontractor [. . .], or (7) between any persons or entities other than the Owner and Contractor.[. . .][315]

Thus, the DSU-TCI Contract explicitly disclaims an intent to create third-party beneficiary status on DSU with respect to TCI's subcontractors on the Project.  As stated in *Pierce*, however, the court's analysis "cannot be divorced from the context in

---

[312] *Id.* at 536 ("In *Cannon* the Delaware Supreme Court referred to the 'buffer zone' which a general contract creates between the owner and a subcontractor. . . ."); *Cannon*, 336 A.2d at 216 (finding the "buffer zone" in that case extinguished where the subcontract evidence of intention to confer third-party beneficiary status on owner); *see also Galvagna v. Marty Miller Constr., Inc.*, No. CIV. A. 96L-01-015, 1997 WL 720463, at *3 (Del. Super. Sept. 19, 1997) ("In construction matters, the parties generally craft their contracts to insulate the owner from the subcontractor; the owner and general contractor deal with one another while the general contractor and subcontractor deal with one another." (citing *Pierce*, 865 F.2d at 535-39)).

[313] D.I. 195, Stip. Facts, ¶ 14; D.I. 243-3, Stip. Ex 139.

[314] D.I. 243-2, Stip. Ex. 48.

[315] D.I. 243-2, Stip. Ex. 48, § 1.1.2.

which it was written.  Here, we are dealing with a general contract and a subcontract in the construction industry."[316]  After review of the TCI-Czar PO, the court concludes it also does not evidence an intent to bestow that third-party beneficiary status on DSU. The PO provides:

> THIS ORDER IS COMPLETE WITH ALL THE ITEMS NECCESSARY [sic] AND INCIDENTAL THERE TO IN STRICT ACCORDANCE WITH THE ENTIRE CONTRACT DOCUMENTS PREPARED [sic] THE OWNER AND/OR THEIR CONSULTANT, INCLUDING WITHOUT LIMITATION: THE GENERAL, SPECIAL AND OTHER CONDITIONS, ALL SPECFICIATIONS, [sic], DRAWINGS, AND INVITATIONS FOR BIDS, BULLETINS, ADDENDA AND MODIFICATIONS THERETO.  NO OTHER CHANGES WILL BE ACCEPTED EXCEPT THOSE STATED HEREIN AND AS PER THE CONTRACT DOCUMENTS. PROVIDE WRITTEN DOCUMENTATION INDICATING IMPACTS FOR CHANGES AND REVISIONS, WHEN REQUESTED[317]

DSU argues this language shows Czar is "subject to performing its work in strict compliance with the contract documents and General Conditions prepared by the Owner."[318]  That argument is little more than saying the language provides DSU, as owner, will benefit from the TCI-Czar Subcontract; the expected result of every subcontract.

DSU also argues the TCI-Czar Subcontract does not disclaim the creation of a third-party beneficiary relationship between the Owner and subcontractor.[319]  This is precisely the wrong inquiry; the court must determine whether there was an intent to *create* third-party beneficiary status on the part of DSU, not whether such status exists

---

[316] *Pierce*, 865 F.2d at 535.
[317] D.I. 243-1, Stip. Ex. 2.
[318] D.I. 231 at 38.
[319] D.I. 231 at 38.

absent disclaimer.[320]  The language quoted above evidences no such intent.

Additionally, DSU does not point to any other evidence from the TCI-Czar Subcontract showing an intent that DSU would have enforceable rights thereunder against Czar.  By way of comparison, such evidence of intent *was* found by the Delaware Supreme Court in *Oliver B. Cannon & Son, Inc. v. Dorr-Oliver, Inc.*, where the court found the owner was a third-party beneficiary of a subcontract that contained indemnification and warranty provisions directly conveying benefits from the subcontractor to the owner.[321]  Here, in contrast, the liability and indemnification provisions in "CZAR ENGINEER, L.C.C. CONTRACT PROVISIONS," which DSU does not dispute is incorporated by reference in Czar's contract with TCI, speaks only to Czar's obligations with respect to TCI.

Consequently, because the court determines DSU is not an intended third-party beneficiary to the TCI-Czar Subcontract, Czar's motion to for summary judgment on DSU's breach of contract claim is granted.

DSU's Count III negligence claim alleges "Czar . . . provided . . . engineering and design information on an ongoing basis throughout the instant project, and answered questions posed in connection with that information.  The engineering and design information and recommendations provided by [Czar] was not incidental to [its] overall engagement in this case" upon which DSU relied and was damaged, "including but not

_____

[320] *Cf. William M. Young Co. v. Bacon*, C.A. No. 89L-JA2,  1991 WL 89817, at *4 (Del. Super. May 1, 1991) ("Young argues that *Pierce* holds that a third-party beneficiary status will exist unless the parties have negated same in the language of the contract.  Young's position is incorrect.").

[321] *See Cannon*, 336 A.2d at 215-16.

limited to damages to the building structure and property other than the panel wall itself."[322]

Czar contends DSU's attempt to put forth a theory of recovery based on an independent negligence or negligent misrepresentation claim cannot be sustained because the economic loss doctrine bars any tort claim unless DSU can show facts sufficient to allow recovery under one of the exceptions allowed by Delaware case law.[323]  Czar asserts DSU cannot make that showing.[324]

The economic loss doctrine prohibits a party who has suffered only economic loss from maintaining a tort claim:  rather it must sue in contract.[325]

Czar contends DSU's allegation it has suffered "damages to the building structure and property other than the panel wall system itself" is not supported by the evidence.[326]  According to Czar, DSU's corporate designee testified he agrees there have been no resulting effects from the panels' condition "other than it doesn't look good."[327]  Czar argues there are no allegations of personal injury, and, there is no

---

[322] D.I. 180-2 ¶¶ 64-69.
[323] D.I. 216 at 8.
[324] *Id.*
[325] *Danforth v. Acorn Structures*, Inc., 608 A.2d 1194 (Del. 1992) ("The economic loss doctrine is a judicially created doctrine that prohibits recovery in tort where a product has damaged only itself (*i.e.*, has not caused personal injury or damage to other property) and, the only losses suffered are economic in nature.") (footnote omitted); *see also Noramco (Delaware), Inc. v. Carew Assoc., Inc.*, C.A. No. 85C-MY-54, 1990 WL 251572, at *3 (Del. Super. Nov. 29, 1990) ("When damages consist solely of a financial nature and there is no personal injury or other property damage, the economic loss doctrine will apply and a claim under a contract or warranty theory may lie as opposed to a claim of negligence, *i.e.*, a tort liability claim.").
[326] D.I. 216 at 8 (quoting D.I. 180-2 ¶ 69).
[327] *Id.* (quoting D.I. 243-13 at 102:13-19).

evidence of "other" damage based on DSU's corporate designee's testimony that the building is being used for its intended purpose, no equipment has been damaged, and he was not aware of any water intrusion.[328]  Czar insists, therefore, the economic loss doctrine precludes all tort claims, absent an exception to that doctrine.[329]

"Delaware has recognized an exception to the economic loss doctrine with the adoption of § 552 of the Restatement (Second) of Torts."[330]  The Restatement provides:

> (1) One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

> (2) [t]he liability stated in Subsection (1) is limited to loss suffered

>> (a) by the person or one of a limited group of persons for whose benefit and guidance he intends to supply it; *and*

>> (b) through reliance upon it in a transaction that he intends the information to influence or knows that the recipient so intends or in a substantially similar transaction.[331]

"[F]or a plaintiff to maintain a claim under § 552 in Delaware, two elements must be present:  (1) 'the defendant supplied the information to the plaintiff for use in business transactions with third parties' and that (2) 'the defendant is in the business of

---

[328] *Id.*

[329] *Id.*

[330] *Delaware Art Museum v. Ann Beha Architects*, C.A. No. 06-481-GMS, 2007 WL 2601472, * 2 (D. Del. Sept. 11, 2007) (citing *Guardian Constr. Co. v. Tetra Tech Richardson, Inc.*, 583 A.2d 1378, 1386 (Del. Super. 1990)).

[331] Restatement (Second) of Torts § 552 (emphasis added).

supplying information.'"[332]

Czar argues that because DSU does not allege other than economic damages, Czar would have to fall within the § 552 exception to the economic loss doctrine for it to be potentially liable, but DSU cannot show either element applies.[333]

Czar contends the first exception does not apply because DSU does not allege, and cannot show, that the information Czar supplied by way of engineering and designing the connections was relied upon by DSU to pursue a business transaction with any other party.[334]  By the time Czar was engaged by TCI, in March 2014,[335] DSU had already entered into its contracts with R+B, W-T, and TCI.[336]  Czar also states that prior to the TCI-Czar Subcontract, TCI had already entered into its agreements with PFF and Ashford.[337]  Czar was the last of the parties to be brought onto the project in March 2014, thus demonstrating this element is not met.[338]  As support, Czar cites *Figg Bridge Engineers, Inc.*, where the court dismissed a similar § 552 claim by the

---

[332] *Delaware Art Museum*, 2007 WL 2601472, at *2 (quoting *Christiana Marine Servs. Corp. v. Texaco Fuel and Marine Mktg. Inc.*, C.A. No. 98C–02–217WCC, 2002 WL 1335360, at *6 (Del. Super. June 13, 2002) and citing *Millsboro Fire Co. v. Constr. Mgmt. Serv.*, C.A. No. 05C-06, 2006 WL1867705, at *2 (Del. Super. June 7, 2006)); *see also State Dep't of Transp. v. Figg Bridge Engineers, Inc.*, C.A. No. S11C-01-031 RFS, 2011 WL 5593163, at *5 (Del. Super. Nov. 9, 2011).

[333] D.I. 216 at 9.

[334] *Id.*

[335] D.I. 195, Stip. Fact, ¶ 20.

[336] *Id.*, Stip. Facts, ¶ 7 (R+B, Jan. 20, 2012), ¶ 12 (W-T, Jan. 12, 2012), ¶ 14 (TCI, Dec. 27, 2013).

[337] D.I. 216 at 10; *see* D.I. 195, Stip. Facts, ¶ 16 ("On or about January 15, 2014, Thomas Co. made its initial submission of PFF's Product Data to Whiting-Turner for review." (*See* Stip. Ex. 33.)), ¶ 18 ("R+B reviewed the PFF Product Data and returned it to Whiting-Turner on January 23, 2014."  (*See* Stip. Ex. 34)).

[338] D.I. 216 at 10.

Delaware Department of Transportation ("DelDOT") against an engineering firm for the same reason:  "[i]t cannot be said that DelDOT relied on the reports to pursue a business transactions with [the general contractor] because the DelDOT['s contract with the general contractor] was executed long before [the engineering firm's] reports were prepared."[339]  Thus, Czar asserts DSU could not have relied on information it supplied in pursuit of business transactions with the other defendants because those transactions occurred prior to Czar providing the information at issue.[340]  Demonstration that the first § 552 element is not met, alone, is enough to grant Czar's motion for summary judgment on the negligence claim.[341]

Czar also contends the second element, being "in the business of supplying information," is not met because, for Czar to fall within this exception, it must have been a "pure information provider."[342]  Under Delaware law, architects and engineers who design particular components of a project are not pure information providers and, therefore, do not fall within the second element of the § 552 exception to the economic loss doctrine.[343]

---

[339] D.I. 216 at 10 (quoting *Figg Bridge Engineers*, 2011 WL 5593163, at *5).
[340] *Id.*
[341] *See Figg Bridge Engineers*, 2011 WL 5593163, at *5 (finding the first element not met, "whether [the engineering firm] is a pure information provider is not reached").
[342] D.I. 216 at 10 (citing *Delaware Art Museum*, 2007 WL 2601472, at *2; *RLI Ins. Co. v. Indian River School Dist.*, 556 F. Supp. 2d 356, 361-2 (D. Del. 2008); *Millsboro Fire Co.*, 2006 WL 1867705, at *2; *Christiana Marine Servs. Corp.*, 2002 WL 1335360, at *5; *Riverbend Cmty., LLC v. Green Stone Eng'g, LLC*, C.A. No. N10C-07-042 MMJ, 2012 WL 1409013 (Del. Super. Apr. 4, 2012) *aff'd*, 55 A.3d 330 (Del. 2012)).
[343] *See, e.g.*, *Millsboro*, 2006 WL 1867705, at *1 (finding defendant engineer, responsible for designing the "heating, ventilation and air conditioning ('HVAC'), as well as the electrical and plumbing systems on the Project" to be outside of § 552); *Delaware Art Museum*, 2007 WL 2601472, at *4 (dismissing the plaintiff's negligence

Czar contends there is no dispute that it provided engineering and design for the connections of the Panel Wall System to the main building structure as part of the overall Project and that all parties have testified and will acknowledge at trial that Czar designed a component part of the Project.[344]

Based on Czar's role in the Project, and the authority it cites, Czar urges the court to determine the second § 552 element is not met because Czar is not a pure information provider and, therefore any potential tort claims against it by DSU are barred by the economic loss doctrine.[345]  The court agrees that Czar was not a pure information provider and is also entitled to summary judgment on DSU's Count III negligence claim.

Additionally, DSU did not respond to Czar's arguments regarding its Count III negligence claim.

"[W]here a party responds to a dispositive motion, but only addresses some subset of the arguments that are the subject of the motion, courts have consistently

---

misrepresentation claim based on the engineer defendant's design of parts of the project did not meet the § 552 information provider exception to the economic loss doctrine).  This court's opinion in *Kuhn Const. Co. v. Ocean & Coastal Consultants, Inc.* relied on Delaware state cases when it applied the economic loss doctrine and dismissed negligence/negligent misrepresentation claims by a builder against an engineer, stating "the current weight of authority suggests that the exception does not apply; the provision of plans and drawings in connection with a construction project is considered to be information that is incidental to the sale of a finished, tangible product." 844 F. Supp. 2d 519, 529 (D. Del. 2012) (citing *Christiana Marine*, 2002 WL 1335360, at *7 (adopting *Tolan and Son, Inc. v. KLLM Architects, Inc.*, 719 N.E.2d 288, 296 (Ill. 1999)); *Millsboro*, 2006 WL 1867705, at *3)).

[344] D.I. 216 at 11.
[345] *Id.*

held that the claims that are not defended are deemed abandoned."[346]

DSU was on notice of Czar's arguments that there are no genuine issues of material fact precluding summary judgment in its favor on Count III.  DSU chose to challenge only a subset of Czar's arguments, its status as third-party beneficiary to the TCI-Czar Subcontract.  Based on DSU's failure to respond, and the evidence and argument Czar provides in support of its motion on DSU's negligence claim, the court determines that claim is abandoned and Czar's motion for summary judgment on Count III is granted.

Lastly, DSU alleges separate claims of breach of contract and unjust enrichment against Czar.[347]  Czar argues that DSU's unjust enrichment claim in Count IV fails because such a claim may not be asserted along with a contract claim.[348]

In *Wood v. Coastal States Gas Corp.*, the Delaware Supreme Court stated that "[b]ecause the contract is the measure of plaintiffs' right, there can be no recovery

---

[346] *Baldonado v. Avrinmeritor, Inc.*, C.A. No. 13-833-SLR-CJB, 2014 WL 2116112, at *7 (D. Del. May 20, 2014) (citing cases), *report and recommendation adopted*, C.A. No.  13-833-SLR/CJB, 2014 WL 2621119 (D. Del. June 10, 2014).  The *Baldonado* court contrasted cases, as here, where a party responded to a dispositive motion and addressed only a subset of the movant's arguments from cases where a party fails to respond in any way to a dispositive motion.  *Id.* at *7 n.6 (citation omitted). The court reiterated that where a party responds to only a subset of the movant's arguments, "the unaddressed claim is deemed abandoned."  *id.*; *see also Blakeman v. Freedom Rides, Inc.*, C.A. No. 12-416-LPS-CJB, 2013 WL 3503165, at *13 (D. Del. July 10, 2013) (same); *Butorin v. Blount*, C.A. No. 15-283-LPS, 2018 WL 4700217, at *1 n.1 (D. Del. Sept. 30, 2018) (determining that by responding to arguments with respect to one claim in a motion to dismiss all claims, the plaintiff abandoned its other claims); *Seals v. City of Lancaster*, 553 F. Supp. 2d 427, 432 (E.D. Pa. 2008) ("Plaintiff's failure to mention these issues in her summary judgment response constitutes abandonment of those claims.").

[347] D.I. 180-2 (Counts I and IV).

[348] D.I. 216 at 11.

under an unjust enrichment theory independent of it."[349]   Following *Wood*, the Delaware

Court of Chancery explained in *Kuroda v. SPJS Holdings, L.L.C.*:

> Unjust enrichment is "the unjust retention of a benefit to the loss of
> another, or the retention of money or property of another against the
> fundamental principles of justice or equity and good conscience."  A claim
> for unjust enrichment is not available if there is a contract that governs the
> relationship between parties that gives rise to the unjust enrichment claim.
> In other words, if "the contract is the measure of [the plaintiff's] right, there
> can be no recovery under an unjust enrichment theory independent of it."
> Thus, "[w]hen the complaint alleges an express, enforceable contract that
> controls the parties' relationship . . . a claim for unjust enrichment will be
> dismissed."[350]

DSU alleges, albeit unsuccessfully on a third-party beneficiary theory, the

existence of a contract and seeks to enforce that contract through Count I.[351]  Czar

maintains that even if DSU were to argue that the unjust enrichment claim should not

be dismissed as to Czar because DSU is not party to the TCI-Czar Subcontract, or vice

versa, that argument would fail "because unjust enrichment cannot be used to

circumvent basic contract principles recognizing that a person not a party to a contract

cannot be held liable to it."[352]

DSU did not respond to Czar's arguments regarding Count IV.

As with Count III, DSU was on notice of Czar's arguments that there are no

genuine issues of material fact precluding summary judgment in its favor on its unjust

---

[349] 401 A.2d 932, 942 (Del. 1979).

[350] 971 A.2d 872, 891 (Del. Ch. 2009) (citations omitted); *see also Doberstein v. G-P Indus., Inc.*, C.A. No. 9995-VCP, 2015 WL 6606484, at *6 (Del. Ch. Oct. 30, 2015) (dismissing the plaintiff's unjust enrichment claim because she could not identify "any factual basis for her unjust enrichment claim independent of the allegations relating to her breach of contract claim").

[351] D.I. 216 at 12.

[352] D.I. 216 at 12 (quoting *Kuroda*, 971 A.2d at 891-92 (citation omitted)).

enrichment claim.  Based on Czar's arguments supporting its motion on that claim, and

DSU's failure to respond, the court determines that claim is abandoned and Czar's

motion for summary judgment on Count IV is granted.[353]

Czar next argues there can be no viable contribution claims where there is no

underlying tort.[354]  Delaware's Uniform Contribution Among Tortfeasors Law, 10 *Del. C.*

§ 6301 *et seq.* ("UCATL") requires the establishment of joint tortfeasor status.[355]  As

discussed above, the court has dismissed DSU's tort claims against Czar.  TCI and

DSU have voluntarily dismissed all of the claims each asserted against each other.[356]

As discussed below, the court dismisses DSU's tort claims against PFF.  DSU does not

assert tort claims against R+B or W-T.  As a result, there are no remaining co-

defendants that could establish joint tortfeasor status with Czar, and none have

---

[353] In its opening brief, Czar argues that even if DSU is a third-party beneficiary of the TCI-CZAR Subcontract, DSU is subject to the same liability limitations in that contract.  *Id.* at 7-8 (citing *NAMA Holdings, LLC v. Related World Mkt. Ctr., LLC*, 922 A.2d 417, 431 (Del. Ch. 2007)).  By not responding to that argument, Czar argued DSU conceded that point.  D.I. 241 at 2.  Because the court determines DSU is not a third-party beneficiary of the TCI-Czar Subcontract, the issue with respect to DSU is moot.  The court discusses Czar's limitation of liability arguments in connection with TCI, and R+B's arguments on the issue, below.

[354] D.I. 216 at 12.

[355] *See Builders & Managers, Inc. v. Dryvit Sys., Inc.*, No. Civ. A. 00C11111JEB, 2004 WL 304357, at *2 (Del. Super. Feb. 13, 2004) ("The right to contribution is triggered when it is appropriate for liability to be apportioned among codefendants.  In Delaware, contribution is governed by the UCATL which provides the parameters for determining when contribution is appropriate and how it is to be decided.  The inherent requirement is that the parties are joint tortfeasors who share a 'common liability.'").  (citations omitted); *New Zealand Kiwifruit Mktg. Bd. v. City of Wilmington*, 825 F. Supp. 1180, 1186 (D. Del. 1993) ("Indispensable to a joint tortfeasor relationship is a 'common liability' either 'joint' or 'several' that two or more parties have to the person injured.  Without this dual liability . . . no right of contribution can exist.") (omission in original) (citation omitted).

[356] *See* D.I. 257.

responded to its motion on the contribution cross-claims.  Thus, Czar's motion is granted as to contribution cross-claims asserted against it.

Other than TCI, no defendant has pled the existence of a contract with Czar whereby Czar is obligated to indemnify any defendant.  Czar's opening brief states all claims for indemnification by all defendants, except TCI, fail because there is no contract or common law right of indemnification and, therefore, none can claim a right of contractual indemnity against Czar.[357]

R+B, the remaining co-defendant generally alleging a cross-claim for indemnification against all other co-defendants,[358] does not respond to Czar's motion on that claim, and has not alleged a right of contractual indemnity against Czar.  Thus, Czar's motion is granted as to R+B's indemnification cross-claim.

Finally, Czar moves for summary judgment in its favor that Czar's liability, if any, is limited to $ 50,000.[359]  Czar contends its clear and unambiguous contractual obligation to indemnify TCI is entirely found in ¶ 15 of the TCI-Czar Subcontract, and is limited to the $50,000 cap specified in ¶ 13.[360]

TCI's response to Czar's motion on this issue is limited to arguing that Czar's limitation of liability provision is unenforceable under 6 *Del. C.* § 2704, which TCI states prohibits the enforcement of an agreement, relative to the construction of a building,

---

[357] D.I. 216 at 14.  After filing its opening brief, Czar advised the court that it erroneously stated that all defendants had filed cross claims for indemnification against Czar, but that PFF and W-T did not file such claims and it was withdrawing any arguments in that section as to PFF and W-T.  D.I. 220 at 1.

[358] *See* D.I. 77.

[359] *See* D.I. 216 at 14-20.

[360] *Id.* at 17.

"purporting" to indemnify or hold a contracting party harmless, as against public policy.[361]  TCI also affirmatively moves for summary judgment in its favor restating its § 2704 argument, as well as arguing the limitation of liability clause is unenforceable because it is ambiguous.[362]  In R+B's answering brief in opposition to the affirmative motions for summary of DSU, TCI, and Czar, R+B joined TCI's opening-brief arguments on the limitation of liability issue.[363]  R+B's brief does not substantively expand on TCI's § 2704 unenforceability and ambiguity arguments.[364]  R+B additionally argues Czar's limitation of liability clause is unenforceable because the possible damages flowing from the breach of the TCI-Czar Subcontract were easily known to Czar at the time of the contracting, and that the limitation prejudices DSU's rights in contravention of the General Conditions of the DSU-TCI Contract.[365]  The court first addresses Czar and TCI's cross-motions, followed by R+B's two additional arguments against Czar's motion on this issue.

"The proper construction of any contract . . . is purely a question of law."[366]

TCI asserts Czar's limitation of liability provision is unenforceable under 6 *Del. C.* § 2704,[367] which provides, in relevant part:

(a) A covenant, promise, agreement or understanding in, or in connection

---

[361] *See* D.I. 224 at 1, 3-8.

[362] *See* D.I. 217; D.I. 218 at 5-6, 17-19.

[363] D.I. 225 at 10.

[364] *Id.* at 11-12, 14.  The court's discussion of these points in the context of TCI's arguments, therefore, also resolves R+B's arguments.

[365] D.I. 225 at 10-11, 14.

[366] *Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1195 (Del. 1992) (citation omitted).

[367] D.I. 218 at 17; D.I. 224 at 3.

with or collateral to, a contract or agreement . . . relative to the construction, alteration, repair or maintenance . . . of a . . . building . . . purporting to *indemnify or hold harmless* the promisee or indemnitee . . . for damages arising from liability for bodily injury or death to persons or damage to property caused partially or solely by, or resulting partially or solely from, or arising partially or solely out of the negligence of such promisee or indemnitee or others than the promisor or indemnitor, or its subcontractors, agents, servants or employees, *is against public policy and is void and unenforceable*, even where such covenant, promise, agreement or understanding is crystal clear and unambiguous in obligating the promisor or indemnitor to indemnify or hold harmless the promisee or indemnitee from liability resulting from such promisee's or indemnitee's own negligence.[368]

In *J.S. Alberici Construction Co. v. Mid-West Conveyor Company, Inc.*, the Delaware Supreme Court stated "[a]lthough section 2704(a) does not indicate the specific purpose underlying the policy expressed, it does express in broad terms the 'promisee,' 'indemnitee' and 'others' as a class prohibited from contracting away liability for their own negligence."[369]  The court held "Section 2704(a) is clear on its face:  a contractual provision requiring one party to indemnify another party for the second party's own negligence, whether sole or partial, 'is against public policy and is void and unenforceable.'"[370]  Here, by contrast, the limitation of liability provision does not require TCI to indemnify Czar (the second party) from Czar's (the second party's) own liability: it places a ceiling on Czar's liability to TCI for Czar's liability, i.e., Czar is responsible for

---

[368] 6 *Del. C.* § 2704 (emphasis added).  The statute recites three exceptions: any obligation owed to the Department of Transportation pursuant to a contract awarded under Title 17 or Chapter 69 of Title 29; policies of insurance issued by authorized insurance companies: and, indemnity obligations in a partnership agreement of a partnership (whether general or limited), limited liability company agreement, trust agreement, governing instrument of a trust, certificate of incorporation or bylaw.  6 *Del. C.* §§ 2704(a), (b), (c).

[369] 750 A.2d 518, 521 (Del. 2013).

[370] *Id.*

its liability up to that ceiling.

TCI contends Delaware State Legislature's inclusion of the word "purporting" within § 2704 casts a broad net and is intended to encompass all conceivable attempts to require one party to indemnify another within the context of a construction contract.[371] The court does not view Czar's limitation of liability clause as one of those attempts swept into the net of § 2704 unenforceability.  Pursuant to § 2704, a provision "purporting to indemnify or hold harmless the promisee or indemnitee . . . for [certain] damages . . . is against public policy and is void and unenforceable."  At issue here, by contrast, is a limitation of liability clause, not a provision attempting to "indemnify or hold harmless" Czar for its actions.

The distinction between the two types of clauses made by the Third Circuit in *Valhal Corp. v. Sullivan Associates, Inc.*[372] is instructive.  In an action governed by Pennsylvania law the court explained, "there are differences between a contract which insulates a party from liability and one which merely places a limit on that liability.  The difference between the two clauses 'is . . . a real one.'"[373]  There, the court held a limitation of liability clause in an architect's contract was enforceable and not in violation of Pennsylvania's Anti-Indemnity Act:

> The terms of the statute pertain only to indemnity and hold harmless provisions.  We have already discussed the very real differences between such clauses and the one in the contract before us.  Those differences preclude an assumption that a statute expressing a prohibition against indemnity and hold harmless provisions announces a public policy against

---

[371] D.I. 218 at 17.

[372] 44 F.3d 195, 203-07 (3d Cir. 1995).

[373] *Valhal*, 44 F.3d at 202 (citations omitted).

88

something as distinct and accepted as limitation of liability clauses.[374]

The Pennsylvania statute, 68 Pa. Stat. Ann. § 491 (Purdons 1994), as quoted in

*Valhal*, provides:

> Every covenant, agreement or understanding . . . in connection with any
> contract or agreement made and entered into by owners, contractors,
> subcontractors or suppliers whereby an architect . . . or his[/her] agents
> . . . shall be *indemnified or held harmless* for damages . . . arising out of:
> (1) the preparation or approval by an architect . . . or his[/her] agents . . .
> of . . . opinions, reports, . . . or specifications, or (2) the giving or the
> failure to give directions or instructions by the architect . . . Or his[/her]
> agents . . . Shall be void as against public policy and wholly
> unenforceable.[375]

TCI states, but does not explain how, the Pennsylvania "statute's scope is much

narrower than § 2704's" in dismissing the relevance of *Valhal* as it relates to this court's

analysis.[376]  The emphasis added by the *Valhal* court demonstrates that court's analysis

was focused on the distinction between indemnification or hold harmless provisions

versus limitation of liability provisions, a distinction the court considers applicable to

6 *Del. C.* § 2704, as both the Delaware and Pennsylvania statutes prohibit agreement

to indemnify or holding harmless.[377]

In *Daimlerchrysler Corp. v. Pennsylvania Nat. Mut. Cas. Ins. Co.*, the Superior

---

[374] *Id.* at 205.

[375] *Id.* at 204 (emphasis added by *Valhal* court).

[376] D.I. 224 at 6.

[377] Compare the Delaware Supreme Court's decision in *J.S. Alberici*.  There, a
subcontracting agreement contained a clause to "indemnify, hold harmless and defend"
and a Kansas choice of law provision, where the clause *would be* enforced.  The court
refused to enforce the choice of law agreement because enforcement of an indemnity
agreement completely shielding the party from liability for its own negligent actions
pursuant to Kansas law "would be clearly repugnant to the public policy of Delaware."
*J.S. Alberici*, 750 A.2d at 521.

Court of Delaware recognized the public policy purpose behind the Act as prohibiting "agreement[s] purporting to hold an owner or general contractor *free from liability* for its own negligence" because they "undermine[] the strong public policy of placing and keeping responsibility for maintaining a safe workplace on those parties [responsible]."[378]

In *RHA Construction, Inc. v. Scott Engineering, Inc.*, the Superior Court of Delaware considered a contract for engineering services and construction drawings regarding property RHA intended to develop.[379] After the project did not go forward, RHA filed suit and defendants moved for summary judgment that, *inter alia*, any award of damages arising from the litigation should be limited to fees paid in accordance with a limitation of liability clause in defendants' contract.[380] Although § 2704 was not at issue in that case, the *RHA* court noted "[l]imitation of liability clauses that relieve a party of liability for its own negligence are generally disfavored under Delaware law," but held, based on the facts of that case, *limiting* the plaintiff's recovery to fees paid would not be unconscionable.[381]

Although neither *Daimlerchrysler* nor *RHA* directly address the current issue, the court concludes that § 2704 does not prohibit enforcement of a limitation of liability

---

[378] No. CIV.A. 01C-04-036, 2003 WL 1903766, at *2-3 (Del. Super. Mar. 17, 2003) (emphasis added) (discussing the contrast between a contractual obligation to procure insurance with the indemnification prohibition of § 2704 in determining whether there was an enforceable action on an insurance policy in face of the statutory prohibition).

[379] C.A. N11C-03-013 JRJ CCLD, 2013 WL 3884937 (Del. Super. July 24, 2013).

[380] *Id.* at *7.

[381] *Id.* at *8 (citations omitted).

clause.  This conclusion is based on the distinction between indemnity and hold

harmless clauses versus limitation of liability clauses, the prior enforcement of a similar

limitation of liability clause in Delaware, and the purpose of the § 2704 prohibition of

indemnity and hold harmless provisions to promote work place safety by incentivizing

the parties to perform their work safely.

The court also rejects TCI's argument that *effect* of enforcing Czar's limitation of

liability clause results in TCI indemnifying Czar for amounts owed in excess of the

limitation in contravention of § 2704's indemnification prohibition.[382]  Here, setting a

ceiling to Czar's potential liability is not equivalent to TCI indemnifying Czar.[383]

Although the amount of Czar's liability is capped, it is still potentially liable for

substantial damages for its actions.[384]

_____

[382] D.I. 235 at 2-3.

[383] *See, e.g.*, *Posttape Assocs. v. Eastman Kodak Co.*, 537 F.2d 751, 755 (3d
Cir. 1976) ("Though it is possible that an agreement setting damages at a nominal level
may have the practical effect of avoiding almost all culpability for wrongful action, the
difference between the two concepts is nevertheless a real one.") (applying
Pennsylvania law) (citation omitted); *Thrash Commercial Contractors, Inc. v. Terracon
Consultants, Inc.*, 889 F. Supp. 2d 868, 575-76 (S.D. Miss. 2012) ("Courts considering
the issue have consistently held that a limitation of liability will be found unenforceable if
it establishes a limitation of liability that "is so minimal compared to [a party's] expected
compensation as to negate or drastically minimize [such party's] concern for the
consequences of a breach of its contractual obligations." (alteration in original) (quoting
*Valhal*, 44 F.3d at 204)).

[384] TCI suggests a holding that § 2704 does not bar enforcement of Czar's
limitation of liability will impermissibly amend, change, expand, or alter § 2704 by
adding an exception to its application beyond the three specifically set forth in the
statute.  D.I. 224 at 7-8.  An exception is not created by the court's determination:  the
statute simply does not bar enforcement of a valid limitation of liability clause.  TCI cites
*City of Dillingham v. CH2M Hill Northwest, Inc.*, 873 P.2d 1271 (Ak. 1994), where the
Alaska Supreme Court considered the enforceability of a $50,000 limitation of liability
provision in a contract  between the city and an engineering firm.  The engineer was
required to design a facility for the EPA in connection with a sewage treatment system.

Thus the court denies TCI's motion for summary judgment that Czar's limitation of liability clause is unenforceable under § 2704, and grants Czar summary on that issue.

TCI also argues Czar's limitation of liability clause is unenforceable because it is ambiguous.[385]

"Clear and unambiguous [contract] language . . . should be given its ordinary and usual meaning.  Absent some ambiguity, Delaware courts will not destroy or twist policy language under the guise of construing it."[386]  "[A] contract is ambiguous only when the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings."[387]  "If a contract is ambiguous, we will apply the doctrine of *contra proferentem* against the drafting party and interpret the contract in favor of the non-drafting party. . . .  The determination of ambiguity lies

---

*Id.* at 1273-1274.  The *Dillingham* court examined Alaska's ant-indemnification statute's legislative history, and concluded the legislature would have included an exception permitting the enforcement of a limitation of liability provision had it so desired and found the provision void.  *Id.* at 1276-78.  Czar points out the Supreme Court of Arizona rejected the same public policy argument in *1800 Ocotillo, LLC v. WLB Grp., Inc.*, 196 P.3d 222, 226 (2008) where it stated the *Dillingham* decision "was largely premised upon the Alaska legislature's *express rejection of a proposal to exempt liability-limitation* provisions when it enacted its anti-indemnification statute." (citing *Dillingham*, 873 P.2d at 1276–78) (emphasis added).  This court believes, as did the Arizona court, that "[r]ather than presume that our legislature implicitly intended to proscribe liability-limitation provisions, we instead believe the legislature specified those contractual terms it meant to declare unenforceable."  *1800 Ocotillo, LLC*, 196 P.3d at 226.

[385] D.I. 218 at 18-19; D.I. 235 at 3-4.

[386] *Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.,* 616 A.2d 1192, 1195 (Del. 1992) (citations omitted).

[387] *Rhone-Poulenc*, 616 A.2d at 1192, 1196 (Del. 1992) (citations omitted).

within the sole province of the court."[388]   "[W]here reasonable minds could differ as to

the contract's meaning, a factual dispute results and the fact-finder must consider

admissible extrinsic evidence.  In those cases, summary judgment is improper."[389]

TCI contends the terms of Czar's limitation appear in two paragraphs, with

unrelated intervening clauses which, when read together, are internally inconsistent,

irreconcilable, and subject to more than one reasonable interpretation.[390]  Paragraph 4

of Czar's proposal letter states:

> *Czar Engineering's work will be limited to work as described herein only.*
> *No other structure will be reviewed and we defer to the building contract*
> *documents for all other design information.*  If the Client, Owner,
> Contractor, or other interested party are aware of deficiencies in the
> balance of the structure, it is incumbent upon them to notify Czar
> Engineering, in writing, and additional services would follow under
> separate contract.  Otherwise, Czar Engineering and/or Lamont H. Czar,
> P.E. cannot and will not accept liability for deficiencies in the balance of
> the structure.[391]

TCI contends this paragraph would permit Czar's liability to TCI to be terminated by the

failure of nonparties to notify Czar of deficiencies "in the balance of the structure."  TCI

states it is unclear whether Czar's liability would be limited to $50,000 or otherwise

altogether excused if notice was not given to Czar, and that the words "balance of the

structure" being undefined only adds to the confusion.[392]

Czar argues the italicized first sentence of paragraph 4, omitted from TCI's brief,

---

[388] *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1160 (Del. 2010).
[389] *GMG Capital Investments, LLC v. Athenian Venture Partners I, L.P.*, 36 A.3d 776, 783 (Del. 2012) (citations and footnotes omitted).
[390] D.I. 218 at 18.
[391] D.I. 243-1, Stip. Ex. 2, March 6, 2014 Czar letter submitting proposal to TCI at 3, ¶ 4 (emphasis added).  TCI did not include the italicized first sentence in its brief.
[392] D.I. 218 at 18.

elucidates the intent of the paragraph.[393]  According to Czar,  it was contracted by TCI to design connections only for the exterior SIP panels, and a different engineering firm was separately contracted by DSU to engineer every other aspect of the building.[394] Czar maintains that paragraph indicates it will rely on the work performed by DSU's other engineers and is not liable for errors made by that other engineer in the rest of the building, which it contends is merely stating the obvious.[395]  Czar acknowledges, however, that "*[w]hat may not be obvious* . . . is CZAR's statement here that if these errors become known to anyone along the way, CZAR will seek additional service fees if its work is impacted."[396]  Czar insists this provision is not a limitation of liability clause: it is a statement that there is a division of liability between parties to a construction project, where each is responsible for their own conduct.[397]

The court finds reasonable minds could differ as to the meaning of this language. Czar acknowledges the lack of obviousness in the language, and the statement that Czar "will not accept liability for deficiencies in the balance of the structure" makes it uncertain whether this provision relates to, or impacts, its limitation of liability provision in paragraph 13 of its contract with TCI.  These questions must be answered by the finder-of fact.  Thus, summary judgment is denied.

Paragraph 13 of Czar's broadly states its liability to TCI for loss caused by Czar's conduct:

---

[393] D.I. 230 at 4.
[394] *Id.* at 9.
[395] *Id.*
[396] *Id.* (emphasis added).
[397] *Id.*

shall not exceed six times the total fees paid to the consultant . . . ,  or $50,000, whichever is greater.  *Furthermore, consultant and client agree that the consultant's liability shall not exceed the available amount of the professional liability insurance coverage for the sub-consultant at the time that the claim is resolved. . . .*[398]

TCI maintains the italicized language makes this paragraph ambiguous because it suggests the possibility that "the available amount of professional liability insurance" may decrease, or render null, its previously stated $50,000 of insurance coverage.[399]

Czar argues paragraph 13 is not ambiguous because that language only creates a window for the limits, i.e., (1) the greater of 6X fees paid or $50,000.00; and (2) the available amount of the professional liability insurance coverage at the time that the claim is resolved.[400]  Czar then states, without citation to the record, the purported amounts of its applicable insurance policy and speculates that its coverage would not be exhausted by its legal fees and potential liability, which could be attested to if necessary.[401]

The court again finds that reasonable minds could differ as to the impact of Czar's available amount of insurance coverage, and Czar's arguments based on extrinsic evidence, and/or attestation thereto, does not allow the court to resolve the ambiguity on summary judgment.[402]

---

[398] D.I. 243-1, Stip. Ex. 2, ¶ 13 (emphasis added).

[399] D.I. 218 at 19; D.I. 235 at 3-4.

[400] D.I. 230 at 9.

[401] *Id.* at 9-10.

[402] *See, e.g.*, *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1229, 1232-33 (Del. 1997) (reversing a grant of summary judgment where the court held an indemnification provision to be ambiguous, thus raising factual issues requiring consideration of extrinsic evidence to determine the intended meaning of the provision in light of the expectations of the contracting parties).

Thus, the court denies TCI's motion for summary judgment that Czar's limitation of liability provision is void under § 2703, grants Czar's motion on the § 2704 issue, and denies Czar's motion for summary judgment that the its limitation of liability in the TCI-Czar Subcontract is unambiguous.  Because that issue must be resolved by the finder of fact, the court denies TCI's motion for summary judgment that Czar's limitation of liability under the contract is void, or unenforceable.

R+B's additional arguments against Czar's limitation of liability are also unavailing.  Delaware courts have evaluated the enforceability of liability limitation clauses using the same criteria for assessing enforceability of a liquidated damages clause.[403]  Under this analysis, a limitation clause "will not be enforced if possible damages are easy to ascertain or if the terms of the contract are found to be unreasonable."[404]

Here, R+B argues the "possible damages" were easily known at the time of contracting based on TCI's original contract price of $749K.[405]  However, R+B then hypothetically contends if Czar's error were discovered at or shortly after the panels were installed, it was easily foreseeable that the cost to remove, replace and reinstall the panels plus any additional remedial actions would have exceeded TCI's original

---

[403] *See, e.g.*, *Donegal Mut. Ins. Co. v. Tri-Plex Sec. Alarm Sys.*, 622 A.2d 1086, 1089 (Del. Super. 1992); *Rob-Win, Inc. v. Lydia Sec. Monitoring Inc.*, No. 04C-11-276, 2007 WL 3360036, at *5 (Del. Super. Apr. 30, 2007) (citing *Donegal*, 622 A.2d at 1089).

[404] *RHA Constr., Inc. v. Scott Eng'g, Inc.*, C.A. N11C-03-013 JRJ CCLD, 2013 Del. Super. LEXIS 301 at *28 (Del. Super. July 24, 2013) (citing *Rob-Win*, 2017 WL 3360036, at *6).

[405] D.I. 225 at 11 (citing D.I. 243-3, Stip. Ex. 139).

contract price to acquire and install the panels.[406]  Thus, R+B asserts the limitation of $50,000 was unreasonable when made and, therefore, the purported limitation of liability is unenforceable.[407]

The court disagrees on both points.  R+B's own hypothetical admits the possible damages are not "easy to ascertain."  Damages could be some unknown amount in excess of TCI's contract *if* Czar was somehow entirely liable for *all* damages because no damages could be attributed to the actions of any other party.  That is an extremely speculative outcome given the multitude of claims against all defendants by DSU, and among defendants themselves.[408]

Separately, R+B's declaration that the $50,000 limitation of liability is unreasonable is made without any analysis or support.  Per the TCI-Czar PO, the total fees to be paid Czar were $6,500.[409]  The $50,000 liability cap is more than seven times the contemplated payment for Czar's services.  Because R+B makes no showing that Czar's limitation of liability was unreasonable at the time TCI and Czar agreed to the terms of their contract, the court declines to hold, as a matter of law, it is unreasonable.[410]

---

[406] *Id.*

[407] *Id.*

[408] In the case cited by R+B, *RHA*, the court found it "untenable to assert the parties would have been able to easily ascertain damages as a result of any alleged breach at the time of contracting" where, *inter alia*, the project "involved three construction or holding companies, real estate agents, lawyers, engineers, [and] the County government . . . ."  *RHA*, 2013 Del. Super. LEXIS 301, at *28-29.

[409] *See* D.I. 243-1, Stip. Ex. 2.

[410] The court notes R+B's answering brief in opposition to Czar's motion concludes with the statement that "Czar's arguments with regard to limitation of liability are untenable and should be rejected" and "requests summary judgment on [this]

97

Next, R+B urges the court to find Czar's limitation of liability clause unenforceable because it somehow prejudices *DSU's* rights under *DSU's contract with TCI*,[411] an argument not advanced by either DSU or TCI themselves.

R+B cites the requirement in § 5.3 (Subcontractual Relations) of the General Conditions of the Contract for Construction between DSU and TCI to preserve all such rights in the subcontracts and not to prejudice the Owner's rights.[412]   R+B's theory is that § 5.3 governs TCI's subcontracting with Czar, Czar' limitation of liability prejudices DSU's rights because DSU did not contract for a limitation of liability on the services TCI was required to provide, and, therefore, there should be no limitation of liability for TCI's subcontractors, i.e., Czar.[413]

The General Terms and Conditions of the DSU-TCI Contract were not incorporated in the TCI-Czar Subcontract, a contract to which the court has determined DSU is not a third-party beneficiary.   The provision R+B cites is an obligation of TCI to DSU, a breach of which creates a potential claim by DSU against TCI, not against Czar. R+B's argument is rejected.

_____

issue[]."  D.I. 225 at 15.  R+B's affirmative motion for summary judgment (D.I. 203) seeks judgment in its favor on Czar's cross-claims against R+B.  *See* D.I. 204 at 4, 16-17 (addressing Czar's cross-claims for indemnity and contribution).  R+B did not move for summary judgment on the disputed limitation of liability clause in the TCI-Czar Subcontract.

[411] D.I. 225 at 13.

[412] *Id.* (citing D.I. 243- Stip. Ex. 48, General Conditions, § 5.3 (". . . Each subcontract agreement shall preserve and protect the rights of the Owner, Construction Manager and Architect under the Contract Documents with respect to the Work to be performed by the Subcontractor so that subcontracting thereof will not prejudice such rights . . . .")).

[413] *Id.*

The remaining issues from TCI's affirmative motion is whether the design of the Panel Wall System was delegated to TCI, and whether the Panel System was constructible.

TCI asserts the panel design was not delegated to TCI.  TCI contends whether it was responsible for the panel design depends upon whether the court determines Specification 07435 pertaining to  the Wall Panels, is a "performance" specification or a "design" specification.[414]

R+B argues TCI's position that the Panel Design was not delegated to TCI is based on the erroneous, and disputed, premise that the Specification is not a Performance Specification that delegated design to TCI.[415]

R+B prepared Specification 07435 - INSULATED METAL WALL PANELS (Addendum 3, 11/14/2013) for the Panel Wall System.[416]  R+B used Permatherm as its basis of design for the panels, and the Specifications listed both Permatherm and PFF as acceptable panel manufacturers.[417]  The Specification provided in part at Part I:

> General:  Construct panel system to provide for expansion and contraction of component materials without causing buckling, failure of joint seals, undue stress on fasteners, other detrimental effects to the panel system or adjacent building systems, or warping of faces of panel system.[418]

It further provided in part at Part 1.5, Submittals:

_____

[414] D.I. 218 at 9 (citing D.I. 243-1, Stip. Ex. 3).  TCI explains the term the term "performance specification" is synonymous with "delegated design.  *Id.* at 9 n.14.
[415] D.I. 225 at 6.
[416] D.I. 243-1, Stip. Ex. 3; D.I. 195, Stip. Fact 9 (identifying this as the "Specifications").
[417] D.I. 195, Stip. Fact. 10.
[418] D.I. 243-1, Stip. Ex. 3 at DSU 006176.

D.  Engineered Drawings and Calculations:  For installed products indicated to comply with certain design loadings, include structural analysis data and design prepared by an independent third party signed and sealed by the qualified professional engineer responsible for their preparation.

> 1.  Panel engineering to be prepared by the following, or another qualified engineer submitted and approved in accordance with prior approval process.

>> a.  Paul D. Hatch, PE, PC, [xxxx xxxxxx xxxxx xxxx], Ellijay, GA 30540. Phone:  [xxx-xxx-xxxx]; E-mail: [xxxxxxxx]@bellsouth.net.[419]

On December 27, 2019, DSU entered into a contract with TCI entitled **AIA**[®]

**Document A132™ –  2009,** *Standard Form of Agreement Between Owner and*

*Contractor, Construction Manager as Adviser Edition* for the Wall System.[420]  On

January 17, 2014, TCI advised W-T it had selected PFF as its manufacturer of record

on the Project.[421]

TCI and R+B each submit evidence suggesting disagreements as to what the

Specifications require of TCI with respect to its contested Panel Wall System design

responsibilities,[422] TCI acknowledges "Courts have confronted [the] issue [of whether a

contract provides a performance specification or a design specification], with varying

results as the inquiry is largely fact driven."[423]  The court finds this to be a case where

the competing arguments and facts preclude the court holding, as a matter of law, that

the TCI was not delegated design responsibility.  Thus, TCI's motion for summary

---

[419] *Id.*, Stip. Ex. 3 at  DSU 00617.
[420] D.I. 243-3, Stip. Ex. 139; D.I. 195, Stip. Fact 14.
[421] D.I. 243-1, Stip. Ex. 33.
[422] *See* D.I. 218 at 2-5; D.I. 225 2-4.
[423] D.I. 218 at 10 (emphasis added).

judgment is denied on this issue.

TCI's also seeks summary judgment that R+B's Panel Wall System was not constructible.[424]  In its opening brief, TCI cites the testimony of DSU's expert, Dannettel, for support.[425]  R+B asserts, to the extent TCI relies on DSU's expert testimony, TCI asks the court to weigh and accept expert opinion to resolve the constructability.[426] R+B argues that because the court is not permitted to weigh evidence at the summary judgment stage, TCI's motion must be denied.[427]  In its reply brief, TCI does not directly counter R+B's argument; instead it incorporates DSU's consolidated-answering-brief argument that expert testimony is *not* required to establish R+B's negligence.[428]  In the end, TCI's apparent reversal in first arguing DSU's expert testimony entitles it to summary judgment, and then promoting DSU's argument that the same testimony is not required to establish R+B's negligence, does not affect the outcome of its motion. Because court has determined, above, the constructability issue is one of several that require expert testimony, and by granting the Motion to Strike that testimony is absent, TCI's motion for summary judgment that the Panel Wall System was not constructible is denied.

TCI moves for summary judgment that DSU's proposed repairs constitute economic waste.  TCI and DSU dismissed all claims against each other,[429] therefore,

---

[424] D.I. 218 at 5-6.
[425] *Id.*
[426] D.I. 225 at 9.
[427] *Id.*
[428] D.I. 235 at 5.
[429] *See* D.I. 257.

TCI's motion is denied as moot.

The court concludes this portion of the opinion by addressing the remaining issues from R+B's motion for summary judgment, i.e., whether it is entitled to summary judgment on the cross-claims against it by Czar, TCI, and W-T.  R+B argues the negligence cross-claims must be supported by expert opinion on the standard of care.[430]  TCI and W-T do not proffer any expert opinion, and Czar's expert opinions are offered only to defend Czar, not fault R+B.[431]

Czar did not respond to R+B's motion.  Czar's cross-claims, however, are premised on it being found liable to DSU, which threat has been removed by the court's grant of summary judgment in Czar's favor on DSU's claims against it.  Moreover, the court found that there are no joint tortfeasors among Czar and any of its co-defendants.  Therefore, R+B's motion is granted as to Czar's negligence claim against R+B.

TCI argues no expert testimony is required to establish R+B's negligence, citing the "common knowledge" exception to the general rule that expert testimony is required to establish the applicable standard of care for professionals.[432]  The court has already determined, in its discussion of DSU and R+B's cross-motions for summary judgment on DSU's breach of contract claim, that expert testimony is required maintain a negligence claim with respect to R+B's professional obligations here.[433]  Because TCI

---

[430] D.I. 204 at 16.

[431] D.I. 204 at 17 (citing D.I. 243-4, Stip. Ex. 175 (Czar expert report by Michael Johannes Paul, P.E., of Larsen & Landis)).

[432] D.I. 224 at 8 (citing *Seiler v. Levitz Furniture Co.*, 367 A.2d 999, 1008 (Del. 1976).

[433] The case cited by TCI, *Dailey v. Purse*, C.A. No. 06C-04-015 RFS, 2008 WL 4824075 (Del. Super. Oct. 15, 2008), to suggest the common knowledge exception

proffers no expert opinion on R+B's professional standard of care, and how that was breached, R+B's motion is granted as to TCI's negligence claim against R+B.[434] The court also notes, TCI's cross-claims against R+B are premised its liability to DSU.[435]  Because TCI and DSU have dismissed all of their claims against each other, the premise of TCI's cross-claims cannot occur.  Thus, this is an additional reason to grant R+B's motion as to TCI's cross-claims.

W-T alleges cross-claims for contribution, implied in law indemnification, and implied in contract indemnification.  W-T's cross-claim for contribution fails because there are no joint tortfeasors from whom W-T could receive contribution.  Each of cross-claims is premised on W-T's liability to DSU.[436]  The court has dismissed DSU's only claim against W-T, breach of contract; thus, DSU is not entitled to recover damages from W-T.  Consequently, R+B's motion for summary judgment on W-T's cross claims is granted.

## III.    CONCLUSION–Czar, TCI, and R+B Motions for Summary Judgment

For the reasons discussed above:

I.      **Czar Engineering, LLC's** Motion for Summary Judgment (D.I. 215) is

---

applies is not persuasive.  The plaintiff there was injured when he fell from scaffolding, allegedly erected negligently by defendant.  *Id.* at *1.  The scaffold's wheels should have been held in place by pins, which were absent.  *Id.*  While moving the scaffolding, a wheel fell off causing the plaintiff injury from a resulting fall.  *Id.*  The court held that because the alleged negligence in not putting the pins in place was within a layman's common knowledge, no expert testimony was required.  *Id.*  This is in no way similar to R+B's allegedly negligent design of the Panel Wall System, which the court has determined is not something within the common knowledge of a lay person.

[434] TCI
[435] *See* D.I. 103 (Cross-Claims).
[436] *See* D.I. 97 (Cross-Claims).

**GRANTED in Part** and **DENIED in part**:

A.    **GRANTED** as to DSU's Count I (Breach of Contract), Count III (Negligence), and Count IV (Unjust Enrichment);

B.    **GRANTED** as to all co-defendants' contribution cross-claims;

C.    **GRANTED** as to R+B's indemnity cross-claim; and

D.    **DENIED** as to its limitation of liability.

II.    **Thomas Company, Inc.'s** Motion for Partial Summary Judgment (D.I. 217) is:

A.    **DENIED** as to the enforceability of Czar's limitation of liability provision;

B.    **DENIED** as to the whether the only engineering required by TCI was the connections back to the building;

C.    **DENIED** as to the constructability of R+B's Panel Wall System; and

D.    **DENIED as MOOT** as to whether DSU's proposed repairs constitute economic waste.

III.    **Richärd+Bauer, LLC's** motion for summary judgment (D.I. 215) is:

A.    **GRANTED** as to the negligence, contribution, and indemnity cross-claims by TCI, W-T, and Czar.

**Precision Foam Fabricators, Inc.'s Motion for Summary Judgement against Delaware State University and Thomas Company, Inc.**

**Thomas Company, Inc.'s Motion for Partial Summary Judgment against Precision Foam Fabricators, Inc.**

PFF moves for summary judgment in its favor on DSU's Counts I (Breach of

Contract), III (Negligence), and IV (Unjust Enrichment) against PFF in the TAC (D.I.

180-2); and TCI's claims for Breach of Contract, Unjust Enrichment, Breach of

Warranty, Common Law Indemnification and Contribution, and Contractual

Indemnification of TCI's Counterclaim in its Answer to Answer, Affirmative Defenses

104

and Counterclaim to [PFF's] Complaint in TCI's Answer to Plaintiff Delaware State University's Second Amended Complaint, Counterclaim, Cross-Claims and Denial of All Cross-Claims and Future Cross-Claims.[437]  TCI moves for summary judgment in its favor on its Breach of Contract claim against PFF.[438]

The court first addresses PFF's motion for summary judgment in its favor on DSU's Counts I, III, and IV in the TAC.  Next, the court analyzes PFF and TCI's cross-motions for summary judgment on TCI's claim against PFF for breach of contract. Lastly, the court discusses PFF's motion for summary judgment in its favor on TCI's remaining claims against PFF for Unjust Enrichment, Breach of Warranty, Common Law Indemnification & Contribution, and Contractual Indemnification alleged in its counterclaims.

## I.      DISCUSSION–PFF and TCI Motions for Summary Judgment

### A.      DSU'S Claims against PFF

Beginning with PFF's motion for summary judgment on DSU's claims against it, DSU's breach of contract claim alleges it "was an intended third-party beneficiary of the agreements reached between Thomas and its subcontractors and suppliers . . .  PFF . . . for the products, services and ongoing information they were obligated to provide

---

[437] D.I. 205 (Precision Foam Fabricators, Inc. Motion for Summary Judgement against Delaware State University and Thomas Company, Inc.).  Briefing on the motion is found at D.I. 206 (PFF Opening Brief); D.I. 222 (TCI Answering Brief); D.I. 231 (DSU Consolidated Answering Brief); D.I. 234 (PFF Reply Brief to TCI); and D.I. 238 (PFF Reply Brief to DSU).

[438] D.I. 207 (Thomas Company, Inc. Motion for Partial Summary Judgment against Precision Foam Fabricators, Inc.).  Briefing on the motion is found at D.I. 209 (TCI Opening Brief); D.I. 223 (PFF Answering Brief); and D.I. 232 (TCI Reply Brief).

specifically for the benefit of DSU[,]"[439] and "[u]pon information and belief . . . PFF . . . was duly bound by the terms and conditions of their respective agreements, and such obligations extend to DSU as an intended third-party beneficiary of those agreements."[440]

PFF contends it is entitled to summary judgment on DSU's breach of contract because DSU is not a third-party beneficiary of PFF's contract with TCI.[441]

With respect to DSU's status as a third-party beneficiary to the TCI-PFF contract, PFF's arguments, DSU's response, and the court's analysis are substantially identical to those on the issue discussed with respect to Czar's motion for summary judgment. Therefore, the court incorporates its analysis of that issue from Czar's motion and briefly summarizes PFF and DSU's respective arguments here.

PFF argues DSU's third-party beneficiary theory fails because the TCI-PFF PO is an express contract, lacking any warranty or indemnity obligations, and not even referring to, or making, DSU a third-party beneficiary.[442]  PFF states its obligation under that PO was simply to manufacture and deliver panels to the Project as specified, which obligations it met.[443]

PFF points to the same provisions of the contract between DSU and TCI, **AIA®**

**Document B132™–2009**, *Standard Form of Agreement Between Owner and Architect,*

---

[439] D.I. 180-2 ¶ 52.
[440] *Id.* ¶ 53.
[441] D.I. 206 at 9-10.
[442] *Id.* at 2.
[443] *Id.*

*Construction Manager as Advisor Edition*, which govern TCI's obligations to DSU[444] as Czar highlighted.  Section 1.1.2 of the General Conditions[445] governing DSU and TCI's relationship explicitly disclaims an intent to create third-party beneficiary status on DSU with respect to TCI's subcontractors on the Project.

The court thus reviews the TCI-PFF contract which provides in nearly identical language as the TCI-Czar contract:

> THIS ORDER IS COMPLETE WITH ALL THE ITEMS NECCESSARY [sic] AND INCIDENTAL THERE TO IN STRICT ACCORDANCE WITH THE ENTIRE CONTRACT DOCUMENTS PREPARED [sic] THE OWNER AND/OR THEIR CONSULTANT, INCLUDING WITHOUT LIMITATION: THE GENERAL, SPECIAL AND OTHER CONDITIONS, ALL SPECFICIATIONS, [sic], DRAWINGS, AND INVITATIONS FOR BIDS, BULLETINS, ADDENDA AND MODIFICATIONS THERETO.  NO OTHER CHANGES WILL BE ACCEPTED EXCEPT THOSE STATED HEREIN AND AS PER THE CONTRACT DOCUMENTS.  PROVIDE WRITTEN DOCUMENTATION INDICATING IMPACTS FOR CHANGES AND REVISIONS, WHEN REQUESTED.[446]

DSU's argument with respect to this language in the TCI-PFF PO is substantially identical to its argument with respect to the TCI-Czar PO, i.e., that it shows PFF is "subject to performing its work in strict compliance with the contract documents and General Conditions prepared by the Owner."[447]  The court again finds that argument to be little more than saying the language provides DSU as owner will benefit from the TCI-Czar contract, the expected result of every subcontract.  The court also reiterates that DSU's parallel statement it made in connection with Czar's motion, i.e., that PFF's

---

[444] D.I. 195, Stip. Fact 14; D.I. 243-3, Stip. Ex 139; D.I. 206 at 10.
[445] D.I. 243-1, Stip. Ex. 48 § 1.1.2 (emphasis added); D.I. 238 at 3.
[446] *Id.*, Stip. Ex. 8.
[447] D.I. 231 at 38.

subcontract does not disclaim the creation of a third-party beneficiary relationship between the Owner and subcontractor,[448] is not the proper inquiry.  The proper inquiry is whether there was an intent to *create* third-party beneficiary status on the part of DSU, not whether such status exists absent disclaimer.[449]  The language in the TCI-PFF PO evidences no such intent and DSU offers no other evidence showing otherwise.  The court agrees with PFF that its contract with TCI "does not contain terms and conditions, or anything approaching the detail of the prime contract between DSU and TCI."[450]

Consequently, because the court determines DSU is not an intended third-party beneficiary to the TCI-PFF PO, PFF's motion to for summary judgment on DSU's Count I breach of contract claim is granted.

DSU's Count III negligence claim alleges "PFF manufactured and provided the defective panels for the Project" upon which DSU relied and was damaged, "including but not limited to damages to the building structure and property other than the panel wall itself."[451]

PFF argues it is entitled to summary judgment on DSU's claim of negligence design because DSU identifies no standard of care or duty owed by PFF, or PFF's breach of that duty, and that the negligence claim is barred by the economic loss

---

[448] *Id.*

[449] *Cf. William M. Young Co. v. Bacon*, C.A. No. 89L-JA2,  1991 WL 89817, at *4 (Del. Super. May 1, 1991) ("Young argues that *Pierce* holds that a third-party beneficiary status will exist unless the parties have negated same in the language of the contract.  Young's position is incorrect.").

[450] D.I. 206 at 10.

[451] D.I. 180-2 ¶¶ 63, 66-69.

doctrine.[452]

In its analysis of Czar's motion on DSU's Count III, the court determined that the economic loss doctrine bars DSU's negligence claim against Czar because no exception to that doctrine allows recovery.  PFF's arguments on the application of the doctrine are substantially similar to Czar's.  The same analysis applies to that claim as alleged against PFF.  Therefore, the court incorporates its analysis of that issue from Czar's motion and briefly summarizes PFF's arguments.[453]

PFF cites the Third Circuit's *Pierce* decision for the proposition that under Delaware law, absent privity of contract, a party may not maintain a cause of action sounding in negligence to recover for purely economic loss.[454]  PFF notes the Superior Court of Delaware's opinions in *Guardian*, adopting of § 552 of the Restatement (Second) of Torts, and *Millsboro*, recognizing that adoption.[455]

PFF argues the exceptions do not apply, asserting no party in the present case disputes that:  (1) DSU and PFF are not in privity of contract or its equivalent; and (2)

---

[452] D.I. 206 at 10-14.

[453] Thus, the court need not address PFF's arguments regarding DSU's failure to identify the standard of care or duty owed by PFF.  The court notes, however, that elsewhere in this opinion the court grants W-T and PFF's Motion to Strike the Thornton Tomasetti Report because, *inter alia*, Dannettel is not qualified to offer the opinions contained therein.  The court also notes DSU does not directly address PFF's arguments for summary judgment based on the standard of care/duty issue in its consolidated answering brief.  DSU limits its to arguments to the assertion that it is a third party beneficiary to the TCI-PFF contract.  *See* D.I. 231 at 37-39.

[454] D.I. 206 at 12 (citing *Pierce Assocs., Inc. v. Nemours Found.*, 865 F.2d 530, 539 (3d Cir. 1988)).

[455] *Id.* (citing *Guardian Const. Co. v. Tetra Tech Richardson, Inc.*, 583 A.2d 1378, 1386 (Del. Super. 1990) and *Millsboro Fire Co. v. Constr. Mgmt. Serv.*, C.A. No. 05C-06, 2006 WL1867705, at *2 (Del. Super. June 7, 2006)).

DSU's alleged losses are purely economic and do not involve property damage or personal injury.[456]  Analogizing its position to *Pierce*, PFF maintains DSU cannot recover against PFF for negligence where its damages are purely economic and there is no privity of contract.[457]  PFF also contends there are no allegations of negligent misrepresentation to allow the court to disregard the privity requirements.[458]

DSU did not respond to PFF's arguments regarding Count III.

Despite being on notice of PFF's arguments that there are no genuine issues of material fact precluding summary judgment in its favor on its unjust negligence claim, DSU responded only to the breach of contract subset of arguments advanced by PFF in its briefing.  Thus, based on the evidence and argument PFF provides in support of its motion, and DSU's failure to respond, the court determines that claim is abandoned.  There is no genuine issue of material in dispute, and PFF's motion for summary judgment on Count III is granted.[459]

DSU's Count IV unjust enrichment claim alleges "Defendant[] . . . PFF . . . [was] directly and unjustly enriched by [its] actions to DSU's impoverishment and detriment[,]"[460] and "[a]s a result of [PFF's] defective and deficient work, [its] enrichment

---

[456] *Id.*

[457] *Id.* (citing *Pierce, supra*, at 865 F.2d 539-41 (under Delaware law, owner had neither a third party beneficiary claim nor a negligence claim against a subcontractor)).

[458] *Id.* at 13.

[459] *See Baldonado v. Avrinmeritor, Inc.*, C.A. No. 13-833-SLR-CJB, 2014 WL 2116112, at *7 (D. Del. May 20, 2014) (responding to only a subset of arguments subject to a dispositive motion is deemed abandonment of the un-responded to claims) (citing cases), *report and recommendation adopted*, C.A. No.  13-833-SLR/CJB, 2014 WL 2621119 (D. Del. June 10, 2014).

[460] D.I. 180-2 ¶ 71.

was unjustified, and there is no remedy available to DSU."[461]

PFF contends it is entitled to summary judgment in its favor on DSU's Count IV unjust enrichment claim because DSU's contracts with TCI and other parties provide full relief.[462]  PFF makes substantially similar arguments as Czar which were addressed in the court's analysis of Czar's motion.  Here again, DSU's claim fails.

In summary, DSU alleges separate breach of contract and unjust enrichment claims against PFF.[463]  PFF argues *quasi*-contractual relief against a third party is not appropriate where a contract exists and provides for full relief.[464]  PFF argues DSU possess multiple direct contracts upon which it seeks relief.[465]  The prime contracts DSU entered regarding the design, engineering, drawings, oversight, furnishing, and installation of the Panels at issue purportedly provide for complete relief in the event of

---

[461] *Id.* ¶ 72.

[462] D.I. 206 at 13.

[463] D.I. 180-2 (Counts I and IV).

[464] D.I. 206 at 13 (citing *Kuroda v. SPJS Holdings, L.L.C.*, 971 A.2d 872, 891 (Del. Ch. 2009); *Chrysler Corp. v. Airtemp Corp.*, 426 A.2d 845, 855 (Del. Super. 1980) ("'The mere fact that a person benefits another is not itself sufficient to require the other to make restitution.' *Ibid*, comment c.  In order to warrant restitution, the retention of the benefit must be unjust.  *Ibid.*" (citing Restatement of Restitution, Section 1).  Absent a showing that the plaintiff was unable to gain contractual relief, it was not entitled to pursue its claims for *quantum meruit*, implied contract, or restitution against a third party not in privity of contract.).

[465] *Id.* at 13-14.  PFF notes DSU contracted with TCI for the design, engineering, drawings, furnishing and installation of the Wall System, which provides for relief in the event of a contract breach.  D.I. 195, Stip. Fact 14.  Those obligations were assured by Liberty Mutual under the performance bond issued on TCI's behalf and in favor of DSU.  D.I. 195, Stip. Fact 15.  DSU contracted with R+B for the design, Drawings and Specifications for, *inter alia*, the façade, which likewise provides relief for design or defects.  D.I. 195, Stip. Fact 7.  DSU contracted with W-T for Construction Manager as Advisor services, which also provides for relief for W-T's breaches.  D.I. 195, Stip. Fact 12.

a breach.[466]  PFF asserts DSU's failure to show a lack of basis for recovery under these contracts that might otherwise justify *quasi*-contractual relief against PFF demonstrates the unjust enrichment claim against PFF should be dismissed.[467]

DSU did not respond to PFF's arguments regarding Count IV.

DSU's Count I alleges a breach of contract claim against PFF; a claim it argues in its opposition brief is supported under a third-party beneficiary argument.[468]  Despite being on notice of PFF's arguments that there are no genuine issues of material fact precluding summary judgment in its favor on its unjust enrichment claim, DSU responded only to the breach of contract subset of arguments PFF advanced in briefing on its motion.  Thus, based on the evidence and argument PFF provides in support of its motion, and DSU's failure to respond, the court determines that claim is abandoned, there is no genuine issue of material in dispute, and PFF's motion for summary judgment on Count IV is granted.[469]

Thus, PFF's motion for summary judgment on all claims asserted against it by DSU is granted in its entirety.

## B.  PFF and TCI's Cross-Motions on TCI's Breach of Contract Claim against PFF

The court next proceeds to PFF and TCI's cross-motions for summary judgment on TCI's breach of contract claims against PFF, followed by PFF's motion for summary judgment on TCI's claims against PFF for unjust enrichment, breach of warranty,

---

[466] D.I. 206 at 14.
[467] *Id.*
[468] *See* D.I. 231 at 37-38.
[469] *See Baldonado*, 2014 WL 2116112, at *7.

common law indemnification and contribution, and contractual Indemnification.

The following procedural background is relevant to TCI's breach of contract claim against PFF.

On November 13, 2015, PFF initiated this litigation by filing suit against TCI in New Castle County Superior Court.[470]  PFF asserted it had not been paid in full for the metal panels it supplied on the Project, and asserted a claim against TCI for breach of contract and a payment bond claim against TCI's surety, Liberty Mutual.[471]  Thereafter, the matter was removed to this court on the basis of diversity jurisdiction.[472]

TCI asserted counterclaims against PFF and joined DSU as a third-party defendant.[473]  On December 18, 2015, TCI filed its Answer, Affirmative Defenses and Counterclaim to [, PFF's,] Complaint, alleging Breach of Contract (Count I), Unjust Enrichment (Count II), Breach of Warranty (Count III), Common Law Indemnification and Contribution (Count IV), and Contractual Indemnification (Count V) against PFF.[474]  On January 4, 2016, TCI filed a Third Party Complaint against DSU, alleging Breach of Contract (Count I), Unjust Enrichment (Count II), and Violation of 29 *Del. C.* § 6516(f) (Count III).[475]  Ultimately, the other parties were joined and the court granted a joint motion to realign the parties with DSU as the plaintiff.[476]  On July 13, 2018, after

---

[470] *See* D.I. 1-1 (PFF Complaint).

[471] *Id.*

[472] *See* D.I. 1 (Notice of Removal).

[473] *See* D.I. 7 (TCI Answer and Counterclaim); D.I. 8. (TCI Third Party Complaint).

[474] D.I. 7.

[475] D.I. 8.

[476] *See* D.I. 73 (Joint Motion to Realign Parties).  The court ordered the realignment of the parties on May 1, 2018.  *See* Docket Entry, May 1, 2018 (SO

realignment of the parties, TCI filed its Answer to Plaintiff Delaware State University's

Second Amended Complaint, Counterclaim, Cross-Claims and Denial of All Cross-

Claims and Future Cross-Claims.[477]   TCI's July 13, 2018 filing reiterated its original

claims against PFF, but under different Count numbers.[478]

TCI's breach of contract claim alleges it "entered a contract with [PFF] to

purchase certain metal panels and related material for use on the Project[,] that

"required PFF to deliver materials 'in strict accordance' with the 'general, special and

other conditions, all specifications, drawings, initiations for bids, bulletins, addenda and

modifications thereto' issued for Project."[479]   "PFF failed to timely deliver its materials to

the Project, resulting in delay and additional costs to [TCI,]" and "when PFF did deliver

its materials, they were deemed defective by DSU and/or its representatives, causing

[TCI] to incur additional costs to investigate, mitigate, remove and reinstall the

materials."[480]

---

ORDERED D.I. 73 Joint MOTION Re-align parties filed by Delaware State University).

[477] D.I. 103.

[478] TCI's original complaint includes these claims against PFF.  *See* D.I. 7.  After additional parties entered the litigation, and the court's realignment making DSU the plaintiff, TCI's July 13, 2018 filing reiterated its claims against DSU made in D.I. 8, added a cross-claim for indemnification against R+B, Czar, PFF, W-T, and Ashford (D.I. 103, Cross-Claim Count I), and reiterated its breach of contract, unjust enrichment, and breach of warranty claims against PFF.  *Id.* (Cross-Claims II, III, and IV, respectively). Although TCI references the claims recited in D.I. 103 at the beginning of its opening brief in support of its affirmative motion for summary judgment, and in its opposition brief to PFF's affirmative motion, (*see* D.I. 209 at 1; D.I. 222 at 1, respectively), TCI and PFF each refer to the Count numbers from D.I. 7 in their respective briefs.  To avoid confusion, the court refers to the basis of the claim being discussed rather than count number, e.g., "breach of contract," rather than "Count *x*."

[479] D.I. 103 at 13-14, ¶¶ 3-4.

[480] *Id.* at 14, ¶ 6.

To prevail on a breach of contract under Delaware law, a party must show:  (1) the existence of a contract; (2) breach of an obligation imposed by the contract; and (3) damages resulting from said breach.[481]  PFF asserts TCI cannot demonstrate facts essential to elements 2 and 3 and it is entitled to summary judgment.[482]

Specifically, PFF argues no party has established that PFF is the cause of the Panel deformations.[483]  PFF asserts there is no evidence that it is the cause of the deformations, which all parties agree are caused by differential temperature between the outside and interior panel skins.[484]  PFF maintains it met its contractual obligation to TCI manufacture and deliver panels to the Project as specified.[485]

TCI argues the evidence shows that PFF breached its contract with TCI related to the first set of panels PFF supplied on the Project because those panels did not meet the requirements of the Project Specifications and did not match the approved panel sample PFF supplied.[486]  As a result of that alleged breach, TCI maintains it is entitled to partial summary judgment related to damages it suffered due to delays resulting from PFF's breach.[487]

It is important to reiterate that TCI's breach of contract claim against PFF only

---

[481] *Markow v. Synageva Biopharma Corp.*, C.A. No. C.A. No. N15C–06–152 WCC CCLD, 2016 WL 1613419, at *4 (Del. Super. Mar. 3, 2016).  PFF acknowledges "there is no dispute that TCI and PFF entered into a valid PO," but assets "that PO was strictly limited only to PFF's manufacture and delivery of the Panels per the specifications TCI provided PFF. . . ."  D.I. 234 at 6.

[482] D.I. 206 at 15.

[483] *Id.* at 1-2.

[484] *Id.* at 2.

[485] *Id.*

[486] *Id.*

[487] *Id.*

concerns the first set of panels PFF supplied, and the damages, if any, TCI suffered as a result of the purported breach.  The following are relevant contracts, requirements, time lines, and events relevant to PFF and TCI's cross-motions.

On January 12, 2012, DSU and W-T entered into a contract titled **AIA® Document C132™ – 2009, *Standard Form of Agreement Between Owner and Construction Manager as Adviser***; **AIA® Document A232™ – 2009, *General Conditions of the Contract for Construction***, *Construction Manager as Adviser Edition*; and Section 00730–SUPPLEMENTARY GENERAL CONDITIONS TO THE CONTRACT.[488]

On January 20, 2012, DSU retained R+B as the Architect of Record for the OSCAR Facility pursuant to an **AIA® Document B132™--2009, *Standard Form of Agreement Between Owner and Architect,*** *Construction Manager as Adviser Edition*.[489]

On December 27, 2013, DSU entered a contract with DSU entered a contract with TCI entitled **AIA® Document A132™--2009, *Standard Form of Agreement Between Owner and Contractor***, *Construction Manager as Adviser Edition for the Wall System* in connection with the Project.[490]  On January 20, 2014, TCI entered into a valid and binding purchase order contract with PFF to purchase insulated panels for the

---

[488] D.I. 195, Stip. Fact 12; D.I. 243-2, Stip. Ex. 94 (DSU-W-T contract); D.I. 243-2, Stip. Ex. 48 (General Conditions); & D.I. 243-3, Stip. Ex. 140 (Section 00730), respectively.

[489] D.I. 243-1, Stip. Ex. 47.

[490] D.I. 195, Stip. Fact 14; D.I. 143-3, Stip. Ex. 139.

benefit of the Project and Owner,[491] which states:

> THIS ORDER IS COMPLETE WITH ALL THE ITEMS NECCESSARY [sic] AND INCIDENTAL THERE TO IN STRICT ACCORDANCE WITH THE ENTIRE CONTRACT DOCUMENTS PREPARED [sic] THE OWNER AND/OR THEIR CONSULTANT, INCLUDING WITHOUT LIMITATION: THE GENERAL, SPECIAL AND OTHER CONDITIONS, ALL SPECFICIATIONS, [sic], DRAWINGS, AND INVITATIONS FOR BIDS, BULLETINS, ADDENDA AND MODIFICATIONS THERETO.  NO OTHER CHANGES WILL BE ACCEPTED EXCEPT THOSE STATED HEREIN AND AS PER THE CONTRACT DOCUMENTS.  PROVIDE WRITTEN DOCUMENTATION INDICATING IMPACTS FOR CHANGES AND REVISIONS, WHEN REQUESTED.[492]

Section 3.12.3 of the Project's General Conditions requires the Contractor to recites "Samples are physical examples that illustrate materials, equipment or workmanship and establish standards by which the Work will be judged.[493]

W-T had "the authority to reject work that does not conform to the Contract Documents."[494]

On May 14, 2014, the Project architect, R&B, approved a sample of the metal panels supplied by PFF.[495]

The Specifications required the PFF supplied panels to have a mirrored finish,[496]

---

[491] D.I. 1-1 (*Precision Foam Fabricators, Inc. v. Thomas Co., Inc.*, C.A. No. N15C-11-115 CLS (Del. Super. Nov. 13, 2015), ¶¶ 9, 17; D.I. 243-1, Stip. Ex. 8.

[492] D.I. 243-1, Stip. Ex. 8.

[493] *Id.*, Ex. 48 (General Conditions) § 3.12.3.

[494] *Id.*, Stip. Ex. 48 (General Conditions) § 4.2.8; *see also* D.I. 243-3, Stip. Ex. 94 (DSU-W-T Contract) § 3.3.14.

[495] D.I. 207-2,  Ex. A (May 14, 2014 Approval) at Thomas0044 ("The sample submitted is acceptable . . . .").

[496] D.I. 243-1, Stip. Ex. 3 (Specifications, Nov. 14, 2013, Addendum 3) at § 2.3.B.2 ("Exterior face . . . to be polished stainless with . . . with [ ] polished mirror finish").

117

which PFF acknowledges was provided the Specifications.[497]

The first set of PFF panels was timely delivered to the Project on September 30, 2014.[498]  The Project schedule issued by W-T in effect at the time required panel installation be completed by October 27, 2014.[499]  Installation began on October 6, 2014.[500]  When installation began, W-T advised TCI that the finish on the installed panels "does not match the samples."[501]  Specifically, the delivered panels had a "dull," "hazy" or "cloudy" look rather than the mirrored appearance of the samples.[502]

On October 8, 2014, DSU formally notified TCI that there was a "discrepancy between the exterior finish of the insulated panels that have been supplied and the sample that was reviewed and approved by the Architect" and requested an immediate meeting with TCI, PFF, W-T and R&B to address the issue.[503]

PFF participated in an October 9, 2014, telephonic conference and an October

---

[497] D.I. 223 at 1; D.I. 234 at 6.

[498] D.I. 195, Stip. Fact 25; *see also* D.I. 2007-2, Ex. B (Oct. 13, 2014 DSU email) at Thomas005.

[499] D.I. 207-2, Ex. C (Sept. 1, 2014 Project Schedule Update) at Thomas009. PFF states the PO made no reference to any schedule and no schedule–or any of the other alleged contract documents–accompanied the PO.  D.I. 223 at 1 (Disputed Fact 2).

[500] D.I. 243-3 Stip. Ex. 124 (Oct. 30, 2014 Project Minutes), at DSU0003821; D.I. 243-12 (George Dep.) at 309:9-23 (confirming minutes are accurate).

[501] D.I. 243-3, Stip. Ex. 125 (Oct. 6, 2014 email).

[502] D.I. 207-2, Ex. D (Oct. 8, 2014 email) at Thomas014-017 (describing panels as "'dull' not mirror like samples"); *id.*, Ex. B (Oct. 13, 2014 DSU email) at Thomas005 (describing panels as "cloudy"); D.I. 243-16 (Mefferd Dep., PFF corporate designee) at 176:25-177:20 (describing panels as "cloudy" and not "shiny"); D.I. 243-12 (George Dep., W-T corporate designee) at 309:24-310:7 ("[W]e . . . started looking at the finish, it was a little blurry, it wasn't that mirror finish that the sample was original provided was."), 176:13-19 ("the first panels were rejected because the finish was not correct").

[503] D.I. 243-1, Stip. Ex. 21 (Oct. 8, 2014 Letter).

10, 2014 in-person meeting to address the issue.[504]  At the time, all parties present, including PFF, "agreed that the metal finish on the first batch of panels that was fabricated does not all align with what was represented by the product sample that was submitted and approved."[505]  Thereafter, DSU formally rejected the PFF panels, confirming the rejection in a formal notice subsequently issued on October 21, 2014.[506]

At deposition, PFF's corporate designee, Ricky Mefferd, testified that the first set of Panels were rejected due to their appearance.

**Q.  . . . Ultimately, the first batch of panels that were delivered to the site were rejected, were they not?**

**A.  They were rejected based on the appearance or esthetics of the panel**.

Q.  Okay.

A.  That is correct.

Q.  And what is your understanding the problems or issues with the appearance and the esthetics of the panels that were delivered?

A.  My understanding is that the owner did not believe that it matched or appeared–it was a different shade than what his–what he had agreed upon, I'll call it.

Q.  A different shade?

A.  A different–not a shade–appearance, I guess, not shade, but . . .

---

[504] D.I. 243-3, Stip. Ex. 127 (Minutes of Oct. 9, 2014 Telephonic Conference); D.I. 207-2, Ex. B (October 13, 2014 DSU Email) at Thomas005 (summarizing Oct. 10, 2014 meeting).

[505] D.I. 207-2, Ex. B (Oct. 13, 2014 DSU email) at Thomas005 (summarizing Oct. 10, 2014 meeting).

[506] *See*  D.I. 243-3, Stip. Ex. 104 (Oct. 21, 2014 Letter); D.I. 243-12 (George Dep.) at 176:18-19 ("the first panels were rejected because the finish was not correct").

Q.  It was cloudy?

A.  It was cloudy.

Q.  It wasn't shiny?

A.  Right.[507]

As a result of the aesthetic defect, Mefferd testified PFF manufactured, and paid

for, new panels.

A.  What, if anything, did [PFF] do to correct—did you manufacture new panels?

A.  We did.

Q:  Who paid for that?

A.  PFF.

**Q.  Okay. So PFF paid for it *acknowledging* that the ones delivered were unacceptable?**

**A.  Based on the finish, correct, yes.[508]**

Mefferd testified PFF acknowledged, and accepted responsibility for, the

rejection.

Q. You acknowledge that the panels were rejected?

A.  I do.

**Q.  And you accepted responsibility for the rejection, correct?**

[Objection]

**A.  We did.**

---

[507] D.I. 243-16 (Mefferd Dep.) at 176:25-177:20 (emphasis added).
[508] *Id.* (Mefferd Dep.) at 178:17-24 (emphasis added).

Q.  And you agreed to provide replacement panels that met the specifications, correct?

A.  Yes.[509]

The court finds the evidence shows, with respect to the first panels delivered, that PFF breached its contract with TCI.  PFF admits "there is no dispute that TCI and PFF entered into a valid PO, that PO was strictly limited only to PFF's manufacture and delivery of the Panels per the [S]pecifications TCI provided PFF . . . ."[510]  PFF states the panels were only rejected "on aesthetic grounds.[511]  That, however, is the point.  The Specifications required the PFF supplied panels to have a mirrored finish.[512]  Correspondence, contemporaneous documentation, and Mefferd's testimony confirm the first set of panels PFF delivered did not meet that requirement.

In an attempt to negate the impact of Mefferd's testimony, PFF submits the affidavit of former PFF employee Daniel Garner attached to its brief opposing TCI's motion,[513] and challenges TCI's arguments for:

> TCI blindly rel[ying] on PFF's corporate designee, who testified that (a) PFF's assets were sold in 2016; (b) he only had knowledge that PFF had a contract and was not involved in the Project; and (c) disputed much of what TCI now relies upon.  Mr. Garner . . . was the better person to testify to these items.  Mr. Garner retired in 2016 and no party subpoenaed him for deposition testimony.[514]

---

[509] *Id.* (Mefferd Dep.) at 211:22-212:6 (emphasis added).

[510] D.I. 234 at 6.

[511] D.I. 206 at 2; D.I. 234 at 1.

[512] D.I. 243-1, Stip. Ex. 3 (Specifications, Nov. 14, 2013, Addendum 3) § 2.3.B.2 ("Exterior face . . . to be polished stainless with . . . with [ ] polished mirror finish").

[513] D.I. 223-1 (Garner Aff.).

[514] D.I. 223 at 4 n.7 (citing D.I. 243-16 (Mefferd Dep.) at 11:1-8, 19:9-16; 19:21-20:3); D.I. 234 at 4 n.4 (same).

121

The court finds PFF's criticism is unwarranted.

A "Rule 30(b)(6) designee presents the corporation's, rather than his personal, 'position' on a topic and, in addition to testifying about facts within the corporation's knowledge, testifies about the corporation's subjective beliefs and opinions, and its interpretation of documents and events."[515]  "A corporation has an affirmative duty to produce a representative who can answer questions that are within the scope of the matters described in the notice."[516]  "The duty of preparation goes beyond the designee's personal knowledge and matters in which the designee was personally involved.  If necessary, the deponent must use documents, **past employees**, or other resources to obtain responsive information."[517]

Generally, "[a] party may not retract prior 30(b)(6) testimony with a later affidavit, and then use that affidavit to preclude summary judgment."[518]  As the *Daubert* Court explained:

> Where the nonmovant in a motion for summary judgment submits an affidavit that directly contradicts an earlier Rule 30(b)(6) deposition and the movant relied upon and based its motion on the prior deposition, several courts have disregarded the later affidavit. However, where the affidavit is 'accompanied by a reasonable explanation' of why it was not offered earlier, courts have allowed a contradictory or inconsistent affidavit to nonetheless be admitted to supplement the earlier submitted Rule 30(b)(6) testimony.[519]

---

[515] *Ethypharm S.A. France v. Abbott Labs.*, 271 F.R.D. 82, 93 (D. Del. 2010).

[516] *Crawford v. George & Lynch, Inc.*, 19 F. Supp. 3d 546, 554 (D. Del. 2013).

[517] *Id.* (internal citations omitted) (emphasis added).

[518] *Daubert v. NRA Grp., LLC*, 189 F. Supp. 3d 442, 458–59 (M.D. Pa. 2016), *aff'd in relevant part*, 861 F.3d 382 (3d Cir. 2017).  Whether to disregard an affidavit under the sham-affidavit doctrine is up to the court's discretion.  *See Daubert*, 861 F.3d at 389.

[519] *Id.* at 258 (citations omitted).

As TCI contends, Mefferd's testimony was undoubtedly within the scope of the topics about which he was to testify.[520]  Here, PFF provides no explanation why the information Garner provides was not offered earlier, or why that information was unavailable to Mefferd prior to his deposition.  Mefferd testified Garner was the most knowledgeable individual about the subject matter of the litigation and would have "extremely" important information.[521]  He was sure PFF had Garner's contact information, but he did not attempt to speak to Garner in preparation for his Rule 30(b)(6) deposition.[522]

Thus, the court grants TCI's motion, and denies PFF's motion, to the extent each seek summary judgment on TCI's breach of contract claim against PFF.[523]  The court must now determine whether summary judgment is appropriate on TCI's claim for damages as a result of that breach.

TCI argues it should be granted judgment in its favor and against PFF in the

---

[520] D.I. 232 at 5 (citing D.I. 243-1, Stip. Ex. 4 (Rule30(b)(6) Notice of Deposition to PFF); *id.*, Stip. Ex. 24 (Supplemental Rule 30(b)(6) Notice to PFF); D.I. 234-16 (Mefferd Dep.) at 11:22-24, 201:5-8 (confirming designee was prepared to testify as to all topics in the notices)).

[521] D.I. 234-16 (Mefferd Dep.) at 136:23-137:17; 201:18-24.

[522] *Id.*  In response to PFF's criticism that no other party subpoenaed Garner, TCI states that once PFF's 30(b)(6) witness acknowledged the finish defect in the first set of panels, it relied on that testimony and had no need to subpoena Garner.  Separately, PFF's argument that Mefferd's testimony "only confirms PFF's *present* general understanding of why the Owner rejected the Panels by an individual who had no involvement in the Project contemporaneously . . . not that it agreed with any rejection or the existence of any alleged aesthetic defects[,]" D.I. 234 at 4, is similarly unpersuasive.  Mefferd was PFF's 30(b)(6) witness, his contemporaneous involvement in the Project was not necessary for him to testify in that role.

[523] Because the court determines the first set of panels breached the contract for lack of compliance with the specification, it need not address the parties' argument that a breach is also shown because the first set of panels did not match the sample panels.

amount of $163,622.68 plus prejudgment interest of $46,398.80 through the date of its motion (and accruing at $25.78 per day thereafter) related to the first set of defective panels PFF supplied on the Project.[524]

PFF argues its motion should be granted on TCI's claim for damages because TCI did not provide any expert report or testimony that PFF delayed the Project or caused TCI field inefficiency or additional costs.[525]  PFF argues TCI's failure to provide expert testimony that PFF breached any duty or caused delay to the Project precludes recovery for claimed delay damages, particularly, where, as here, TCI has sought recovery for delays from the Owner, not PFF.[526]  Similarly, PFF argues TCI's motion should be denied because TCI has not met its burden of showing the rejection of the first set of panels actually delayed and impacted TCI or that TCI's damages resulted from PFF's breach and not for other causes, including TCI's own failures to mitigate.[527]

The following evidence is relevant to the damages issue.

The first set of PFF panels was timely delivered to the Project on September 30, 2014.[528]  Installation began on October 6, 2014[529] despite finish issues being noted and TCI notifying PFF of the issue that day.[530]  On October 8, 2014, DSU issued a letter

---

[524] D.I. 209 at 2.

[525] D.I. 206 at 6.

[526] *Id.* at 2.

[527] D.I. 223 at 1.

[528] D.I. 195, Stip. Fact 25; *see also* D.I. 2007-2, Ex. B (Oct. 13, 2014 DSU email) at Thomas005.

[529] D.I. 243-3 Stip. Ex. 124 (Oct. 30, 2014 Project Minutes), at DSU0003821; D.I. 243-12 (George Dep.) at 309:9-23 (confirming minutes are accurate).

[530] *See* D.I. 207-2, Ex. B (Oct. 13, 2014 email) at Thomas005.

identifying the concern and TCI ceased panel installation that day.[531]

On October 10, 2014, the parties met to discuss a path forward.[532]   At that meeting, the parties agreed that the overall project schedule it did not appear the overall project schedule would be impacted by the panel replacement issue.[533]   PFF agreed to manufacture replacement panels at its cost.[534]   DSU and W-T approved PFF's proposed replacement panels on October 29, 2014.[535]   The replacement panels were delivered to the Project on October 31, 2014 and were confirmed to have the appropriate mirrored finish.[536]

After the first set of panels was rejected, W-T advised TCI that the rejection cased a delay to the Project and that TCI would have to establish a recovery schedule to avoid impact to the overall schedule.[537]   W-T also advised TCI it would not be paid for any work on the Project until the replacement panels were delivered.[538]   W-T further instructed TCI to provide a "make-up once the panels are onsite due to the finish delay" and that it was expecting 10-hour days 5 days per week and an additional 8-hour shift

---

[531] *Id.*

[532] *Id.*

[533] *Id.* at Thomas006.  W-T's designee stated it was able to mitigate the affect of TCI's delay relating to panel replacement on other trades involved in the Project.  D.I. 243-12 (George Dep.) at 208:1-4.

[534] *See* D.I. 243-16 (Mefferd Dep.) at 178:17-24.

[535] *See* D.I. 207-2, Ex.  G (Oct. 29, 2014 Email) at Thomas022.

[536] *See* D.I. 207-2, Ex. H (Nov. 4, 2014 Email) at Thomas023-024.  At the time of rejection, Thomas had already installed 12 panels. *See* D.I. 243-3, Stip. Ex. 127 (Minutes of Oct. 9, 2014 Telephonic Conference).

[537] *See* D.I. 243-3, Stip. Ex. 104 (Oct. 21, 2014 Letter).

[538] *See* D.I. 207-2, Ex. F (Oct. 13, 2014 Email) at Thomas019.

on Saturdays.[539]

Mefferd's testimony acknowledged there was a cost to remove the rejected panels that had been installed, and that some period of time necessarily elapsed after the first set of panels was rejected until it delivered replacement panels to be installed.[540]  Although he assumed TCI had a schedule it was required to keep with respect to the Project, he was not privy to that schedule.[541]  The TCI-PFF PO did not reference any schedule and there is no evidence TCI provided PFF any other documents, except for the Specifications, when TCI issued the PO to PFF.[542]

TCI submits a lengthy summary of its damages from October 5, 2014 through July 23, 2015 in support of the amount of damages it seek from PFF.[543]  Based on the

---

[539] *See, e.g.*, *Id.*, Ex. I (Oct. 22, 2014 email) at Thomas025; *id.*, Ex. J (Oct. 29, 2014 email) at Thomas026 (confirming Thomas would work "10-hour days plus Saturdays to get back on schedule."); D.I. 243-12 (George Dep.) at 297:9-17(testifying that W-T advised TCI of the need to continue working overtime to make up for time lost because of the rejected PFF panels).

[540] D.I. 243-16 (Mefferd Dep.) at 203:13-17, 205:13-17, 211:2-6.

[541] *Id.* (Mefferd Dep.) at 203:7-12.  He testified that PFF "do[esn't] get production schedules on a normal basis for all of our customers."  *Id.* (Mefferd Dep.) at 207:18-208:1.

[542] Mefferd testified PFF did not receive other relevant documents until the issues with the first set of panels arose.  *See id.* (MefferdvDep.) at 24:14-23, 51:14-19, 56:6-13; 207:18-208:1.

[543] D.I. 207-2,  Ex. K (Audited Damages Calculation and Project Payroll and Expense Records).  Expenses TCI attributes to the delay caused by the rejection of the first set of PFF panels are:  $53,345 in direct labor costs to erect the original defective panels, *id.*, Ex. K at Thomas052 (calculation of direct labor costs to erect panels) and Thomas044-200 (audited payroll and Project expense records); $54,074.65 in direct labor costs to remove the erected defective panels, *id.*, Ex. K at Thomas033 (calculation of direct labor costs to remove panels) and Thomas044-200 (audited payroll and Project expense records); $32,758.94 in overtime costs as a result of accelerating work to mitigate the delay caused by the original defective panels. *id.*, Ex. K at Thomas034 (calculation of overtime costs incurred related to first set of defective panels) and Thomas044-200 (audited payroll and Project expense records).  TCI

126

expenses set forth therein, and the amount it attributes to PFF, TCI calculates its damages resulting from PFF's breach of contract are $163,622.68.[544]  It calculates statutory interest on $163,622.68, from the date of breach, September 30, 2014, to the date of this motion totals $46,398.80.[545]

The court denies TCI's motion with respect to damages.  Compensation for injury due to a breach of a contract should "place [the injured party] in the same position that he would have been in if the contract had been performed.  The measure of damages is the loss actually sustained as a result of the breach of the contract."[546]  However, "[a] court must . . . reduce the calculated damages by the amount of loss 'that [the plaintiff] could have avoided by reasonable efforts.'"[547]

> [O]n a motion for summary judgment the evidence and inferences drawn from it are viewed in the light most favorable to the non-moving party . . . . It is axiomatic that a plaintiff, in order to recover damages from a defendant for breach of contract, must demonstrate with *reasonable certainty* that defendant's breach caused the loss.  Reasonable certainty is not equivalent to absolute certainty; rather, the requirement that plaintiff

---

asserts that, overall, it was delayed 10 months in the completion of the Project, resulting in additional field/general conditions costs of $193,340.875 (for supervision, equipment rentals, job trailer, etc.) and additional home office overhead of $41,092.20. *id.*, Ex. K at Thomas039 (calculating delay and additional field/general conditions costs).  TCI attributes one month of that delay (Sept. 30, 2014-Oct. 31, 2014), or 10%, to PFF, resulting in additional field/general condition costs of $19,334.09 in costs and additional home office overhead costs of $4,109.  *See* D.I. 195, Stip. Facts 25 (showing initial panels delivered Sept. 30, 2014); D.I.  243-3, Stip. Ex. 124 and D.I. 207-2, Ex. H (Nov. 4, 2014 email) at Thomas023 (showing replacement panels delivered Oct. 31, 2014).

[544] See D.I. 207-2, Ex. K (Audited Damages Calculation and Payroll Records) at Thomas027-200.

[545] D.I. 207-2, Declaration of George Thomas, at Thomas004-005 ¶ 4 (calculating prejudgment simple interest of 5.75% per annum with daily interest of $25.78).

[546] *J.J. White, Inc. v. Metro. Merch. Mart*, 107 A.2d 892, 894 (Del. Super. 1954).

[547] *Vici Racing, LLC v. T-Mobile USA, Inc.*, 763 F.3d 273, 294-95; 299 (3rd Cir. 2014) (alteration in original) (internal quotation marks and citations omitted).

show defendant's breach to be the cause of his injury with "reasonable certainty" merely means that the fact of damages must be taken out of the area of speculation.[548]

TCI argues its actual costs in correcting PFF's defective performance is the correct measure of damages here, and the only method of demonstrating that cost is through TCI's financial records.[549]

With respect to TCI's motion for damages, the focus is the damages TCI allegedly suffered due to the delay resulting from PFF's rejected first set of panels, and the extent those damages are attributable to PFF with reasonable certainty.  PFF asserts TCI fails to meet its burden to prove its resulting damages.[550]

PFF states the delay in the installation of the replacement panels did not impact the overall Project schedule.[551]  The overall Project schedule is not the precise issue, however, the issue is what damages TCI specifically suffered as a result of the delay from the rejection of the first set of panels.

TCI requests summary judgment as to a specific amount of damages, but PFF presents arguments raising a reasonable doubt as to the amount of damages to which TCI may be entitled.  First, PFF raises the issue of whether TCI attempted mitigation with respect to *TCI's* extra expenses, noting TCI continued to install additional panels from the first set delivered after being apprised of the finish issue, and now seeks

---

[548] *Tanner v. Exxon Corp.*, No. 79C-JA-5, 1981 WL 191389, at *1 (Del. Super. 1981) (citations omitted); *see also Vici Racing*, 763 F.3d at 294 (stating damages may not be speculative).
[549] D.I. 232 at 9-10.
[550] D.I. 223 at 9.
[551] *Id.*

damages for the installation and removal of those additional panels.[552]

PFF also contends TCI's support for its claims to recover direct and indirect costs from PFF for the installation and removal of rejected panels, and alleged acceleration and delay costs, is dubious and speculative.[553]  Despite TCI's representation its damages are based on an audited financial statements reflecting actual payroll costs and expenses incurred as a result of PFF's breach,[554] that exhibit includes the following statement from the accounting firm that compiled the report:

> We have not audited or reviewed the accompanying summary, nor were we required to perform any procedures to verify the accuracy or completeness of the information contained in the summary, which was prepared by management, and, accordingly, we do not express an opinion, a conclusion, nor provide any assurance about whether the summary is in accordance with the contractual basis of accounting that is a basis of accounting the entity uses to comply with terms of a contract with third-parties.[555]

PFF argues, therefore, that the amounts on which TCI requests summary judgment are nothing more than TCI's self-allocation of costs allegedly attributable to PFF, with no corresponding analysis or rationale justifying those costs.[556]  PFF also argues TCI makes no effort to trace or substantiate these claimed costs against the materials allegedly provided in support thereof, and that it is not possible to reverse engineer or back into these numbers using the information TCI provided.[557]

---

[552] TCI states it mitigated the delay to the overall Project by its acceleration of work, *see, e.g.*, D.I. 222 at 11, at great costs that it now seeks to recover from PFF.

[553] D.I. 234 at 8.

[554] *See, e.g.*, D.I. 209 at 9 (citing D.I. 207-2, Ex. K); D.I. 222 at 13 (same).

[555] D.I. 207-2, Ex. K at Thomas029

[556] D.I. 223 at 5, 9.

[557] *Id.*

TCI responds that PFF provides no effective defense to its calculations and cites no evidence to dispute the veracity of the damages calculations.[558]  It also suggests PFF could have challenged TCI about the legitimacy of its damages claim or questioned the underlying data at the 30(b)(6) deposition of TCI.[559]

TCI does not convincingly respond to either PFF's questioning of its effort to mitigate its own damages, as opposed to avoiding delay of the overall Project, or the veracity of the unaudited calculation of expenses.  It is TCI's burden to establish the damages for which it seeks summary judgment.  PFF has raised reasonable questions creating a genuine issue of material fact as to the appropriate amount of damages.

Therefore, although PFF's breach is established, TCI has not proven its entitlement to the amount of damages it seeks and its motion for summary judgment as to that amount is denied.

Because the court granted TCI's breach of contract claim against PFF, the court need not examine the parties' arguments as to whether to sever trial on the issue of the first set of panels.  The court determines that the sole determination at trial of TCI's damages as a result of that breach does not warrant severance of that discrete issue.  Thus, the court denies TCI's request for severance and/or a separate trial on its breach of contract claim against PFF.

**C.    TCI's Remaining Claims Against PFF**

TCI's breach of warranty claim alleges that PFF "expressly and impliedly

---

[558] D.I. 232 at 9.
[559] *Id.*

warranted the  fitness of its materials for use on the Project, but PFF has breached that warranty."[560]  TCI contends the TCI-PFF contract contains an express warranty and the evidence in the record supports a claim for breach of implied warranty.[561]

PFF maintains TCI offers no evidence to establish that PFF breached any such warranties.[562]  It states there are no express warranty provisions in the TCI-PFF PO and, although the PO generically references some documents, none provide an express or affirmative warranty by PFF; and, except the for the Specifications, none of the documents mentioned in the final paragraph of the PO were provided to PFF until after the PFF's work was done.[563]  PFF maintains that absent any language in the PO expressly stating that PFF warrants the panels or any specific provision, there is no express warranty and, therefore, nothing upon which TCI can rely to show that PFF breached an express warranty.[564]

TCI does dispute PFF's assertion it did not receive certain documents.  It argues, however, whether PFF reviewed the incorporated documents before it entered into the TCI-Czar Contract is irrelevant because PFF is bound by their terms.[565]  TCI also maintains the document PFF admits to reviewing, the Specifications, contains the

---

[560] D.I. 103 at 15, ¶ 11.
[561] D.I. 222 at 2.
[562] D.I. 206 at 16.
[563] *Id.* (citing D.I. 231-1, Stip. Ex. 8 (TCI-PFF PO); D.I. 243-16 (Mefferd Dep.) at 24:14-23; 51:14-20; 56:6-13; 207:18-208:1; D.I. 243-1, Stip. Ex. 11 (Feb. 16, 2015 email from Dan Garner of PFF to George Thomas of TCI)  (PFF received specification (only) on 11-18-13)).
[564] D.I. 206 at 16-17.
[565] D.I. 222 at 14.

warranty provision.[566]

The court finds the evidence does not support TCI's claim for breach, or existence of, an express warranty.  First, in response to PFF's motion, TCI provides scant legal support for its statement that whether PFF reviewed the purportedly incorporated documents prior to entering its contract with TCI is irrelevant.[567]  PFF, however, notes that Delaware courts have held "[a] contract may be created by reference to the terms of another instrument if a reading of all documents together gives evidence of the parties' intention and the other terms are clearly identified."[568]  However, "[a] mere reference in one agreement to another agreement, without more, does not incorporate the latter agreement into the former by reference."[569]  Read together, the Specifications PFF acknowledges receiving, and other documents

---

[566] D.I. 234 at 9 (citing D.I. 243-1, Stip. Ex. 3 § 1.9 (requiring provision of a one year warranty that "panels are free from defects in materials and workmanship" and to replace or repair any defective panels during that timeframe).

[567] TCI cites a footnote several pages earlier in its brief raising the issue of an affidavit negating concessions in previous deposition testimony about rejection of PFF's panels.  D.I. 222 at 14 (citing *id.* at 5 n.5).  Neither the affidavit nor deposition testimony addressed a warranty.  The extent of its legal citation on the topic in TCI's opening brief in support of its motion is that a party "is presumed to have read the [] agreement and, by signing it, agreed to be bound by the terms set forth in the agreement and those incorporated by reference[,]" *Rose Heart, Inc.v. Ramesh C. Batta Assocs., P.A.*, C.A., 1994 WL 164581, at *4 (Del. Super. Apr. 12, 1994), and that a "Defendant is presumed with knowledge of the terms of the contract it executed, including those terms incorporated by reference." *Healy v. Silverhill Const. Co.*, 2007 WL 2769799, at *3 (Del. Com. Pl. Sept. 19, 2007).  D.I. 209 at 12 n.6.  TCI's attempted reliance on the Garner affidavit has been discussed above.

[568] *Realty Growth Investors v. Council of Unit Owners of Pilot Point Condominium*, 453 A.2d 450, 454 (Del. 1982).

[569] *Wolfston v. Supermarkets General Holdings Corp.*, C.A. No. 17047, 2001 WL 85679, at *5 (Del. Ch. Jan. 23, 2001).

identified by TCI,[570] do not show that intent.  The express warranty provisions in each of those document concern TCI's obligations to DSU, not PFF's obligations to TCI.  The court has determined elsewhere in this opinion that DSU does not have third-party beneficiary status with respect to the subcontracts of any defendants with which it has direct contracts for the Project.  Thus, the court grants PFF's motion for summary judgment on TCI's express warranty claim.

PFF also argues TCI fails to demonstrate how it breached an implied warranty of fitness.  Under Delaware law, a plaintiff claiming breach of the implied warranty of fitness for a particular purpose, must prove that:  (1) plaintiff had a special purpose for the goods; (2) defendant knew or had reason to know of that purpose; (3) defendant knew or had reason to know that the plaintiff/buyer was relying on the seller's superior skill to select goods that fulfilled that purpose; and (4) the plaintiff in fact relied on defendant's superior skill.[571]

PFF does not challenge the first two elements under consideration:  TCI had a special purpose for the panels, and PFF knew or had reason to know of that purpose.  PFF argues no evidence supports TCI's contention that it relied on PFF's superior skill to select the panels, or that PFF had reason to know of such alleged reliance.[572]  The

---

[570] D.I. 222 at 14 (citing D.I. 243-1, Stip. Ex. 48 (General Conditions) § 3.5 ("The Contractor warrants to the Owner, Construction Manager, and Architect that materials and equipment furnished under the Contract will be of good quality and new . . . [and] that the Work will conform with the requirements of the Contract Documents . . . .); D.I. 243-3, Stip. Ex. 140 (Supplemental General Conditions) § 3.5 (reciting additional one year warranty requirements).

[571] *Atamian v. Ryan*, C.A. No. 03C-12-038(RBY), 2006 WL 1816936, *4 (Del. Super. June 9, 2006) (citation omitted).

[572] D.I. 206 at 2 (¶ 1), 4, (¶¶ 8-11), 18.

court determines that questions of fact on these issues precludes summary judgment on TCI's breach of implied warranty claim against PFF.

PFF does not dispute that it was one of only two acceptable manufacturers of the panels,[573] thus at least leading to a reasonable question as to whether PFF had reason to know that TCI was relying on PFF's superior skill to provide panels that fulfilled their purpose in the Project.  Whether TCI relied on that skill is at issue with, for instance, PFF's recommendation, or not, to make V-Channels in the panels, a decision implicated in the panel deformations.  PFF argues the evidence shows its product data made TCI aware that making V-Channels in the panels was recommended to relieve stress when they are subjected to a temperature differential that could cause warping of the panels.[574]  For its part, TCI submits deposition testimony which states it relied on that PFF advised against making V-Channels in the panels.[575]

The court, therefore, denies PFF's motion for summary judgment on TCI's implied breach of warranty claim.

TCI contends PFF's motion for summary judgment on its common law indemnification and contribution claim should survive summary judgment because DSU asserted a negligence claim against both TCI and PFF, and those claims have yet to be adjudicated.[576]  TCI also argues that, while no adjudication has been made, and therefore no payments made by TCI, that does not bar TCI from pursuing contribution

---

[573] *See* D.I. 195, Stip. Fact ¶ 10.

[574] D.I. 206 at 18.

[575] D.I. 222 at 14 (citing D.I. 243-1 (Thomas Dep.) at 93:9-94:3; 104:22; 234:16-25.).

[576] *Id.* at 15.

from PFF under Delaware's Uniform Contribution Among Tortfeasors Law, 10 *Del. C.* § 6301 *et seq.* ("UCATL"). [577]

TCI and DSU have recently dismissed their respective claims against each other.[578]  The court has granted summary judgment in favor of PFF and Czar, on DSU's tort claims against each.  Those claims are now adjudicated.  Section 6301 requires the establishment of joint tortfeasor status.[579]  Dismissal of DSU's tort claims against PFF and Czar, and DSU's dismissal of its claims against TCI, means no joint tortfeasor status can be established.

Thus, PFF's motion for summary judgment on TCI's common law indemnification and contribution claim is granted.

TCI concedes to summary judgment in favor of PFF on its Unjust Enrichment and Contractual Indemnification claims against PFF.[580]  Thus, the court grants PFF's motion for summary judgment on those claims by TCI against PFF.

---

[577] *Id.*

[578] D.I. 257.

[579] *See Builders & Managers, Inc. v. Dryvit Sys., Inc.*, 2004 WL 304357, at *2 (Del. Super. Feb. 13, 2004) ("The right to contribution is triggered when it is appropriate for liability to be apportioned among codefendants.  In Delaware, contribution is governed by the UCATL which provides the parameters for determining when contribution is appropriate and how it is to be decided.  The inherent requirement is that the parties are joint tortfeasors who share a "common liability.") (citations omitted); *New Zealand Kiwifruit Mktg. Bd. v. City of Wilmington*, 825 F. Supp. 1180, 1186 (D. Del. 1993) ("Indispensable to a joint tortfeasor relationship is a 'common liability' either 'joint' or 'several' that two or more parties have to the person injured. Without this dual liability . . . no right of contribution can exist.") (omission in original) (citation omitted).

[580] *See* D.I. 222 at 15 n.7 ("As it is now undisputed that Thomas and PFF are parties to express contract, Thomas does not object to the dismissal of its unjust enrichment claim.  Thomas likewise recognizes that proscriptions contained in 6 *Del. C.* § 2704 apply to the contractual indemnification provisions at issue in this case.").

**II.     CONCLUSION–PFF and TCI Motions for Summary Judgment**

For the reasons discussed above:

I.     Precision Foam Fabricator's Motion for Summary Judgment against Delaware

State University and Thomas Company, Inc. (D.I. 205) is:

   A.     **GRANTED** as to DSU's Count I (Breach of Contract); Count III

   (Negligence); and Count IV (Unjust Enrichment);

   B.     **DENIED** as to TCI's Breach of Contract claim against PFF.

   C.     **GRANTED** as to TCI's claims for Unjust Enrichment; Common Law
          Indemnification and Contribution; and Breach of Express Warranty; and

   D.     **DENIED** as to TCI's Breach of Implied Warranty.

II.     **Thomas Company, Inc.'s** Motion for Partial Summary Judgment against

Precision Foam Fabricators, Inc. (D.I. 207) is:

   A.     **GRANTED** on its Breach of Contract claim against PFF.

   B.     **DENIED** on its request to sever its Breach of Contract claim.

   C.     **DENIED** as to the specific amount of damages TCI seeks against PFF.

An appropriate order shall issue.

November 19, 2020                              _____/s/ Mary Pat Thynge_____
                                               Chief U.S. Magistrate Judge

136